

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,

                    Plaintiff,

        vs.                          Case No. CR 18-172-GW

MICHAEL LERMA, et al,

                    Defendants.
_____/


                    REPORTER'S TRANSCRIPT OF
                    TRIAL TRANSCRIPT - DAY 4
                    Friday, February 28, 2025
                         8:30 a.m.
                    LOS ANGELES, CALIFORNIA


_____

                TERRI A. HOURIGAN, CSR NO. 3838, CCRR
                  FEDERAL OFFICIAL COURT REPORTER
                  350 WEST FIRST STREET, ROOM 4311
                  LOS ANGELES, CALIFORNIA  90012
                         (213) 894-2849


UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

UNITED STATES ATTORNEY'S OFFICE
United States Attorney
BY:  KYLE W. KAHAN
     JASON A. GORN
     KELLYE NG
     Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California  90012

**FOR THE DEFENDANT:**  MICHAEL LERMA

LAW OFFICES OF MARRI DERBY
BY:  MARRI B. DERBY
     Attorney at Law
23 Corporate Plaza Drive, Suite 150
Newport Beach, California  92660

LAW OFFICES OF JOEL MICAH FURMAN
BY:  JOEL MICHAH FURMAN
     Attorney at Law
1432 Edinger Avenue, Suite 240
Tustin, California  92780

**FOR THE DEFENDANT:**  CARLOS GONZALEZ

LAW OFFICE OF KENNETH M. MILLER
BY:  KENNETH M. MILLER  (remotely present)
     Attorney at Law
26944 Camino de Estrella, Suite B
Capistrano Beach, California  92624

RICHARD G. NOVAK APLC
BY:  RICHARD G. NOVAK
     Attorney at Law
65 North Raymond Avenue, Suite 320
Pasadena, California  91103

**UNITED STATES DISTRICT COURT**

```
 1
      APPEARANCES:  (Cont.)
 2
      FOR THE DEFENDANT:  JUAN SANCHEZ
 3
          O'MELVENY and MYERS LLP
 4        BY:  CHARLES PETER DIAMOND
               AMY RILEY LUCAS
 5             Attorneys at Law
          1999 Avenue of the Stars, Suite 800
 6        Los Angeles, California  90067

 7        RICHARD P. LASTING LAW OFFICES
          BY:  RICHARD P. LASTING
 8             Attorney at Law
          315 East 8th Street, Suite 801
 9        Los Angeles, California 90014

10
      FOR THE DEFENDANT:  JOSE VALENCIA GONZALEZ
11

12        LAW OFFICE OF DANIEL A. NARDONI
          BY:  DANIEL A. NARDONI
13             Attorney at Law
          215 North Marengo Avenue, Suite 328
14        Pasadena, California  91101

15        SHAUN KHOJAYAN and ASSOCIATES PLC
          BY:  SHAUN KHOJAYAN
16             Attorney at Law
          515 South Flower Street, 19th Floor
17        Los Angeles, California  90071

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1

                          **WITNESS INDEX**

2

                            **\* \* \***

3  **WITNESS:**                                        **Page**

4  **JOSEPH TALAMANTEZ**

5      Direct Examination by Mr. Gorn          18

6

  **TREVOR TWITCHELL**

7

    Direct Examination by Ms. Ng            141
8      Cross-Examination by Ms. Lucas          154

9  **JOSEPH TALAMANTEZ, recalled**

10     Direct Examination by Mr. Gorn          155
    Cross-Examination by Ms. Derby          258
11     Redirect Examination by Mr. Gorn        262
    Recross Examination by Ms. Derby        264
12     Further Direct Examination by Mr. Gorn   266

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                        **EXHIBIT INDEX**

2                          **\* \* \***

   **EXHIBIT NO.**                          **PAGE**
3
   137 - 142                                 47
4
   506                                       49
5
   504                                       50
6
   133 - 139                                 54
7
   150 - 157                                 60
8
   162                                       65
9
   508                                       74
10
   509                                       75
11
   363                                       77
12
   505                                       81
13
   507                                       84
14
   502                                       85
15
   367                                       90
16
   503                                       105
17
   500                                       128
18
   215, 216, 217, 218                        245
19
   277, 278                                  247
20
   167                                       256
21

22

23

24

25

1      **LOS ANGELES, CALIFORNIA; FRIDAY, FEBRUARY 28, 2025**

2                          **8:30 a.m.**

3                          --oOo--

4

5

6           THE COURTROOM DEPUTY:  Please be seated and come to

7      order.  This United States District Court is now in session,

8      the Honorable George H. Wu, presiding.

9           THE COURT:  All right.  Let me indicate to the

10     parties, I just want to make sure I got the briefing from the

11     government.

12          The briefing from Ms. Derby, you gave -- you sent me the

13     wrong thing.

14          MS. DERBY:  It's the right thing, it's just the

15     label, in the way it was labeled.

16          THE COURT:  No, no, no.  You are talking about

17     *Massiah*.

18          The things you sent me discusses the *Massiah* issue, not

19     the Lerma issue.

20          MR. KAHAN:  My review of it is the first two pages

21     addresses the contested issue, then the subsequent two or so

22     pages are about the *Massiah* writ issue.

23          THE COURT:  No, the only thing I got was the

24     document that says, response to government's lay opinion,

25     testimony from Detective Self.  That is fine.

1          Then the first page covers that, but then after that,

2      you know, it goes to weird portions.

3              MS. DERBY:  I attached the wrong document, Your

4      Honor.  I will attach it right now.

5          Then I got the response from counsel from Carlos

6      Gonzalez, and then from Jose Gonzalez, but there is another

7      defendant.

8              Did the other defendant not respond?

9              MR. NOVAK:  The Carlos Gonzalez pleading, explicitly

10     says, in couple of places, it's jointly filed on behalf of Juan

11     Sanchez, also, I just didn't add all of the names of counsel.

12             THE COURT:  All right.  That is fine.

13             MR. NOVAK:  That's what it says.

14             THE COURT:  All right.

15         Let me ask a preliminary question, I presume that the

16     government's intention anyway was to call --

17             MR. GORN:  Mr. Talamantez.

18             THE COURT:  -- To cover the same area, right?

19             MR. KAHAN:  Yeah, we didn't expect for him to

20     testify, specifically to Defendant Lerma's membership in the

21     Mexican Mafia.

22         Our plan was to just use all of the evidence that we

23     have around us, that we're building up to make that argument.

24             THE COURT:  Well, let me put it this way, the

25     government is always going to be offering evidence of one sort

8

1    or another.

2        At this point in time, I'm not going to be able to make

3    a decision on this, first of all, obviously, Ms. Derby's

4    response.

5        I do agree, it seems to me that, and again, this is not

6    a situation where, like, the counsel are offering a severance

7    mistrial.

8        Again, the rule that was violated here was the rule that

9    insofar as Officer Self was not supposed to testify on this

10   subject, because he was offered solely as a -- well, I made a

11   ruling, that he would not be able to testify in his lay

12   capacity, because it basically was summarizing the other stuff

13   that was going to be offered during the course of the case.

14       So this is not a situation where this is somehow the

15   government's -- nefarious conduct during the course of the

16   trial has opened something up.

17       This is a situation where he was limited because he was

18   going to be testifying as an expert as to certain things, and

19   as a lay witness as to very limited portion as to the -- in

20   regards to the recordings and translations that were done in

21   the recordings.

22       The government, in its direct, did not violate any of

23   the law, on the rulings that I made.

24       The issue is the cross that was done not only by

25   Ms. Derby, but also counsel for Jose Valencia Gonzalez, he went

1    in an area too that was beyond what was -- beyond what Officer

2    Self was called for and my ruling.

3            So, when you say, the defense wants some sort of

4    severance as a result, if I permit the government to inquire,

5    because the questioning of two of the defense of the four sets

6    of defense counsel opened the door, you know, what can I say?

7            I haven't decided what I'm going to do yet, but I have

8    to read Ms. Derby's response as well, but I don't see the

9    nature of the defendant's response, other than what otherwise

10    could be cured by the Court instructing the jury insofar as

11    limiting the responses for the responses, if I allow further

12    responses from the witness or whatever.

13            MR. NOVAK:  Our No. 1 request was that the Court

14    instruct the jury that Mr. Lerma, through his counsel, violated

15    a Court order, and that that testimony --

16            THE COURT:  No.

17            MR. NOVAK:  -- is stricken.  That's a limiting

18    instruction that is less prejudicial than the defendants, than

19    to admit it, and then say it's only admissible against Michael

20    Lerma, because the linchpin to the enterprise theory of this

21    case that comes out of the grand jury, is that it's the Michael

22    Lerma cell of the enterprise.

23            THE COURT:  Let me also indicate that Michael

24    Lerma's cell was not referenced in this trial so far.

25            MR. NOVAK:  That's right.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  It was referenced by a defense counsel

2    in the question.

3          MR. NOVAK:  The same counsel.

4          THE COURT:  No, By different counsel.

5          MR. NOVAK:  My client and I have not asked any

6    questions about Mr. Lerma.

7          THE COURT:  Let me put it this way, things like this

8    will happen.

9          MR. NOVAK:  Understood.

10          THE COURT:  You know, so, but I cannot put the blame

11    in the government on any of these things.  So far any of these

12    errors have been committed by the government.

13          MR. NOVAK:  I am not saying it is the government's

14    fault.  I am saying we have a triangle.  We have multiple

15    parties with multiple interests.

16          THE COURT:  Let me stop.  This always happens, in

17    the context of multiple defendants.  And yet, there is not a

18    bar to trial for multiple defendants.

19          MR. NOVAK:  Unless it is unfairly prejudicial.

20       Your Honor, I'm not trying to be difficult.

21          THE COURT:  You are never difficult.

22          MR. NOVAK:  I'm so easy.

23          THE COURT:  What can I say?

24          MR. NOVAK:  We made different suggestions.  There is

25    a hierarchy, eventually the Court will enter an order.

1          We understand.

2          THE COURT:  The other thing I could consider is just

3     striking the testimony of the officer indicating that -- it

4     might formulate just some instruction.

5          MR. NOVAK:  That was our suggestion.

6          THE COURT:  I might do something, there is a whole

7     range of possibilities.  I don't know what I'm going to do yet.

8          MR. KAHAN:  Two things, one, the government is

9     comfortable with holding off Deputy Self for that issue, until

10    the Court decides.  We can bring him back later, perhaps even

11    last.

12         THE COURT:  I don't know if the defendants want to

13    bring him last, at some point in time, after I have made the

14    decision on this.

15         But let me brood about this some more.

16         The only thing, I didn't see any specific cases that

17    were cited by anybody that kind of, like, hits this type of

18    what happened, so, I will give you guys another maybe a day or

19    two to find any cases that support a similar type of situation.

20         MR. KAHAN:  Understood.  What I would ask in the

21    meantime is that the Court instruct the jury about the dual

22    role for Deputy Self.

23         The defense did turn Deputy Self into a factual witness

24    and, to an extent, at least for now, a lay opinion witness.

25              THE COURT:  The only problem I have with that is

1    that I don't know what to extent to -- in other words, if I

2    allow something to come in, et cetera, at this point in time, I

3    don't know whether it would be helpful to the jury to know the

4    distinction.

5         It concerns us, I suppose who are familiar with the

6    distinctions between lay and expert witnesses.

7         But, you know --

8         MR. KAHAN:  It's an issue that the Ninth Circuit

9    examines very closely.

10        THE COURT:  I understand that.  I agree that the

11   instructions have to be made.

12        But assuming this problem had not come up, I would not

13   have been instructing the jury on the distinction until all of

14   the evidence is in.

15        MR. KAHAN:  I agree with that.

16        THE COURT:  Obviously, before the case goes to the

17   jury, I will instruct them on the difference between expert and

18   lay witnesses.

19        MR. KAHAN:  Sure.  I'm seeing as best practice is,

20   that particularly for dual role witnesses, even if the defense

21   has determined, is that usually if there is not an instruction

22   by the Court, there is at least some dialogue beforehand, like

23   what I did with the lay part of his testimony -- this is

24   completely unrelated, absolutely separate.

25        That didn't happen on the defense's side, so I want to

```
 1   make sure is that this Court admonish the jury, so that
 2   distinction is apparent --
 3             THE COURT:  Before Mr. Self's final testimony is
 4   given, I will give that instruction, in addition to giving it
 5   at the close of the case as well.
 6             MR. KAHAN:  Assuming there is any more.
 7             THE COURT:  If there is not any more, I will give it
 8   at that point in time.
 9        In other words, I don't want to give the instruction
10   prior to the time I make a decision on how the -- if I'm going
11   to allow the door being open to result in further lay testimony
12   from Mr. Self.
13             MR. KAHAN:  My only concern with that approach is
14   that, let's say, if that happens next Friday, for instance, a
15   week from now or the following Monday or Tuesday, we're pretty
16   well removed from Detective Self.
17        I think the weight of that admonishment may be different
18   than if it's done now, which is part of the analysis that --
19             THE COURT:  No.
20             MR. KAHAN:  Understood.
21             THE COURT:  Great.
22             THE COURTROOM DEPUTY:  All of the jurors are here.
23             MR. GORN:  Your Honor, before the jury comes in, is
24   it the Court's intention we would start with Special Agent Joe
25   Talamantez?
```

1          THE COURT:  You would be calling your next witness.

2          MR. GORN:  That said, the government's estimate was

3   about four hours with Special Agent Talamantez.

4          As now we have dealt with some of the recordings in this

5   case, and seeing the objections that have been laid by the

6   defense, I do want to let Your Honor know that it looks like

7   we're going to be doing call by call by call, rather than batch

8   exhibits, that might extend the estimate by one to two hours.

9          THE COURT:  I don't know that the jury has been told

10  beforehand, how long that officer's testimony is going to be, I

11  presume it will be what it is.

12         MR. GORN:  I just want to explain that in case the

13  Court is frustrated.

14         THE COURT:  I'm frustrated now, But not necessarily

15  about that.

16         MR. GORN:  Yes, Your Honor.

17         MR. KHOJAYAN:  Your Honor, On Mr. Jose Gonzalez's

18  behalf.  The papers I did file did touch on, and include case

19  law regarding opening the door.

20         THE COURT:  Yes, I want something that is more

21  similar to this type of opening.

22         Obviously, there has been opening the door in various

23  different types of situations, and I wanted something if it's

24  close to what we have here, if there is anything, there may not

25  be any, but I will allow further briefing.

1          MR. NOVAK:  So what the Court is ruling is in a

2    multi-defendant case where one defendant opens the door and

3    another defendant says that prejudicial, what should the Court

4    do?

5          THE COURT:  Yes, but especially, if it relates to,

6    you know -- again, here, it's not as if it was the taboo

7    subject.

8          In other words, nobody was going to offer that type of

9    evidence, and therefore, it's opened the door for something

10   that has been decided would not come in at all in any way,

11   shape, or form.

12         Here, there is always going to be offering from the

13   government, insofar as Mr. Lerma's position with the Mexican

14   Mafia.  The only thing about it was, it wasn't going to come

15   from Officer Self, because Officer Self was initially only

16   going to be called as an expert witness and lay witness for a

17   limited area.

18         But there is now an inquiry as to his scope and insofar

19   as his lay witness status is concerned.

20         I would also note, nobody raised an objection at the

21   time the questions were asked and the time he responded.

22         Had any defense counsel raised an objection, then, yes.

23         MR. KAHAN:  I think I may have raised a few outside

24   the expert objections.

25         THE COURT:  But not for that particular reason.

**UNITED STATES DISTRICT COURT**

1          MR. KAHAN:  It was outside of the expert scope,

2     regardless, I laid objections, including for relevance.

3          THE COURT:  So the government is even in a more

4     sterling position.

5          MR. NOVAK:  I'm not saying that the government has

6     done anything to prejudice Mr. Gonzalez.

7          I'm saying, Mr. Lerma's counsel has.

8          We are not one entity.  We are four different

9     defendants, with four separate rights.

10         THE COURT:  I understand that.

11         Javier, can we bring in the jury?

12         MR. KAHAN:  I am going to guess, this Court would

13    not be inclined, at this stage, to admonish the jury with the

14    Model 1.13, about the separate consideration of evidence for

15    each defendant just to make sure that it is really hammered

16    home?

17         THE COURT:  I already instructed them, they were

18    part of the instructions.

19         MR. KAHAN:  Part of the preliminary, just, sort of,

20    a reminder, as sort of limiting instruction at this stage, just

21    to protect --

22         THE COURT:  I understand your concern, but I have

23    already instructed them already, and if I instruct them -- in

24    other words, they are not going to understand why I'm doing

25    that again, at this point, unless I explain to them the entire

```
 1   situation, on which I haven't made a ruling yet.
 2              MR. KAHAN:  I understand the Court's ruling.
 3              THE COURT:  Okay.
 4              THE COURTROOM DEPUTY:  Please rise for the jury.
 5              (Jury enters the courtroom at 9:03 a.m.)
 6              THE COURTROOM DEPUTY:  You may be seated.
 7              THE COURT:  Good morning, ladies and gentlemen.
 8        I apologize for not starting on time, I had to resolve
 9   another issue with counsel.
10        We are ready to call the next government's witness.
11              MR. GORN:  Thank you, Your Honor.
12        At this time the government would call FBI Special Agent
13   Joseph Talamantez.
14              THE COURT:  All right.
15              THE COURTROOM DEPUTY:  Please raise your right hand.
16        Do you solemnly swear that the testimony you shall give
17   in the cause now before the Court, shall be the truth, the
18   whole truth and nothing but the truth, so help you God?
19              THE WITNESS:  Yes, I do.
20              THE COURTROOM DEPUTY:  Have a seat.  Be careful with
21   that step.
22        Thank you.  Please state your name and spell your last
23   name for the record.
24              THE WITNESS:  My name is Joseph Talamantez,
25   T-A-L-A-M-A-N-T-E-Z.
```

1        JOSEPH TALAMANTEZ,

2        having been duly sworn,

3        testified as follows:

4        MR. GORN:  Good morning, Special Agent Talamantez.

5        THE WITNESS:  Good morning.

6        DIRECT EXAMINATION

7    BY MR. GORN:

8    Q    Can you just start by explaining where do you work?

9    A    I work for the FBI, and I'm assigned to the Los Angeles

10   division.

11   Q    What is your title there?

12   A    Special Agent.

13   Q    How long have you been a Special Agent with the FBI?

14   A    Approximately, 22 years.

15   Q    What are your general duties and responsibilities as a FBI

16   Special Agent?

17   A    As an FBI Special Agent, I'm assigned to investigate

18   matters of criminal violations, either federal or state.

19   Q    Can you just describe to the jury your educational

20   background?

21   A    I have a computer science degree from Trinity University

22   with concentration in software engineering and algorithm

23   design.

24   Q    Can you talk about what training you received in order to

25   become a special agent with the FBI?

```
 1    A     To become a special agent, I go to the FBI academy, in

 2    Quantico, Virginia.

 3          When I went through, it was a 16-week program.

 4          During the course of the academy, they try to teach you

 5    everything they think you need to start the job.

 6          That includes evidence collection, interview and

 7    interrogation, surveillance, gang culture, drug recognition,

 8    running of informants.  And it also includes things, which I'm

 9    not currently assigned to, counter-intelligence investigations,

10    counter-terrorism, and some cyber type of violations.

11    Q     Now, in your over 20 years of experience at the FBI, have

12    you had any role or experience in training others within the

13    FBI?

14    A     Yes.

15    Q     What training have you done?

16    A     What training have I have conducted, or have I provided?

17    Q     That you have provided.

18    A     So I'm currently the lead investigator of a task force,

19    meaning that I'm frequently assigned either new FBI agents or

20    task force officers and I train them on conducting interviews,

21    investigations, and also gang culture and drug recognition.

22    Q     Special Agent Talamantez, where are you currently

23    assigned?

24    A     I'm currently assigned to the West Covina Resident Agency,

25    which is basically a satellite office.  LA is very big
```

**UNITED STATES DISTRICT COURT**

```
1   territory, so we have satellite offices that break down
2   specific areas of responsibility.
3           And within the West Covina Resident Agency, I'm assigned
4   as a lead investigator at the San Gabriel Valley Safe Streets
5   Task Force.
6   Q    What agencies do you work with in that task force?
7   A    The task force is sponsored by the Pomona Police
8   Department.  We have been, since its inception, around 2008.
9           The task force has members from Pomona, obviously, from
10  the El Monte Police Department, from the DEA, Los Angeles
11  County Sheriff's Department, and the FBI.
12  Q    How long have you been with the task force?
13  A    I have been with the task force since its inception, which
14  is around 2008, and I became the lead investigator in around
15  2010.
16  Q    What areas does the task force cover in LA County?
17  A    So, the task force is the FBI's way to investigate violent
18  crime, gang crime, and drug crime in eastern Los Angeles County
19  or the San Gabriel Valley.  That essentially covers Los Angeles
20  County Jail, all the way to the end of the Los Angeles County
21  line, which is around Pomona.
22  Q    Are you familiar also with Metropolitan Detention Center?
23  A    I am.
24  Q    Is that the federal jail here in Los Angeles?
25  A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     As part of your investigations, does that also sometimes
 2   come into contact with MDC or Metropolitan Detention Center?
 3   A     Yes.  It's not in our general area of responsibility, but
 4   we are occasionally assigned cases that originate at the MDC.
 5   Q     As part of your job, do you conduct investigations into
 6   the Mexican Mafia?
 7   A     Yes.
 8   Q     As a special agent with the FBI, when did you first
 9   encounter the activities of the Mexican Mafia?
10   A     Almost immediately upon being assigned to Los Angeles
11   division, which was in January of 2006.
12         I pretty quickly began working with the Pomona Police
13   Department, and it wasn't long after that, where I was exposed
14   to Hispanic gangs and the Mexican Mafia.
15   Q     How many investigations have you done involving the
16   Mexican Mafia?
17   A     Over a dozen.
18   Q     How many Mexican Mafia members have been a target of one
19   of your investigations?
20   A     Somewhere between five and ten.
21   Q     Now, does your investigation of the Mexican Mafia members
22   require you to also investigate local criminal street gangs?
23   A     Yes.
24   Q     Why is that?
25   A     Because the Mexican Mafia is, essentially, what is known
```

**UNITED STATES DISTRICT COURT**

```
 1   as a gang of gangs.
 2        It's a gang that is comprised of senior leadership from
 3   street gangs.
 4        So investigating the Mexican Mafia requires you to
 5   understand the street gangs, who are the ones that are doing
 6   the activity on behalf of the Mexican Mafia, because most --
 7             MR. KHOJAYAN:  Objection.  702 move to strike,
 8   Rule 16.
 9             THE COURT:  Overruled.  He can testify.
10   BY MR. GORN:
11   Q    Now, I want to ask you about Surenos.  Do you investigate
12   Surenos as part of your general investigations into the Mexican
13   Mafia?
14   A    Yes.
15   Q    And how do Surenos fit into your investigations when you
16   have just described that you are looking into criminal street
17   gangs as well as the Mexican Mafia?
18   A    Sureno is a description.  Sureno describes the gang
19   members that are from Southern Hispanic street gangs.
20        So when you say, you are investigating Surenos, you are
21   actually saying, are you investigating gang members from
22   Southern Hispanic gangs who collectively form a group that is
23   known as the Surenos, which are the soldiers for the Mexican
24   Mafia.
25             THE COURT:  Let me ask witness, why do you refer to
```

1   it as Southern Hispanic gangs, you mean Southern California

2   Hispanic gangs?

3           Why use the term Southern?

4               THE WITNESS:  What did I say?

5               THE COURT:  You said Southern Hispanic gangs.

6               THE WITNESS:  Southern California Hispanic gangs.

7               THE COURT:  Okay.  Thank you.

8   BY MR. GORN:

9   Q    How many investigations of Hispanics street gangs have you

10  been involved with in your career with the FBI?

11  A    Dozens.

12  Q    In general terms, what types of crimes have you previously

13  investigated involving the Mexican Mafia?

14  A    Extortion, kidnapping, robbery, burglary, and theft,

15  murder, attempted murder, murder conspiracy, arson.

16  Q    How many different Hispanic street gangs have you

17  investigated that were affiliated with the Mexican Mafia?

18  A    Every Southern California Hispanic street gang that we

19  investigated is associated with the Mexican Mafia.

20  Q    How does a local gang show their affiliation to the

21  Mexican Mafia?

22  A    A lot of different ways.

23          Sometimes the gang itself will have the Number 13 inside

24  of it, which shows its allegiance.

25          Every gang member may display differently or not at all.

1    They would have, in some cases, tattoos that are showing

2    respect to the Mexican Mafia or the Sureno collection.

3    Q    Now, you have previously described that the Mexican Mafia

4    is a gang of gangs.

5        Does the Mexican Mafia, based on your investigations,

6    extend into the local jails in Los Angeles County?

7    A    Yes.

8    Q    And does it also extend to MDC, Metropolitan Detention

9    Center, the federal detention center here in Los Angeles?

10   A    Yes.

11   Q    Could you just describe, from what your investigations

12   have shown you, the basic structure of the Mexican Mafia inside

13   of the jails?

14   A    Sure.

15           MR. KHOJAYAN:  Objection.  Your Honor, 702.  He was

16   going to testify as a lay witness.

17           THE COURT:  What is your response to that objection?

18           MR. GORN:  Well, this is going to get into his

19   investigations that he did inside the jail, Your Honor.

20       His basic knowledge is going to explain the context of

21   what he observed and investigated in those jails.

22           THE COURT:  All right.  I will overrule the

23   objection.

24   BY MR. GORN:

25   Q    So sir, I will ask you the question again, can you just

```
1   describe, based on your investigations, what is the basic

2   structure of the Mexican Mafia from inside of those jails?

3   A    So from my investigations, what I learned is that

4   generally, one or more Mexican Mafia members will have control

5   of a custody facility, and they will have individuals who we

6   refer to as either a facilitator, which is a high level

7   associate, or shot callers, which are below facilitator, which

8   run certain portions of the custody facility; for instance, LA

9   County Jail is very large.

10           MR. NOVAK:  Objection 403, 702, motion to strike.

11       I would like to approach.

12           THE COURT:  Let me instruct the jury as follows:

13       As I indicated with certain of the witnesses, at least

14   one of the witnesses who testified already, he was testifying

15   as an expert witness; in other words, he was testifying based

16   on his either knowledge, training, experience, or whatever, as

17   to opinions that he formulated based on that.

18       I will instruct you later on that as an expert witness,

19   they are to be treated as a normal witness is to be treated,

20   except that they can offer opinions, based on their education,

21   training, et cetera, et cetera.

22       The mere fact that an expert is called as a witness and

23   even qualified as an expert, doesn't mean that everything that

24   expert testifies to is true and correct.

25           In other words, they are judged the same standards of
```

1     credibility that any other witness is.

2          Normally, most persons who are considered to be of the

3     other category, besides expert witnesses, just lay witnesses,

4     lay witnesses are normally considered to be percipient

5     witnesses, they either see or hear the specific event, they

6     testify on what they saw or heard.  Those are what is sometimes

7     referred to lay witnesses.

8          Expert witnesses testimony is based on their training,

9     experience, give us opinions.  Most lay witnesses are not

10    allowed to give opinions, unless there is some basis for their

11    doing so.

12         So that's the difference between expert and lay

13    witnesses.

14         So, for example, Officer Self was called to testify

15    primarily as an expert witness.

16         He was allowed to testify in a brief area as a lay

17    witness, but most of his testimony was based on expert

18    testimony.

19         Do all of you understand that?

20         This officer is testifying on the basis of his lay

21    witness -- I guess, as a lay witness.

22         In other words, he can testify as to what he saw or

23    heard or did, et cetera, et cetera.

24         But unless otherwise called for, by some exception to

25    the rule that lay witnesses are not allowed to give opinions,

1   most of what he is testifying to will be about what he saw or

2   heard or did.

3         If he conducted an investigation, he can testify to what

4   steps he took to conduct the investigation.

5         Do all of you understand that?

6         Let me ask the attorneys, do you want a sidebar still?

7               MR. NOVAK:  Yes.

8               MR. KHOJAYAN:  Yes.

9                     (Sidebar begins.)

10              THE COURT:  Yes.

11              MR. KHOJAYAN:  Your instructions are correct, except

12  Mr. Talamantez, Special Agent Talamantez, is only supposed to

13  testify as a lay witness.

14        I thought he was going to come in and say, I went to the

15  MDC, this is the investigation that I conducted.

16        Instead, he's improperly getting into the structure of

17  the Mexican Mafia, which he was not noticed to be an expert

18  witness, to provide that testimony.

19        We already heard that testimony from Deputy Self.

20        It is unnecessary, prejudicial, it violates Rule 16.  We

21  never received any notice.  Both sides have continuously

22  referred to Agent Talamantez as a lay witness, but here he is

23  for the last -- all of these questions are --

24              THE COURT:  Not all of the questions.

25              MR. KHOJAYAN:  Most of the questions are laying the

```
 1    foundation for an expert opinion, opinion about structure of

 2    the Mexican Mafia, all of his investigations of the Mexican

 3    Mafia, the way they run the prisons.

 4          What is that?

 5          It's not a lay witness testimony, that is expert

 6    opinion, which he wasn't supposed to give.

 7          I move for a mistrial.

 8                THE COURT:  Are you guys going to move for a

 9    mistrial every single instance that you come up here?

10                MR. KHOJAYAN:  Well, not every time.

11                MR. GORN:  Your Honor, as stated in the government's

12    trial brief, it's a very limited foundation, because he's going

13    to be talking about the investigation now that he did from

14    inside of the jails, and all of the context of that, and

15    talking about the exterior investigation they did from outside.

16          There needs to be, at least, a minimum amount of context

17    for him to describe what investigation he did.

18          It's not within a vacuum.  We're not asking for any

19    opinions or anything of the like, but a very basically modicum

20    of understanding of the Mexican Mafia.

21                MR. NOVAK:  The last question did ask an opinion

22    about structure of the Mexican Mafia's operations, both on the

23    streets and in the jail.

24                THE COURT:  Let me stop you, I agree with you.

25          That will shut you up at this point in time.
```

1              MR. NOVAK:  When the Court says, I agree, I always

2      shut up.

3              THE COURT:  You need to rephrase your question.

4          You can ask him how he conducted his investigation, and

5      you can even ask him why he conducted his investigation in a

6      particular way.

7          If you do that, it gets around a lot of problems that

8      the counsel are objecting to, okay?

9              MR. GORN:  Yes.

10                        (Sidebar ends.)

11             MR. GORN:  I'm sorry, I will wait for counsel to sit

12     down.

13     BY MR. GORN:

14     Q     Special Agent Talamantez, as part of your investigation in

15     this case, did you look at the conduct within the jail system?

16     A     Yes.

17     Q     And did you find -- excuse me, as part of your

18     investigation, did you investigate the influence of the Mexican

19     Mafia inside of MDC, Metropolitan Detention Center?

20     A     Yes.

21     Q     And also as part of your investigation in this case, did

22     you investigate the influence of the Mexican Mafia outside of

23     the jail system?

24             MS. DERBY:  Objection.  Calls for conclusion.

25             Well, it's vague as to influence and it lacks

1    foundation.

2            THE COURT:  Well, insofar as your objection as it to

3    be somewhat ambiguous, let me ask the witness, do you

4    understand the question?

5            THE WITNESS:  Yes.

6            THE COURT:  Okay.

7        As to the remainder of the objection, I will overrule

8    the objection, but I will only allow the answers to be either

9    yes, no, I don't understand the question as asked, or I cannot

10   answer the question as asked.

11       Those are his four choices in response to that question,

12   but now the question is, do you remember the question?

13           THE WITNESS:  I do not.

14           THE COURT:  Let me have the reporter read back the

15   question.

16                        (Record read back.)

17           THE WITNESS:  Can I answer?

18           THE COURT:  Yes, only one of the four responses.

19           THE WITNESS:  Yes.

20   BY MR. GORN:

21   Q    Throughout the investigations, what investigative

22   techniques do you use in investigating the activities of the

23   Mexican Mafia?

24           THE COURT:  Is that question, relationship to the

25   last question, are you talking about total or outside the

1    prison?

2            MR. GORN:  We're talking about outside of the

3    prison.

4            THE COURT:  Okay.

5    BY MR. GORN:

6    Q    Special Agent Talamantez, you can respond.

7    A    The question was what investigative techniques do I use to

8    investigate the Mexican Mafia outside of prison?

9    Q    Yes.

10   A    A number of different techniques can be used.

11           One, is because the Mexican Mafia is a prison gang, it

12   does include some investigation within inside of custody

13   facility to figure out how that conduct can relate to outside

14   activity.

15           One of the main things that I do is listen to recorded

16   jail phone calls, from within inside of custody facilities, to

17   see if they are coordinating criminal activity with

18   co-conspirators on the outside, and try to determine

19   relationships they may have with each other.

20           It includes surveillance of the individuals that they're

21   talking about.

22           It could include search warrants on those individuals.

23           It could include reviewing phone records, interviews

24   being conducted or reviewing what is known as a kite

25   communications, that are intercepted with inside of the prison,

```
 1    and talking to people who are part of the organization that are
 2    providing information to law enforcement.
 3    Q    The people who are providing information to law
 4    enforcement, are those informants or cooperators?
 5    A    Yes.
 6    Q    And you mentioned those, how did they particularly assist
 7    you in your investigations in the case?
 8              MR. KHOJAYAN:  Objection.  403, calls for hearsay,
 9    701, 702, what we discussed at sidebar, Your Honor.
10              THE COURT:  Rephrase your question.
11    BY MR. GORN:
12    Q    You mentioned cooperators, how does that assist you or how
13    does any information provided by a cooperator assist you in
14    furtherance of your investigation of the Mexican Mafia?
15              MR. KHOJAYAN:  Objection, 701, 702.
16              THE COURT:  Why don't you lay a foundation first for
17    the responses.
18    BY MR. GORN:
19    Q    Sure.  Have you spoken to cooperators about the substance
20    of the Mexican Mafia?
21    A    Yes.
22    Q    How does speaking to cooperators assist you in learning
23    about the Mexican Mafia?
24              MR. KHOJAYAN:  Objection.  Your Honor, he is
25    supposed to testify as a lay witness.  This is not a 702
```

```
 1  witness.
 2           THE COURT:  Rephrase your question.
 3  BY MR. GORN:
 4  Q    You said that you have previously spoken with cooperators
 5  regarding the Mexican Mafia; is that correct?
 6  A    That's correct.
 7  Q    Do you rely on cooperators in furtherance of your
 8  investigations of the Mexican Mafia?
 9  A    Their information is an important resource, yes.
10  Q    Is it unusual for a cooperator, regarding the Mexican
11  Mafia, to speak with law enforcement?
12  A    It's difficult to get people to talk about the Mexican
13  Mafia, yes.
14  Q    Why?
15  A    They are fearful.  It's dangerous to cooperate with law
16  enforcement for a gang member, specifically, one that is part
17  of a Southern Hispanic gang -- Southern California Hispanic
18  gang that answers to the Mexican Mafia.
19  Q    I want to talk to you directly about jail calls, which you
20  referenced as part of your investigative means in looking into
21  the Mexican Mafia.
22           What is the importance of listening to jail calls from
23  inside a jail to the outside world?
24  A    It allows us to identify individuals who have influence
25  within their gang, and what individuals they are working with
```

1    in order to conduct criminal activity.

2    Q    Now, all of those jail calls that you listened to, are

3    they ingoing calls to the jail or are they all outgoing calls

4    from the jail?

5    A    They are outgoing phone calls.  Inmates are not allowed to

6    receive incoming phone calls.

7    Q    Okay.  Now, I would like to direct your attention to this

8    case as the lead case agent.

9         Did you oversee the investigation here?

10   A    Yes, I was the lead investigator.

11   Q    What is the focus of your investigation?

12   A    The focus of the investigation was criminal activity in

13   the City of Pomona and surrounding areas.

14   Q    Approximately, when did your investigation begin?

15   A    Approximately, 2012, around there.

16   Q    During the course of your investigation, did you listen to

17   jail calls?

18   A    Yes.

19   Q    How many jail calls do you think you have listened to in

20   this investigation alone?

21   A    Well over 100.

22   Q    Have you reviewed documents relevant to the Mexican Mafia,

23   such as jail records and communications?

24   A    Yes.

25   Q    Have you reviewed kites?

1   A     Yes.

2   Q     And based on your experience and knowledge, what is a

3   kite?

4   A     A kite is a communication usually done inside of a custody

5   environment.

6        It is a message that is written very small, on a small

7   piece of paper.

8        That message is written very small because it has to be

9   transported some place within inside the custody facility,

10  either hidden inside a property or hidden inside of somebody's

11  body, so it could be transported without being confiscated by

12  law enforcement.

13  Q     Also, as part of this case, have you spoken to an

14  associate or member -- excuse me -- an associate of the Mexican

15  Mafia?

16  A     Yes.

17  Q     Have you and other law enforcement conducted search

18  warrants related to this investigation?

19  A     Yes.

20  Q     Now, you mentioned that this investigation started around

21  the City of Pomona.

22       Are you familiar with the City of Pomona?

23  A     I am.  Like I said, the task force is sponsored by the

24  Pomona Police Department and that's where we have been

25  headquartered since the inception of the task force.

1  Q    So from your experience in the gang task force, do you

2  know about the presence of the street gangs in the City of

3  Pomona?

4  A    Yes.

5  Q    And as it relates to this case, could you briefly describe

6  the Pomona gang makeup in that area?

7  A    In Pomona?

8  Q    Yes.

9  A    Pomona has several Hispanic street gangs.  It is somewhat

10  unique in that sense.  A lot of cities in San Gabriel Valley do

11  not have the number of gangs that Pomona has, they

12  predominantly have one single gang or maybe two.

13       Pomona has very many.  They have Cherryville Pomona,

14  Pomona 12th Street, Happy Town Pomona, North Side Pomona, South

15  Side Pomona, Pomona Sur, West Ghetto Family, a number of gangs.

16       So when we started looking at them, you identify which

17  ones are the most prominent, who are the most influential

18  members, and you start from there.

19  Q    I want to talk to you specifically about Cherryville and

20  12th Street.

21       Are those neighboring gangs in the City of Pomona?

22  A    Somewhat neighboring, they kind of split up the city in

23  what areas they would operate it.

24  Q    Is there a dividing line between the two?

25  A    They would call the dividing line, the railroad tracks

**UNITED STATES DISTRICT COURT**

```
 1    that basically divide the City of Pomona, with Cherryville
 2    being on the north end of the railroad tracks, and 12th Street
 3    being on the south end.
 4    Q    Back in 2012 and 2013, is that when you began your
 5    investigation into Pomona gang activity?
 6    A    Yes.
 7    Q    Did that investigation eventually to defendants, Michael
 8    Lerma, Carlos Valencia Gonzalez, Jose Gonzalez, Juan Sanchez,
 9    as well as their associates?
10    A    Yes.  Let me clarify.  I have been investigating gangs in
11    Pomona since it's inception of the task force in 2007.
12         In 2012, that is when this investigation into Pomona
13    became initiated, and it did include those defendants.
14    Q    My counsel reminded me, it's Jose Valencia Gonzalez,
15    correct?
16    A    Jose Valencia Gonzalez, yes.
17    Q    Thank you.
18         As to all of the defendants I just mentioned, are they
19    originally from the Pomona area?
20    A    Yes.
21    Q    How do you know this?
22    A    From previous investigations and contacts.
23    Q    Now, beginning with Defendant Michael Lerma, was he ever
24    part of a criminal street gang?
25    A    Yes.
```

```
 1   Q     How do you know this?

 2   A     From my previous investigations in Pomona, talking to

 3   people and investigating.

 4   Q     What gang memberships did Michael Lerma have in the City

 5   of Pomona?

 6              MR. NOVAK:  Objection, 702 again.

 7              MR. KHOJAYAN:  702, 704(b).

 8              THE COURT:  Let me have counsel on sidebar for just

 9   a moment.

10                        (Sidebar begins.)

11              THE COURT:  Let me ask, I presume that the question

12   is prefatory.

13         You are going to ask the follow-up questions as to who

14   told him what?

15              MR. GORN:  Yes.

16              THE COURT:  During the course of the investigation?

17              MR. GORN:  Well, it's going to come out through the

18   jail calls and the investigation as well.

19              MR. KHOJAYAN:  Why can't we just play the jail

20   calls?

21         Why is he giving the opinion of guilt of people, he is

22   dancing around it, who is in the gang, what the basis of

23   somebody being in a gang.

24              THE COURT:  No.  That's not what the question was.

25   You have a copy of the question, so you should know what the
```

1    question actually is.

2              MR. KHOJAYAN:  Well, he's going one by one for each

3    defendant.

4         Why does this purportedly lay witness, think this member

5    is a member of a gang.

6              THE COURT:  No.  He can basically state what his

7    investigation was, and, you know --

8              MR. NOVAK:  It's a conclusion.  It's like a prelim

9    testimony.  He's summarizing his investigation to --

10             THE COURT:  Let me check.  The question was:  What

11   gang membership did Lerma have in the City of Pomona?

12             MR. KHOJAYAN:  Which would require -- it's an expert

13   opinion.

14             THE COURT:  But he, I presume he is going to could

15   ask, for example, what did your investigation show in regards

16   to the membership of Lerma, the gang membership --

17             MR. NOVAK:  I'm not saying there is not a

18   foundation.  I am saying he is asking for his opinion.

19        I believe that the appropriate thing is to call someone

20   who is a percipient witness who has personal knowledge or an

21   admissible document to show membership.

22        It's basically prelim testimony, summarizing the result

23   of his investigation, for with a witness, who we don't have 702

24   notice of.  If we had 702 notice saying he is going to express

25   the same opinions that the Court essentially excluded with

1    Deputy Self, then the Court would have said, no, this is

2    improper opinion testimony, because it's too close to the

3    allegations in the case.

4         He's basically saying, I have concluded that what is in

5    the indictment is true, which is exactly what the Court has

6    excluded --

7              MR. GORN:  The defense counsel has already elicited

8    that he was a 12th Street member.

9              MR. KHOJAYAN:  It doesn't mean anything about gang

10   membership.

11             THE COURT:  Let me stop you.  You just need to

12   rephrase your question.

13             MR. GORN:  As part to the investigation, what he

14   learned about the gang membership.

15             THE COURT:  Let me ask you this:  You can ask him

16   what -- just ask what specific aspects of your investigation

17   showed any connection between Lerma and any street gangs.

18             MR. NOVAK:  Doesn't that call for hearsay, or for

19   him telling the jury --

20             THE COURT:  He can state what his investigation was,

21   by definition.

22             MR. KHOJAYAN:  So he has, he's described search

23   warrants, he has described listening of phone calls.  I

24   thought, frankly, after he described the steps he took, he is

25   going to play phone calls.

1          But instead, it's opinions about gang membership, which

2    he hasn't been given notice to do.  It's improper --

3              THE COURT:  Let me stop you.  This is prefatory --

4              MR. GORN:  To the jail calls --

5              THE COURT:  The jail calls --

6              MR. GORN:  They are talking about 12th Street and

7    Cherryville and all of the jail calls.  There needs to be basic

8    foundation for how all of these players interrelate --

9              MS. DERBY:  There needs to be foundation.  He is

10   laying this false foundation, saying Lerma is a gang member,

11   then he's going to jump to jail calls.  Just start playing the

12   jail calls --

13             THE COURT:  Let me stop you.  You don't have control

14   over the government's presentation of its evidence.

15        If the government has evidence of it, they can bring it

16   out.  He can testify as to what steps he took, insofar as

17   investigating specific aspects.

18        If one specific aspect of the investigation was Lerma's

19   connection to any of the gangs in Pomona, he can ask him, did

20   you investigate the specific connections between Lerma and the

21   gangs.

22        And if, in fact, that's what he was doing, he can

23   testify to that.

24        He can say what, you know, what are the results of that

25   investigation, he can also ask him that.

1          MR. NOVAK:  If I may, the results of the

2    investigation is what crosses the line from what I did, to what

3    my opinion is, to what my conclusion is as an expert is.

4          Although, we can't control the order, if they play the

5    calls and then they say, okay, you heard these words, what do

6    these words mean, that is okay.

7          But that is not the same as, based on everything you

8    did, what is your opinion about the membership of these people

9    in these different organizations.

10         THE COURT:  That wasn't the question he asked.

11         MR. NOVAK:  It was pretty close to it.

12         THE COURT:  It's not.

13         MR. GORN:  I just want to be clear, from Your

14   Honor's point, what is the next question the government can ask

15   regarding the investigation and Defendant Lerma's 12th Street

16   membership.  I just want to be clear as to what is allowed.

17         THE COURT:  It's not up to me to tell you what the

18   questions you should be asking.

19         Last time I looked, I wasn't -- I was no longer an

20   Assistant United States Attorney, and even then, I was in the

21   civil --

22         MR. GORN:  Your Honor instructed me on the follow-up

23   question.

24         THE COURT:  I won't instruct you on the follow-up

25   question.  You have able colleagues, who will prompt you.  And

```
 1    I'm sure you have a much willing audience of attorneys who are
 2    willing to object.
 3                        (Sidebar ends.)
 4    BY MR. GORN:
 5    Q    Special Agent Talamantez, what steps did you take in
 6    investigating these specific aspects, like Defendant Lerma's
 7    connection to gangs in Pomona?
 8    A    I first started by trying to identify who I believe would
 9    be influential gang members within the Los Angeles County Jail
10    so I could listen to their phone calls.
11         And also trying to find people in the City of Pomona
12    that would talk to me about how things operate.
13    Q    And what were the results of that investigation?
14              MS. DERBY:  Objection.  It's calling for an opinion.
15              THE COURT:  Well, let me indicate to the witness,
16    the question doesn't call for an opinion, it actually calls for
17    what were the actual results of the investigation; in other
18    words, what turned up.
19              THE WITNESS:  That Cheryl Perez was the Senora
20    running Pomona on behalf of Mr. Lerma.
21              MR. KHOJAYAN:  Objection.  Improper opinion.  Move
22    to strike.
23              THE COURT:  I will strike it, unless there is
24    foundation laid for the response.
25              MR. GORN:  We can get into that later, it's fine for
```

1    now.

2              MS. DERBY:  I think we need to strike it now.

3              MR. GORN:  You can strike it now.  We will get into

4    it.

5              THE COURT:  I will strike the response now.  It may

6    be coming in later on or not.

7    BY MR. GORN:

8    Q    Special Agent Talamantez, looking around the courtroom

9    today, are you able to identify the individual you know as

10   Defendant Michael Lerma?

11   A    Yes.

12   Q    Can you please identify by stating an article of clothing

13   and where they are seated today?

14   A    The gentleman towards the back wearing the light blue

15   collared shirt, moustache, shaved head.

16             MR. GORN:  May the record reflect the witness's

17   identification of Michael Lerma.

18             THE COURT:  Yes.

19             MR. GORN:  Do you know based on you investigation,

20   any monikers that Defendant Mr. Lerma, used?

21             THE WITNESS:  Pomona Mike or Big Mike.

22   BY MR. GORN:

23   Q    Now, as part of your investigation, did you also look into

24   Defendants Carlos Gonzalez, Jose Valencia Gonzalez and Juan

25   Sanchez?

1    A    Yes.

2    Q    Starting with Defendant Carlos Gonzalez, how do you know

3    that individual?

4    A    Previous contacts, this investigation, and from listening

5    to phone calls.

6    Q    Previous contacts.  Were those personal contacts?

7    A    Some.

8    Q    And as to Jose Valencia Gonzalez, how do you know him?

9    A    Same.

10   Q    Have you had personal contacts?

11   A    Some.

12   Q    And as to Defendant Juan Sanchez, how do you know him?

13   A    From this investigations, reviewing incidents that have

14   occurred and reports.

15   Q    Looking around the courtroom today, are you able to

16   identify the person that you know as Defendant Jose Valencia

17   Gonzalez?

18   A    Yes.

19   Q    And can you identify that individual by indicating an

20   article of clothing they are wearing and where they are seated

21   today?

22   A    In the second row, wearing glasses with the goatee, in a

23   darker blue collared shirt.

24            MR. GORN:  May the record reflect the witness's

25   identification of Jose Valencia Gonzalez.

```
 1              THE COURT:  Yes.
 2   BY MR. GORN:
 3   Q    Based on your investigation and personal contacts with
 4   Jose Valencia Gonzalez, the defendant, do you know what his
 5   moniker was?
 6   A    Swifty.
 7   Q    And I take it that you have spoken with Defendant Jose
 8   Valencia Gonzalez, do you -- are you able to identify his voice
 9   from speaking with him?
10   A    His voice and in context, yes.
11   Q    So I want to now, in the exhibit binder in front of you,
12   if you can start looking at Exhibits 137 through 142.
13         If you can look at those, and when you are done look
14   back at me.
15   A    Okay.
16   Q    Do you recognize the individual in Exhibits 137, through
17   142?
18   A    Yes.
19   Q    Who is it?
20   A    Jose Valencia Gonzalez.
21   Q    Are those true and accurate photographs of Defendant Jose
22   Valencia Gonzalez, as you know him?
23   A    Yes.
24         MR. GORN:  At this time, Your Honor, the government
25   would move into evidence Exhibits 137 through 142.
```

```
 1              THE COURT:  Any objection?

 2              MR. KHOJAYAN:  No, Your Honor.

 3              THE COURT:  They are admitted.

 4         (Exhibits 137 through 142 received into evidence.)

 5              MR. GORN:  Permission to publish?

 6              THE COURT:  All right.

 7   BY MR. GORN:

 8   Q    Can we start with Exhibit 137?

 9        Looking at Exhibit 137, is this an individual you

10   recognized as Defendant Jose Valencia Gonzalez?

11   A    Yes.

12   Q    Now, you previously mentioned Cherryville gang in Pomona,

13   correct?

14   A    Correct.

15   Q    Are you familiar, based on your investigation of

16   Cherryville gang, any identifiers that members of Cherryville

17   gang that you have seen previously, in your experience, have

18   identified themselves as Cherryville gang members?

19   A    Usually with cherries or ville, or Cherryville

20   Q    And can we move to Exhibit 138.

21        And sir, looking at the exhibit of 138, were you able to

22   find any identifiers as to Jose Gonzalez that were tattoos you

23   believe or have seen previously rather on Cherryville gang

24   members?

25   A    Yes, he has cherries tattooed on him.
```

1    Q     If you can go to Exhibit 139, please, an Exhibit 140, and

2    Exhibit 141, and Exhibit 142.

3          So Special Agent Talamantez, did you identify any

4    tattoos of note as they relate to Cherryville gang on Jose

5    Valencia Gonzalez?

6    A     Yes.

7    Q     What did you identify?

8    A     He has cherries with what appears to be the word, "ville,"

9    written inside of them, on the left-hand side of his neck.

10   Q     Can we zoom in on the left-hand side of his neck.  Can we

11   go to 137?

12          Zooming in on the neck, are you able to see in front of

13   you, on the left side of the defendant's neck, what is

14   indicated a tattoo for Cherryville gang?

15   A     Yeah.  It's a little bit blurry, but there are cherries

16   with the word, "ville."

17   Q     Are there any other identifiers that you saw on Defendant

18   Jose Valencia Gonzalez?

19   A     For Cherryville, I don't believe so.

20   Q     Now, were you able to locate or review in law enforcement

21   database, a photo of Jose Valencia Gonzalez when he was a

22   little bit younger?

23   A     Yes.

24   Q     I now draw your attention to 142.  If can you look at that

25   and look at me when you are done.

1    A    142?

2    Q    142.  Excuse me, one second.

3         I'm sorry, 506.

4    A    506.

5         Hold on different binder, okay.

6    Q    Do you recognize the individual in that photo?

7    A    Yes.

8    Q    Who is it?

9    A    Jose Valencia Gonzalez.

10   Q    Is that a true and accurate photo of Jose Valencia
11   Gonzalez, the defendant, from a little bit younger?

12   A    Yes.

13            MR. GORN:  Your Honor, at this time the government
14   would move in 506.

15            MR. KHOJAYAN:  No objection.

16            THE COURT:  It's admitted.

17            (Exhibit 506 received into evidence.)

18            MR. GORN:  Permission to publish?

19            THE COURT:  Yes.

20   BY MR. GORN:

21   Q    Sir, is this the individual that you identified as Jose
22   Valencia Gonzalez?

23   A    Yes.

24   Q    If we can zoom in on the left side of the neck, is that
25   the tattoo that you described earlier related to Cherryville

1    gang?

2    A    Yes.  It's still blurry, but there is less tattoo, so you

3    can see it has the stems and leaves and the cherries with the

4    word, "ville," inside of it.

5    Q    Can you look at Exhibit 504?

6    A    Yes.

7    Q    Do you recognize the individual in that photo?

8    A    Yes.

9    Q    Who is that?

10   A    Jose Valencia Gonzalez.

11   Q    Is that a true and accurate photo of Jose Valencia

12   Gonzalez?

13   A    Yes.

14            MR. GORN:  At this time, government would move into

15   504.

16            THE COURT:  Any objection?

17            MR. KHOJAYAN:  It's cumulative, but no objection.

18            THE COURT:  I will admit it.

19            (Exhibit 504 received into evidence.)

20            MR. GORN:  Permission to publish?

21            THE COURT:  Yes.

22   BY MR. GORN:

23   Q    Zooming in on the left side of the defendant's neck, do

24   you recognize what we're looking at?

25   A    It's actually clear, when you don't zoom in, you can see a

1    better picture of the cherries and the ville.

2    Q    How are you familiar with any tattoos related to

3    identifying a Surenos?

4    A    Generally, yes.

5    Q    And you briefly talked about Surenos, but what are

6    Surenos?

7    A    Surenos is the term that is used to describe gang members

8    from Hispanic gangs in Southern California, that collectively

9    are under the Mexican Mafia umbrella and are the soldiers.

10   Q    And then in your investigation and knowing Defendant Jose

11   Valencia Gonzalez, did you see any tattoos on the defendant

12   representing any Sureno?

13   A    The tattoos that he had.  They are indicative of that,

14   they are the Aztec drawings and tattoos that he has.

15        The Surenos and the Mexican Mafia like to adopt the

16   Aztec culture, for being warriors and portraying that they are

17   soldiers.

18             MS. DERBY:  Objection.

19             MR. KHOJAYAN:  Move to strike soldiers, 403.  Lay

20   witness opinion, he's not a 702 witness.

21             THE COURT:  You need to lay a foundation for that

22   portion of his answer.

23   BY MR. GORN:

24   Q    Okay.  As part of your investigations, do you look into

25   the makeup and the structure of Surenos?

```
 1   A     Yes.
 2   Q     And as part of your investigations, are you able to
 3   identify a hierarchy within Surenos and certain types of
 4   positions that Surenos have?
 5   A     Yes.
 6               MR. KHOJAYAN:  Objection.  702.
 7               MR. GORN:  This is the foundation, Your Honor.
 8               THE COURT:  I think you should be asking him on the
 9   basis of this investigation, did you look into those areas.
10   BY MR. GORN:
11   Q     So on the basis of this investigation, did you also look
12   into Surenos and the structures of Surenos?
13   A     Yes.
14   Q     In this investigation, did you investigate or learn about
15   the different roles that Surenos have, as part of being a
16   Sureno?
17   A     Yes.
18   Q     Are you familiar with the term soldier?
19   A     Yes.
20   Q     And what is a soldier, based on your investigation?
21   A     Somebody who conducts criminal activity on behalf of the
22   Mexican Mafia.
23   Q     Now, I want to transition to Defendant Juan Sanchez,
24   looking on the courtroom, are you able to identify the person
25   you know as Juan Sanchez in court?
```

1    A    Yes.

2    Q    Can you please identify him by stating a article of

3    clothing he is wearing and where they are seated?

4    A    He's in the front row, wearing glasses in the white shirt

5    with a blue tie.

6                MR. GORN:  May the record reflect the witness's

7    identification of Juan Sanchez?

8                THE COURT:  Any objection?

9                MR. LASTING:  No, objection.

10   BY MR. GORN:

11   Q    As part of your investigation in this case, did you learn

12   any monikers that Defendant Sanchez had?

13   A    Yes.

14   Q    What's that moniker?

15   A    Squeaks or Squeaky.

16   Q    I want to draw your attention to Exhibit 134 through 139?

17   A    Okay.

18   Q    Do you recognize the individual from all of those

19   photographs from Exhibits 143 through 149?

20   A    Yes.

21   Q    Who is the individual in those photographs?

22   A    Juan Sanchez.

23   Q    Are those true and accurate photos of Defendant Juan

24   Sanchez, as you know him?

25   A    Yes.

1    Q    At this time the government would move in Exhibits 133 to

2    139.

3            THE COURT:  Any objection?  Admitted.

4        (Exhibit 133 through 139 received into evidence.)

5            MR. LASTING:  No, Your Honor.

6    BY MR. GORN:

7    Q    Beginning with Exhibit 143.

8            Is this individual that you identified as Defendant Juan

9    Sanchez?

10   A    Yes.

11   Q    Also known as Squeaks?

12   A    Yes.

13   Q    I want to direct your attention to Exhibit 144.

14           I want to talk to you about the defendant's right hand.

15           Do you see a sign that says a letter P on the right

16   forearm?

17   A    Yes.

18   Q    Based on your investigation in this case, does that have

19   any relevance as to any gang membership or ties?

20   A    It shows that he is from Pomona.  It's just showing pride

21   in the city.

22   Q    Right below that, the tattoo which is says, 113 percent?

23   Does that have any significance?

24   A    Yes.

25   Q    What does it show?

```
1    A    From this investigation, I learned that the Surenos and

2    Mexican Mafia put particular importance in the Number 13

3    because it represents the 13th letter in the alphabet.

4         So in this case he's showing that instead of giving

5    100 percent, he's giving 113 percent.

6    Q    Now, looking at the defendant's left hand, do you see

7    three dots there close to the thumb?

8    A    Yes.

9    Q    And as part of your investigation, were you able to

10   determine any significance of those three dots that you see

11   there?

12   A    No.

13   Q    Now, going to Exhibit 145.

14        Looking at the defendant's right forearm, do you see any

15   tattoos there that are -- that you looked at as part of your

16   investigation?

17   A    Yes.

18   Q    What did you see?

19   A    You can see cherries on the inside of his right hand wrist

20   that is just below what looks like Pomona.

21   Q    We will zoom in there.

22        We zoomed in on the area of the defendant's right

23   forearm with what appears to be cherries?

24   A    Yes.

25   Q    Was that what you noted in terms of any sort of gang
```

|     |                                                                        |
|-----|------------------------------------------------------------------------|
| 1   | identifiers as part of your investigation in this case or was          |
| 2   | there anything else?                                                   |
| 3   | A    I believe he has more Cherryville tattoos, but yes.               |
| 4   | Q    Let's go to Exhibit 146.                                          |
| 5   | Looking at 146, are you able to identify any indicators                |
| 6   | of Pomona or Cherryville?                                              |
| 7   | A    Yes.                                                              |
| 8   | Q    Can you just describe what is it that you are particularly        |
| 9   | looking at in Exhibit 146?                                             |
| 10  | A    The large cherries that are tattooed on his stomach.              |
| 11  | Q    Right above that, is there any wording you identify              |
| 12  | belonging to the City of Pomona?                                       |
| 13  | A    It's outline of the letters that spell out Pomona.               |
| 14  | Q    Now, in terms of looking at the defendant's neck, do you          |
| 15  | see any other indicia of Cherryville?                                  |
| 16  | A    Yes.                                                              |
| 17  | Q    What is it that you see?                                          |
| 18  | A    That he has Cherryville in two separate words tattooed on         |
| 19  | his neck line.                                                         |
| 20  | Q    Is that displayed in the zoomed-in photo we have now of           |
| 21  | Exhibit 146?                                                            |
| 22  | A    Yes.                                                              |
| 23  | Q    Now, if we can just zoom back out, and looking at the             |
| 24  | shoulders of the defendant, did you also note, a C and a V -- a        |
| 25  | C on the right shoulder and the V on the left shoulder?               |

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.

 2   Q     As part of your investigation into Cherryville, did that

 3   have any significance?

 4   A     Yes.

 5   Q     What does it mean?

 6   A     Stands for cherry and then ville.

 7   Q     And we will get other exhibits for that 147, please.

 8         Is that, in 147, does that display the V you just

 9   discussed?

10   A     Yes.

11   Q     And looking at Exhibit 148, is that the defendant's last

12   name?

13   A     It is.

14   Q     And finally looking at Exhibit 149, I want to ask you in

15   terms of Pomona gangs, is there a specific tattoo that you have

16   learned in your investigation, called the rolling Ps?

17   A     Yes.

18   Q     What is a rolling P?

19   A     The insignia that the City of Pomona uses.  It's P's in a

20   circle, you can see it on his right-hand elbow and a lot of the

21   individuals will have that same tattoo.

22   Q     Is that displayed there, the rolling P tattoo, you just

23   described?

24   A     Yes.

25   Q     That is on Exhibit 149.
```

**UNITED STATES DISTRICT COURT**

1        Now in terms of Sureno affiliation, are there any

2   tattoos that, you know, based on your investigation that you

3   have seen on Sureno members identifying the Surenos?

4   A    Yes.

5   Q    What types of tattoos do you know of?

6   A    The two most that I have seen in this investigation, are

7   either the words SUR, Sureno, or what is known as a kanpol

8   which is the Aztec Number 13, which is represented by two bars

9   equaling the number five and three dots.

10       They are each representing a one, which is ten, plus

11  three, which is 13.

12  Q    And in your investigation of Defendant Sanchez, did you

13  see any tattoos that would affiliate or be identified as a

14  Sureno tattoo?

15  A    Now or before?

16  Q    Now.

17  A    Now, yes.

18  Q    What?

19  A    He has that SUR tattooed on the left-hand side of his head

20  right now, that is also in a shape of a kanpol.

21  Q    Now transitioning to Defendant Carlos Gonzalez.

22       Looking around the courtroom today, are you able to

23  identify the person you believe is Defendant Carlos Gonzalez in

24  court today?

25  A    Yes.

1    Q    Can you please identify them, by identifying an article of

2    clothing they are wearing and where they are seated today?

3    A    Sitting in the front row, wearing light blue shirt and a

4    tie.

5         MR. GORN:  May the record reflect the witness's

6    identification of Defendant Carlos Gonzalez?

7         THE COURT:  Any objection?

8         MR. NOVAK:  No.  Thank you.

9         THE COURT:  That's fine.

10   BY MR. GORN:

11   Q    Sir, I should say, Special Agent Talamantez, based on your

12   investigation, did you learn of a moniker related to Defendant

13   Carlos Gonzalez?

14   A    Yes.

15   Q    And what was that moniker you learned?

16   A    Popeye.

17   Q    I want to show you or direct your attention to

18   Exhibits 150 through 157.

19        Do you -- if you could look at those and look back at me

20   when you are done.

21   A    Okay.

22   Q    Special Agent Talamantez, do you recognize the individual

23   in those exhibits?

24   A    Yes.

25   Q    Who is it?

60

```
 1   A     Carlos Gonzalez.

 2   Q     Are those true and accurate photos of Defendant Carlos

 3   Gonzalez, as you know him to be?

 4   A     Yes.

 5            MR. GORN:  Your Honor, at this time the government

 6   would move Government's Exhibits 150 through 157.

 7            THE COURT:  Any objection?

 8        (Exhibits 150 through 157 received into evidence.)

 9            MR. NOVAK:  No, thank you.

10            MR. GORN:  Permission to publish?

11   BY MR. GORN:

12   Q     Sir, beginning with Exhibit 150, is this the defendant you

13   identified as Carlos Gonzalez?

14   A     Yes.

15   Q     And you briefly described, as to the other defendants'

16   tattoos indicative Cherryville.

17            Looking at this photograph, are there any tattoos that,

18   based on your investigation, that are related to the

19   Cherryville gang?

20   A     Several.

21   Q     Can you describe them, one by one, what you see in

22   Exhibit 150?

23   A     The first one is the cherries that is tattooed across his

24   chin.

25            On each side of his shoulder he has a cherry, and then a
```

1    ville.

2         In the middle of the bottom of his neck line, he has a

3    tattoo of a cherry.

4    Q    So we will zoom in on the defendant's chin in the

5    Exhibit 150.

6         What is zoomed in on, on the chin, is that what you

7    described as the cherries tattooed on the defendant's chin?

8    A    Yes.

9    Q    If you can zoom out and into the neck line of the

10   defendant, the zoomed in, there, in the middle, right below the

11   neck, and at the top of the chest, is that the cherry you

12   described?

13   A    Yes.

14   Q    If we could move on to Exhibit 151.

15        Looking at this photograph, are you able to identify any

16   tattoos from your investigation linked to Cherryville?

17   A    To Cherryville?

18   Q    Yes.  What are those?

19   A    On his fingers he has tattoos of cherries with the stems

20   coming out.

21   Q    Is that on the left hand, the index finger and middle

22   finger?

23   A    Yes.

24   Q    If we can zoom in.

25        Are those the cherries you described?

**UNITED STATES DISTRICT COURT**

62

```
 1   A     They are.
 2   Q     And now, drawing your attention to the little finger on
 3   the left hand, displayed in Exhibit 151, zooming in on that, do
 4   you see what that is?
 5   A     Yes.
 6   Q     What is that?
 7   A     The Number 13.
 8   Q     As part of your investigation in this case, did that have
 9   any significance to you?
10   A     Yes.
11   Q     What was that significance?
12   A     As I explained on the 113 percent, I learned in this
13   investigation that the Number 13, is particularly important to
14   the Mexican Mafia, because it's the 13th letter is the
15   alphabet, which is M.
16         Many gangs will have the Number 13 to show allegiance to
17   the Mexican Mafia.
18   Q     Now, I want to draw your attention to Exhibit No. 153.
19         Do you see this photograph in front of you, sir?
20   A     Yes.
21   Q     And looking where the red bracelet appears to be on the
22   defendant's left hand, do you see the tattoo behind that?
23   A     Yes.
24   Q     Can you just describe what you are seeing as its relevant
25   to your investigation?
```

1   A    Yeah, it's a little bit hard to see in this photo because

2   his watch is blocking it, but the part that is visible is two

3   bars with the word SUR spelled out inside of them.

4   Q    What is the significance of SUR?

5   A    SUR for Sureno, sir.

6   Q    Now, looking at the stomach of the defendant, do you see

7   the letters there or a word, Seferino?

8   A    Yes.

9   Q    As part of your investigation in this case, did the name

10  or an individual by the name of Seferino Gonzalez, was that a

11  focus of your investigation?

12  A    It was.

13  Q    As part of your investigation in this case, did you

14  discover a link between Defendant Carlos Gonzalez and an

15  individual named, Seferino Gonzalez?

16  A    Yes.

17  Q    And can you just describe, was there any familial

18  relationship between Defendant Carlos Gonzalez, and Seferino

19  Gonzalez?

20  A    Yes.  They are brothers.

21  Q    As part of your investigation, do you know any familial

22  relationship between Carlos Gonzalez and Jose Valencia

23  Gonzalez?

24  A    Yes.

25  Q    What is that relationship?

1    A    They are brothers.

2    Q    Is it fair to say that Seferino Gonzalez, Carlos Gonzalez

3    and Jose Valencia Gonzalez, are brothers?

4    A    Yes.

5    Q    I want to draw your attention going back to 153 of

6    Defendant Carlos Gonzalez's right elbow.

7         If we zoom in on that, are you able to see that?

8    A    Yes.

9    Q    And what is that tattoo?

10   A    It is the rolling P's tattoo.

11   Q    I want to draw your attention now to Exhibit 154.  Then to

12   Exhibit 155.

13        Does that also show the Seferino tattoo?

14   A    Yes.

15   Q    If we can zoom in on the SUR tattoo on the left, is that

16   the SUR tattoo you previously described?

17   A    Yes, still partially covered by the watch, but you can see

18   the two bars with the words SUR tattooed.

19   Q    Understood.

20        So as part of your investigation, to have the two bars,

21   is there a specific tattoo, you have identified as a kanpol?

22            MR. FURMAN:  Objection.  Asked and answered.

23            THE COURT:  I will sustain the objection.

24   BY MR. GORN:

25   Q    Now, I want to direct your attention to Exhibit No. 162.

```
 1   A    162?

 2   Q    Yes.

 3   A    Okay.

 4   Q    Do you recognize the individuals in that photograph?

 5   A    Yes.

 6   Q    And what is this a photograph of?

 7   A    Who is it of?

 8   Q    Yes.

 9   A    It's of Robert Messersmith, Stretch, Chris Ferreira,

10   Caveman, Michael Lerma, Jose Valencia Gonzalez, and Carlos

11   Gonzalez.

12   Q    Is this a true and accurate photograph depicting

13   defendants Mike Lerma, Carlos Gonzalez, and Jose Valencia

14   Gonzalez, as you know them to be?

15   A    Yes.

16          MR. GORN:  Your Honor, at this time, government

17   would move in Exhibit 162.

18          THE COURT:  All right.  Any objection?

19          MR. KHOJAYAN:  No, Your Honor.

20          MS. DERBY:  No, Your Honor.

21          THE COURT:  It's admitted.

22          (Exhibit 162 received into evidence.)

23          MR. GORN:  Permission to publish, Your Honor.

24          THE COURT:  Yes.

25   BY MR. GORN:
```

```
 1   Q     Can we zoom in on that photograph.
 2         So looking at the man in the middle, wearing the black
 3   tank top, do you recognize that person?
 4   A     Yes.
 5   Q     Who is that person?
 6   A     Michael Lerma.
 7   Q     Now, to Defendant Lerma's left, it would be our right, the
 8   individual wearing the glasses.
 9         Do you recognize who that is?
10   A     Yes.
11   Q     Who is that?
12   A     Jose Valencia Gonzalez.
13   Q     And to Jose Valencia Gonzalez's right, or his left, who is
14   the individual at the end, wearing the black Nike shoes?
15   A     Carlos Gonzalez.
16   Q     Now, so you previously mentioned some names as to two
17   other individuals.
18         Starting with the individual on the furthest left of
19   this photograph, who is that?
20   A     A guy known as Stretch, Robert Messersmith.
21   Q     And the other individual to his right, who is that?
22   A     It's an individual named Chris Ferreira, he goes by
23   Caveman.
24   Q     Now, we are fast forwarding a little bit, but were those
25   two individuals later housed at MDC, 6 North around June
```

1    of 2020?

2    A    Yes.

3    Q    And in June of 2020 was Defendant Lerma also in unit 6

4    North at MDC?

5    A    Yes.

6    Q    And to -- as to defendant Jose Valencia Gonzalez, was he

7    also housed at Metropolitan Detention Center in June of 2020?

8    A    Yes.

9    Q    Was he also in 6 North?

10   A    Yes.

11   Q    And as to Defendant Carlos Gonzalez, in June of 2020, was

12   he also at MDC in unit 6 North?

13   A    Yes.

14   Q    Now, not featured in this photograph, but Defendant Juan

15   Sanchez, was he also in MDC in 6 North in June of 2020?

16   A    Yes.

17   Q    Now, as part of your investigation, and what you just

18   described in the tattoos you saw, was your investigation

19   focused in part on the Cherryville gang?

20   A    Yes.

21   Q    As part of your investigation, was that based on the facts

22   here that -- excuse me, the evidence that you were obtaining

23   linking Defendants Jose Gonzalez, Juan Sanchez, and Carlos

24   Gonzalez to the Cherryville gang?

25            MS. DERBY:  Objection.  Leading and compound.

```
 1                THE COURT:  Rephrase the question.
 2   BY MR. GORN:
 3   Q    As part of your investigation, did you have information
 4   linking Defendant Jose Gonzalez to the Cherryville gang?
 5                MR. KHOJAYAN:  Objection.  704(b).
 6                MR. GORN:  It's a lay opinion.
 7                MR. KHOJAYAN:  403.
 8                THE COURT:  Let me have counsel on sidebar for just
 9   a second.
10                     (Sidebar begins.)
11                THE COURT:  Is there going to be an objection to
12   what his investigation concluded?
13                MR. KHOJAYAN:  In the sense, that he is going to
14   say, that they are all apart of the Michael Lerma enterprise,
15   that they are all members -- he's to be a lay witness that is
16   supposed to play the phone calls, and not give an opinion.
17                THE COURT:  He's going to testify as to his
18   investigation, he conducted an investigation.
19                MR. KHOJAYAN:  Very good.
20                THE COURT:  I presume his testimony is going to be,
21   well, what was the result of your investigation.
22                MR. FURMAN:  That goes to one of the issues in this
23   case, so that's -- in this case one of the things that the jury
24   is going to be asked to decide at the end, so his testimony as
25   a lay witness is a completely improper.
```

1          MR. KHOJAYAN:  I will also add we have also heard

2     testimony that was allowed of the tattoos and that is an

3     indication of their membership in the Cherryville gang.

4          It's cumulative, he's going to repeat a member if the

5     Cherryville gang.

6          MR. GORN:  It's not cumulative, because we need to

7     discuss the context of the jail calls, where they are

8     discussing Cherryville, these specific defendants, and also

9     Defendant Lerma's affiliation to 12 Street.

10         There is going to be structure evidence as to how the

11    enterprise was operating in Pomona, despite two rival gangs not

12    getting along on the streets.

13         But as Your Honor saw on the last exhibit, in prison

14    they do get along, and all of that context needs to be laid for

15    the jail calls to come in, to be understood by the jury.

16         MR. NOVAK:  Calls are admissible.

17         Then the question is do we have an understanding about

18    why street gangs with rivalries collaborate or whatever the

19    government's question is, notwithstanding the street rivalry.

20         MR. GORN:  Are you going to allow that opinion to

21    come in?

22         MR. NOVAK:  I think it's different from what is the

23    result of this investigation.

24         The Court keeps saying he can testify to the result of

25    his investigation.  Were not in a preliminary hearing, and it

1    is 702 testimony.

2           MR. GORN:  It's lay opinion, and it is not expert

3    opinion.

4           He's using it based on his investigation, that he viewed

5    these three individuals as part of Cherryville.

6           Based on his investigation, as we already laid out, the

7    Defendant Lerma was a member of 12th street, and these are

8    going to be reflected in the calls, and there is the tattoos

9    that Your Honor saw.

10          THE COURT:  No.  Let me ask this:  Maybe we should

11   play the recorded calls, and he can indicate, you know, in the

12   course of his investigation, you know, I mean --

13          MR. GORN:  I was laying the general foundation

14   before we get into those calls, as to how he made the

15   determinations, Your Honor, just the general background.  It is

16   a very narrow question.

17          THE COURT:  The way you are asking the questions,

18   you could put all of the stuff in there, if you were to just

19   ask the questions in a different way.

20          I think, what they are objecting to, in the end, is you

21   are trying to get all of these conclusionary statements in, but

22   you don't lay the preliminary, step by step by step, which is

23   then, you did what in your investigation, why did you do this

24   in your investigation, why did you -- what was the next step of

25   the investigation, why did you do that in the investigation,

1    which is part and parcel of the investigation.

2            MR. KHOJAYAN:  While we're here, I wanted to do this

3    outside the presence of the jury.

4            One of the calls includes Bill McCord, who is deceased.

5    But certainly to say, first of all, that he's deceased or not,

6    is not relevant.

7            And in this murder case, it's going to sound like

8    possibly these defendants had something to do with it, so I

9    would ask that they not -- that's what came out -- that's not

10   what came out in the Deshannon trial, it was left, he is

11   deceased.

12           THE COURT:  I presume there is no objection to the

13   parties stipulating that the individual died in an automobile

14   accident, totally unrelated to the case.

15           MR. NOVAK:  Is that one of the results in the

16   investigation, that he concluded.

17           MR. GORN:  He spoke with Bill McCord and then he

18   died.

19           MR. NOVAK:  He died in a car accident?

20           MR. GORN:  A motorcycle crash.  I'm not eliciting he

21   just mysteriously died.

22           MR. NOVAK:  I would agree with the Court, it's the

23   way the questions are asked, and the foundation.  As I said

24   before, he does have a foundation for his opinions, but he is

25   not an opinion witness, so I know the government disagrees.

1          But when you say as a result of your investigation, what

2     did you conclude, that is 702, and it's 702 in what we started

3     out getting very, very close to sort of Category B of Deputy

4     Self's testimony, which was improper opinion.

5          That's where we started here, I'm concerned we're just

6     going back.

7               MR. KHOJAYAN:  While we are at sidebar, I will also

8     say as a lay witness, he can, of course, help the jury describe

9     things that are vague and ambiguous in the calls, that is what

10    701 says.

11         But a lot of these calls, when you read the transcripts,

12    Your Honor, you will see that they are not vague and ambiguous.

13         What a pink slip is to a car, and other things that are

14    -- further, I would also indicate he did not do any undercover

15    work in this case.

16         So he has no foundation, and it's improper 702 opinion

17    for him to opine what the jargon means.

18         We will get to it, but I want Your Honor to be aware of

19    that.  The case is *United States versus Freeman*.

20              MR. GORN:  We're not getting into pink slips,

21    counsel, you can make a timely objection.

22              THE COURT:  I'm leaning to just playing the audios,

23    you can ask some discussion as to what that relates to his

24    investigation, et cetera.

25              MR. GORN:  That was my next point.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Then why didn't you come up with that

2    first, then we wouldn't have to do all of this stuff.

3          MR. GORN:  Just one minor point.

4                    (Sidebar ends.)

5          MR. GORN:  Can we go back to Exhibit 153.

6          So showing you, again, what has already been admitted as

7    Exhibit 153, speaking as to Seferino Gonzalez, did your

8    investigation in 2012 and 2013, more specifically, start by

9    listening to calls from Seferino Gonzalez or jail calls from

10   Seferino Gonzalez?

11   A    Yes.

12   Q    Now, are you familiar with an individual named Cheryl

13   Perez?

14   A    Yes.

15   Q    And are you aware of her having a daughter?

16   A    Yes.

17   Q    And did any of your investigation begin because of Cheryl

18   Perez's daughter?

19   A    I'm assuming that you are talking about -- she has several

20   daughters, but I'm assuming you are talking about Sonia

21   Castaneda?

22   Q    Yes.

23   A    It did not.

24   Q    I want to show you an Exhibit of 508, if you can look in

25   your binder.

1    A    Okay.

2    Q    Do you recognize an individual in that photograph?

3    A    Yes.

4    Q    Who is that?

5    A    Seferino Gonzalez.

6    Q    Is that a true and accurate photo, as you recognize

7    Seferino Gonzalez?

8    A    Yes.

9         MR. GORN:  Your Honor, at this time government would

10   move in Exhibit 508.

11        MR. KHOJAYAN:  No objection.

12        THE COURT:  It's admitted.

13        (Exhibit 508 received into evidence.)

14   BY MR. GORN:

15   Q    If you can look at Exhibit 509, the next page?

16   A    Okay.

17   Q    Do you recognize that individual?

18   A    Yes.

19   Q    And who is that?

20   A    It's still Seferino Gonzalez.

21   Q    Is that a true and accurate photo of Seferino Gonzalez?

22   A    Yes.

23   Q    And, Your Honor, government would also move in

24   Exhibit 509.

25        MR. KHOJAYAN:  No objection.

```
 1                  THE COURT:  It's admitted.

 2                     (Exhibit 509 received into evidence.)

 3                  MR. GORN:  Permission to publish Exhibit 508 and

 4   509?

 5                  THE COURT:  Yes.

 6   BY MR. GORN:

 7   Q     Looking at 508, is that the individual you identified as

 8   Seferino Gonzalez?

 9   A     Yes.

10   Q     As part of your investigation, did you learn any facts to

11   connect him to the Cherryville gang?

12   A     Yes.

13   Q     What did you learn?

14   A     That he is in fact a member of the Cherryville gang.

15   Q     Have you previously met or spoken with Seferino Gonzalez?

16   A     Yes.

17   Q     Do you know his voice?

18   A     Yes.

19   Q     From your investigation, did you also learn a moniker that

20   he used?

21   A     Yes.

22   Q     What was it?

23   A     Spooky.  Spooks.

24   Q     In June and July of 2013, did you know where he was

25   living?
```

```
1   A    Yes.

2   Q    And did you query law enforcement databases for his

3   whereabouts?

4   A    Yes.

5   Q    I forgot to do this, can we publish the Exhibit 509, I

6   believe.

7        So going back to 509 as you identified as Seferino

8   Gonzalez.

9        Were you able to identify any tattoos you saw as part of

10  your investigation that would relate to Cherryville gang?

11  A    The cherries in the middle of his chest.

12  Q    Is that his sternum?  If we can zoom in, are those the

13  cherries you have identified?

14  A    Yes.

15  Q    Okay.  So I just mentioned looking at law enforcement

16  databases for defendant -- excuse me, Seferino Gonzalez rather,

17  were you able to find his location?

18  A    Yes, I knew where he was.

19  Q    Based on your law enforcement knowledge and the resources

20  that were at your disposal, are you familiar with the Los

21  Angeles Sheriff's Department Inmate Information Center?

22  A    Yes.

23  Q    And are you able to access that to find out whereabouts

24  for specific inmates?

25  A    Yes.
```

1  Q    And I want to show you Exhibit 363.

2        If you can look at that in your binder.

3  A    Okay.

4  Q    Do you recognize that exhibit?

5  A    Yes.

6  Q    What is it?

7  A    It's the Los Angeles County Sheriff's Department Inmate

8  Information Center that is available to anybody who has got an

9  Internet connection.

10  Q    Is that true and accurate information as it relates to

11  Seferino Gonzalez, where he was living in June and July

12  of 2013?

13  A    Yes.

14        MR. GORN:  Your Honor, at this time government would

15  admit 363.

16        MR. KHOJAYAN:  No objection.

17        THE COURT:  Admitted.

18        (Exhibit 363 received into evidence.)

19        MR. GORN:  Permission to publish?

20        THE COURT:  Yes.

21  BY MR. GORN:

22  Q    Can we zoom in on the housing location on the middle of

23  that document?

24        Now, looking at this document, does it reflect a housing

25  location for Seferino Gonzalez?

1    A    Yes.

2    Q    And it says there, North County Correctional Facility,

3    what is that?

4    A    It is a jail that is part of the LA County system, that is

5    in Castaic, by Magic Mountain.

6    Q    As part of your investigation, are you able to get jail

7    calls from the North County Correctional Facility?

8    A    Yes.

9    Q    I also want to zoom out, if we can go down.

10        If we can go to a bail amount.

11        Now, as part of your investigation, did you learn that

12   Seferino Gonzalez was in custody for a charged offense?

13   A    Yes.

14   Q    Is there an outstanding bail amount for him while he was

15   in custody for June of 2013?

16   A    Yes.

17   Q    Is that reflected here in the Inmate Information Center

18   form that we're showing?

19   A    It is.

20   Q    And based on your investigation, did you know what

21   Seferino Gonzalez was in custody for?

22   A    Yes.

23   Q    What was it?

24   A    It was some crimes that were committed in the City of

25   Pomona.

**UNITED STATES DISTRICT COURT**

```
 1   Q     Now, I want to transition to another individual.
 2         Do you know a person by the name of Kelly Deshannon?
 3   A     Yes.
 4   Q     How do you know her?
 5   A     Through this investigation and previous contacts.
 6   Q     When you have had previous contacts, have you previously
 7   spoken in person with her?
 8   A     Yes.
 9   Q     Are you able to identify her voice?
10   A     Yes.
11   Q     And as part of her investigation into this case, did you
12   learn of Kelly Deshannon's role, as it played into your
13   investigation?
14   A     Yes.
15   Q     And as part of your investigation, did you learn about any
16   connection that Kelly Deshannon had to Seferino Gonzalez?
17   A     Yes.
18   Q     What was that connection?
19   A     At the time of this case, she was his girlfriend and also
20   acted as a secretary.
21   Q     Based on your investigation, what does it mean to be a
22   secretary?
23   A     From this case, I learned that a secretary is somebody who
24   helps an individual, who is inside of custody with tasks such
25   as helping to collect money or pass messages or to carry on
```

**UNITED STATES DISTRICT COURT**

1    activities that would otherwise be still taking place on the

2    street.

3    Q    And as part of your investigation, and listening to jail

4    calls, were you able to determine any role that Seferino

5    Gonzalez had as part of your investigation?

6    A    Yes.

7                MS. DERBY:  Objection.  Vague as to role, and 702.

8                THE COURT:  Well, lay a foundation for the answer.

9    BY MR. GORN:

10   Q    Sure.  Did you listen to jail calls in this case?

11   A    I did.

12   Q    Did you hear conversations that Seferino Gonzalez was

13   having with Kelly Deshannon?

14   A    Yes.

15   Q    You previously described Kelly Deshannon as being a

16   secretary, correct?

17   A    Correct.

18   Q    And from those communications with his secretary, were you

19   able to determine, based on your investigation the role that

20   Seferino Gonzalez had?

21   A    Yes.

22   Q    What was that role?

23               MS. DERBY:  Objection.  The evidence would speak for

24   itself.  His opinion is not valid at this point, and no

25   foundation has been laid.

```
 1                  MR. GORN:  Your Honor.

 2                  THE COURT:  I will allow him to indicate after the

 3      transcript has been played, those portions which he references.

 4                  MR. GORN:  Yes, Your Honor.

 5                  THE COURT:  At this point.

 6                  MR. GORN:  Okay.  Going to now Exhibit 505, can you

 7      look at that?

 8             We're going to go back to Kelly Deshannon.

 9                  THE WITNESS:  Different notebook, hold on.

10             Okay.

11      BY MR. GORN:

12      Q    Do you recognize that individual?

13      A    Yes.

14      Q    Who is this?

15      A    Kelly Deshannon.

16      Q    Is that a true and accurate depiction of Kelly Deshannon

17      as you know her?

18      A    Yes.

19                  MR. GORN:  At this time government would move in

20      505.

21                  THE COURT:  Any objection?

22                  MR. KHOJAYAN:  No objection.

23                  THE COURT:  Admitted.

24                  (Exhibit 505 received into evidence.)

25                  MR. GORN:  Permission to publish?
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Yes.
 2   BY MR. GORN:
 3   Q    Is this the individual in Exhibit 505 you identified as
 4   Kelly Deshannon?
 5   A    Yes.
 6   Q    Through your investigation, did you also encounter another
 7   individual named Cheryl Perez?
 8   A    Yes.
 9   Q    You already briefly mentioned her, but who is she?
10   A    She's a Cherryville gang member, living in the City of
11   Pomona, but was also the Senora for Mike Lerma.
12              MS. DERBY:  Objection.  Lack of foundation.
13              THE COURT:  I think you need to lay a foundation for
14   his answer to that question.
15   BY MR. GORN:
16   Q    How do you know Cheryl Perez?
17   A    This investigation and personal contacts in the City of
18   Pomona.
19   Q    Have you personally spoken with her before?
20   A    Yes.
21   Q    As part of your investigation in this case, did you listen
22   to jail calls involving Cheryl Perez?
23   A    Yes.
24   Q    And in those jail calls, was she speaking with Seferino
25   Gonzalez?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.

 2   Q     Was she also speaking with Kelly Deshannon?

 3   A     Yes.

 4   Q     In those conversations, was she also speaking with Jose

 5   Valencia Gonzalez, the defendant?

 6   A     Yes.

 7   Q     From those jail calls, were you able to determine what

 8   Cheryl Perez was doing, when she was speaking with all of the

 9   individuals I just mentioned?

10           MR. FURMAN:  Objection.  Compound, lack of

11   foundation, improper opinion testimony.

12           MR. KHOJAYAN:  Vague as to what she was doing.

13           THE COURT:  Rephrase your question.

14   BY MR. GORN:

15   Q     Sir, I wanted to direct your attention to Exhibit 507.

16   A     Okay.

17   Q     Do you recognize that photograph?

18   A     Yes.

19   Q     Who is that a photo of?

20   A     Cheryl Perez.

21   Q     Is that a true and accurate photo of Cheryl Perez as you

22   know her?

23   A     Yes.

24           MR. GORN:  At this time, government would move into

25   Exhibit 507.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Any objection?

2          MS. DERBY:  No, Your Honor.

3          Mr. GORN:  Permission to publish?

4          THE COURT:  Admitted.

5              (Exhibit 507 received into evidence.)

6   BY MR. GORN:

7   Q    Is this individual you identified as Cheryl Perez in

8   Exhibit 507?

9   A    Yes.

10  Q    I want to ask you about another individual by the name of

11  Trisha Perez.

12          Do you know who that is?

13  A    Yes.

14  Q    And have you previously spoken with her or as part of your

15  investigation have learned who she is?

16  A    I have spoken to her and learned who she is, yes.

17  Q    And from your knowledge and speaking to her, do you know

18  if she goes by any other last names?

19  A    Trish Perez.  At some point, I believe, she went by Trish

20  Salas.

21  Q    As part of your investigation, did she have any contacts

22  with Defendant Michael Lerma?

23  A    Yes.

24  Q    And also Cheryl Perez, based on your investigation, did

25  she have any contacts with Defendant Michael Lerma?

```
1   A     Yes.

2   Q     And if you can, excuse me, I need to bring in one more

3   exhibit, Exhibit No. 502.

4         Do you recognize that individual?

5   A     Yes.

6   Q     And who is that individual?

7   A     Trish Perez.

8   Q     Is that a true and accurate photo representing Trisha

9   Perez, as you know her?

10  A     Yes.

11         MR. GORN:  Your Honor, government moves to admit

12  Exhibit 502.

13         MS. DERBY:  No objection.

14         THE COURT:  All right.  Admitted.

15         (Exhibit 502 received into evidence.)

16         MR. GORN:  Permission to publish?

17         THE COURT:  Yes.

18  BY MR. GORN:

19  Q     Sir, is that Trisha Perez?

20  A     Yes.

21  Q     As part of your investigation, did you look at financial

22  records from this case?

23  A     Yes.

24  Q     Does the California prison system have inmate financial

25  accounts?
```

```
 1   A     Yes.

 2   Q     Are you able to access those?

 3   A     Yes.

 4   Q     And from those accounts, are you able to see how people on

 5   the outside deposit money for inmates that are in California

 6   prison facilities?

 7              MS. DERBY:  Objection.  Lack of foundation.

 8              THE COURT:  You need to lay a foundation for his

 9   ability to answer that question.

10   BY MR. GORN:

11   Q     Are you familiar with JPay?

12   A     Yes.

13   Q     What is JPay?

14   A     JPay is the way that the California Department of

15   Corrections and Rehabilitation allows outside individuals to

16   put money into a commissary account for inmates that are within

17   their custody.

18          That money can then be used to buy commissary items or

19   other goods that are sold by the California Department of

20   Corrections.

21              MS. DERBY:  Objection.  Motion to strike.  There is

22   still no foundation as to how he has this knowledge.

23              THE COURT:  I will sustain the objection.  You need

24   to lay the foundation.

25   BY MR. GORN:
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    Have you ever seen a JPay record before?

 2    A    Yes.

 3    Q    Have you reviewed JPay records before?

 4    A    Yes.

 5    Q    Do you use JPay records in investigations?

 6    A    Yes.

 7    Q    From your review of JPay records, what do JPay records

 8    show?

 9              MS. DERBY:  Objection, Your Honor.  It lacks

10    foundation.

11              THE COURT:  I will allow him to indicate what he saw

12    in the JPay records that he reviewed.

13    BY MR. GORN:

14    Q    You can answer the question, what do JPay records show?

15              MS. DERBY:  Objection.  That is not answering the

16    question that the Court indicated.

17              THE COURT:  I would agree.

18    BY MR. GORN:

19    Q    Based on your investigation in any JPay records you

20    reviewed, what did JPay records show?

21              MR. KHOJAYAN:  Objection.  Best evidence rule.

22              THE COURT:  Overruled.

23              MR. GORN:  You can answer.

24              THE WITNESS:  Money being deposited on the JPay

25    account of Michael Lerma by Cheryl Perez and Trish Perez or
```

1    Trish Salas.

2    BY MR. GORN:

3    Q    Through your investigation, were you able to retrieve

4    financial JPay records from the prison account belonging to

5    Michael Lerma?

6    A    Yes.

7    Q    Was there a specific correctional facility where Defendant

8    Lerma had a JPay account?

9    A    Yes.

10   Q    What was it?

11   A    Pelican Bay.

12   Q    Did you request the JPay records for Pelican Bay as it

13   related to Defendant Michael Lerma?

14   A    Yes.

15   Q    And dating back to 2012, did you locate financial records

16   that were provided to you for the prison account for Defendant

17   Michael Lerma?

18   A    Yes.

19   Q    In reviewing those records, did you specifically see

20   records through that prison account between Cheryl Perez and

21   Defendant Michael Lerma?

22   A    Yes.

23   Q    Did you also get JPay financial records from 2014 and 2015

24   regarding Defendant Lerma's same JPay account?

25   A    Yes.

```
 1    Q    Did you find in those years, financial records showing

 2    deposits between Defendant Lerma's account and Trisha Perez?

 3    A    Yes.

 4    Q    And in those financial records, regarding Trisha Perez was

 5    it under the name of Trisha Perez or Trisha Salas?

 6    A    I believe it was Trish Salas.

 7    Q    Sir, I want to show you -- it is Exhibit 350 in your

 8    binder.

 9    A    Okay.

10    Q    Do you recognize that exhibit?

11    A    Yes.

12    Q    What is it?

13    A    It is the printout of the JPay account summary for Michael

14    Lerma.

15    Q    Is that a true and accurate record that you received as

16    part of your investigation in this case?

17    A    Yes.

18         MR. GORN:  Your Honor, at this time the government

19    would move to admit Government's Exhibit 350, the JPay record,

20    concurrently along with the 90211 certificate that is

21    Exhibit 367.

22         THE COURT:  Any objection?

23         MS. DERBY:  No, Your Honor.

24         THE COURT:  It's admitted.

25         (Exhibit 367 received into evidence.)
```

```
1              MR. GORN:  Permission to publish to the jury.  It
2    will be 350.
3    BY MR. GORN:
4    Q    If we can start with the first page.
5         Can you see the Exhibit 350, page 1, in front of you?
6    A    Yes.
7    Q    Is this a copy of the 90211, the certification of business
8    records regarding your request for the JPay records belonging
9    to defendant, Michael Lerma?
10   A    Yes.
11   Q    If we can go down, one more page to page 2.
12        Is that the signed certification for the business
13   records regarding the JPay accounts?
14   A    Yes.
15   Q    Now, going to page 3, why do you look at documents like
16   this as part of your investigation?
17   A    To establish connections between individuals that are
18   being investigated and individuals who are on the street.
19   Q    So you are looking for personal or financial contacts
20   between individuals outside and outside of facilities and those
21   that are inside of facilities?
22   A    Yes.
23   Q    I want to direct your attention to the first deposit which
24   will be February 8th, 2012.
25              MS. DERBY:  Objection.  That misstates the document.
```

```
 1              THE COURT:  Rephrase the question.
 2   BY MR. GORN:
 3   Q    On the bottom of the page, do you see a date of February
 4   8th, 2012?
 5   A    Yes.
 6   Q    And if we could -- can you just explain for that row, as
 7   part of your investigation, did you look at this financial
 8   transaction?
 9   A    Yes.
10   Q    And what did this financial transaction show to you?
11   A    It showed that on February 8th of 2012, Cheryl Perez made
12   a deposit of $120 on to Michael Lerma's JPay account while he
13   was housed in Pelican Bay State Prison.
14   Q    Can we go to date of 9/11 right above it?
15        As part of your investigation, did you look at a deposit
16   on 9/11, 2012 from Cheryl Perez?
17   A    Yes.
18   Q    Is that highlighted here in that row?
19   A    It is.
20   Q    And as part of your investigation, what did you find as to
21   that 9/11/2012 transaction?
22   A    Cheryl Perez deposited a $100, on the JPay account of
23   Michael Lerma while he was housed at Pelican Bay State Prison.
24   Q    Can we go to the deposits on October 14, 2014.
25        Do you see a deposit on October 14, 2014?
```

1    A    Yes.

2    Q    As part of your investigation, did you review that

3    document and did it have significance as part of your

4    investigation?

5    A    Yes.

6    Q    What was it?

7    A    That it appears to be Cheryl Perez's daughter, Trish,

8    depositing $150 on to the JPay account of Michael Lerma while

9    he was housed at Pelican Bay State Prison.

10   Q    Going to a deposit on December 24th, 2014.

11        As part of your investigation, did you know any

12   relevance as to this deposit?

13   A    Yes.

14   Q    What is that relevance?

15   A    It appeared to be the daughter of Cheryl Perez, Trish

16   Salas, depositing $200 on to the JPay account of Michael Lerma

17   while he was housed at Pelican Bay State Prison.

18   Q    Drawing your attention to June 2014, as part of your

19   investigation, did you notate a deposit on this date, between

20   Trisha Salas or Perez and Defendant Michael Lerma?

21   A    Yes.

22   Q    What was the significance, if any, as to your

23   investigation to their deposit?

24   A    It was another deposit on to the JPay account of Michael

25   Lerma.  This time for $100 and at this time, Michael Lerma

1    appears to be housed in the Corcoran State Prison, not Pelican

2    Bay State Prison.

3    Q    Directing your attention to August 26, 2015, as part of

4    your investigation, did you know any significance as to this

5    transaction?

6    A    Yes.

7    Q    Who is this -- or who is this transaction from?

8    A    It is again from a Trish Salas of $100 on to the JPay

9    account of Michael Lerma, who is still at Corcoran Prison.

10    Q    So were all of these deposits from Cheryl Perez and her

11    daughter, Trisha Perez, to defendant, Michael Lerma, while he

12    was in custody?

13    A    Yes.

14    Q    And in your own words, what is the significance of

15    payments like these as it relates to your investigation?

16             MS. DERBY:  Objection.  Calls for an opinion.

17             THE COURT:  Rephrase your question.

18    BY MR. GORN:

19    Q    In your lay opinion, was there any reason why you looked

20    at these documents to further your investigation?

21    A    Yes.

22    Q    What was it?

23    A    To establish or to determine if there was a connection

24    between the two individuals.

25    Q    In your opinion, was there a connection?

```
 1   A     Yes.

 2   Q     Is that displayed because of these financial transactions?

 3   A     And further investigation, yes.

 4   Q     At a certain point in your investigation, did you focus on

 5   a July 2013 assault with a firearm incident in the City of

 6   Covina?

 7   A     Yes.

 8   Q     For some of us that don't know that area, where is Covina?

 9   A     Covina is approximately the middle of the San Gabriel

10   Valley, off of the 10 freeway, neighboring West Covina, which

11   is the larger city.

12   Q     As that investigation progressed, did you obtain

13   information that led to, I believe, that Seferino Gonzalez,

14   Kelly Deshannon, Defendant Jose Gonzalez and Cheryl Perez were

15   involved in that assault?

16   A     Yes.

17   Q     In summary, what did you investigate and what did you

18   find?

19   A     In summary --

20         MS. DERBY:  Objection, Your Honor.  Calls for a

21   conclusion and a very lengthy answer that we're not able to

22   properly assess and object to.

23         MR. KHOJAYAN:  Narrative, 702, 403.

24         THE COURT:  I will allow him to respond to what in

25   fact, he did investigate.
```

1          I will allow that first part.  As to the second portion,

2     we will see what happened to the first part, after his answer.

3               THE COURT:  Before we do that, why don't we take a

4     break, we will start again at 11 o'clock.

5               (The jury exits the courtroom at 10:45 a.m.)

6               THE COURTROOM DEPUTY:  Please come to order.

7               THE COURT:  We're missing some people.

8          Let me ask counsel, somebody wanted to bring something

9     to my attention?

10              MS. LUCAS:  No, Your Honor.  Yes, Your Honor, Amy

11    Lucas for Defendant Sanchez.

12         I have been sitting here listening to many of these

13    objections and sidebars, and, you know, to avoid running up to

14    podium and having a sidebar every time this comes out, I think

15    we need to lodge our objection and concerns with you and talk

16    to you about it.

17         I have been looking at the case law, I know that *Serna*

18    was cited in a lot of the motions in limine briefing that

19    predated trial.

20         And the concern we have with Agent Talamantez is that a

21    key element of RICO is the structure organization, and

22    management of the affairs of the racketeering enterprise that

23    the government alleges.

24         And they are supposed to be proven by facts.  And they

25    should be coming in through documents and wiretaps and

1   cooperating witnesses, and undercover officers, and the like,

2   instead of law enforcement opinions, especially on a case

3   agent.

4        *Serna* was actually a case that was decided in the

5   context of experts.  Even worse, here, in *Serna* they said it is

6   not appropriate, you can't have a highly partisan police

7   officer coming in and establishing the elements of your case

8   through someone who is offering opinions instead of offering

9   facts.

10       That is exactly what we're seeing here.  Every time he

11  is asked, and what did you conclude, what did that mean to you.

12       The jury is supposed to be looking at facts, so the

13  problem we have is if he wants to come in and authenticate

14  documents or photographs, or put in a wiretap that he recorded,

15  subject to any other objections under the rules of evidence,

16  that would be fine.

17       But having him say, as an undisclosed expert, who we

18  don't have a Rule 16 disclosure for, we don't have his prior

19  testimony, we don't have what his opinions are, tying it up

20  with a bow, based on his 22 years of being a law enforcement

21  agent and investigating this case for over a decade or whatever

22  it was he testified to, is highly prejudicial, and it's not

23  appropriate.

24            THE COURT:  Let me hear a response from the

25  government.

1          MR. GORN:  We're not asking based on his 22 years of

2    experience.  We're not asking going back for all of this time,

3    we're saying, based on your investigation, what did your

4    investigation show as to this or that.

5          And right now, we're getting into the calls.  We're

6    always talking about the underlying facts of the case, when

7    this witness is talking about the status of his investigation,

8    and what he did.

9          And in terms of -- I don't know any specific really

10   objections at this point, I think right now, what counsel has

11   just described is very broad, but in terms of the specific

12   testimony as to gang membership, we went through all of the

13   tattoos and he's identifying all of these things as part of his

14   investigation, regarding the gang membership, which now ties

15   into our calls, which is what we're listening to, is discussing

16   racketeering activity as it relates to 12th Street and

17   Cherryville, in Pomona.

18         But there needs to be an underlying foundation as to who

19   these players are, when they are coming up in the calls.

20   That's what we have from this agent.

21         MS. LUCAS:  We don't see any distinction between

22   asking what was your conclusion in this investigation versus

23   what is your conclusion based on your 22 years of experience.

24         It's all still an opinion that was undisclosed.  Even if

25   it had been disclosed, which it wasn't, it's inappropriate to

1    prove elements of the crime through expert opinion.

2              THE COURT:  Well, are you saying that the RICO

3    elements cannot be established through expert opinion?

4              MS. LUCAS:  What I'm saying is, gangs existence, and

5    organization and history, should therefore, be proven through

6    undercover officers, cooperating witnesses, admissions by

7    defendants, co-conspirators statements, physical evidence,

8    documents, videos, photographs, wiretaps and recordings, not

9    through opinions of law enforcement who are, quote, highly

10   partisan.

11             THE COURT:  Do you have something to add?

12             MS. DERBY:  The only thing I would add is, this

13   would be so streamlined, let's start playing the documents, the

14   recordings, the search warrants.

15        Let's get into the evidence instead of asking him his

16   conclusions, what are his thoughts about after he did X, Y, Z.

17   Let's put on the evidence.

18             THE COURT:  Let me just ask, I had thought that the

19   RICO was the Mexican Mafia.

20             MR. NOVAK:  The RICO is the Michael Lerma cell.

21             THE COURT:  No, the Michael Lerma cell is, I

22   precluded reference to Michael Lerma cell.

23             MR. NOVAK:  No.  That's what the indictment says

24   what the Court precluded is expert testimony, that there is

25   such a thing.

1          THE COURT:  The reference to Michael Lerma cell,

2    it's not going to be the Michael Lerma cell, but the RICO is

3    the Mexican Mafia.

4          MR. NOVAK:  That's not what the indictment says.

5    The indictment says that the enterprise is the Michael Lerma

6    cell of the Mexican Mafia.

7          THE COURT:  No.  What they are describing is a

8    portion of the Mexican Mafia.

9          MR. NOVAK:  But what Ms. Lucas --

10          THE COURT:  In other words, they have to establish

11    that there is -- in other words, the RICO is the Mexican Mafia.

12          What we're talking about now, is the activities of a

13    portion of the Mexican Mafia.

14          MR. NOVAK:  The enterprise is defined -- the

15    enterprise is defined in the indictment as the Michael Lerma

16    cell of the Mexican Mafia.

17          What Ms. Lucas is saying, is that, she's right, this

18    Court has already precluded testimony by an expert.

19          THE COURT:  No.

20          MR. NOVAK:  About --

21          THE COURT:  No.  That's not what this Court

22    precluded insofar as the reference to the Michael Lerma cell.

23          I said they could not reference the Michael Lerma cell.

24          MR. NOVAK:  No, I'm going back to the Court's ruling

25    on the scope of Deputy Self, which this testimony has driven a

1    hole through the Court's order.

2        That is what we are saying.  We are using a

3    non-designated expert to testify to what the Court said an

4    expert cannot testify to, because the case law said it must be

5    proved through percipient witnesses.

6        THE COURT:  Everybody knew -- that Detective Self

7    was going to talk about the Mexican Mafia, and clearly the

8    Mexican Mafia is a RICO enterprise.

9        Now, this particular case, is not involving the entire

10   Mexican Mafia, it's concerns about the particular acts, the

11   overt acts that are the subject matters of the indictment.

12       I agree with you on that, they do have to establish that

13   through testimony.

14       But in terms of the overall context of the RICO

15   activity, it's the Mexican Mafia.

16       MS. DERBY:  Your Honor, I would just note that the

17   objection to the Michael Lerma cell, was the use of the word

18   cell.

19       So it could be called the Michael Lerma franchise.

20       THE COURT:  You are trying to back door these

21   things, you had so many objections to the reference to the

22   Michael Lerma cell, saying it's so prejudicial.

23       And now you are saying, well, actually it is a cell, we

24   don't want it to be called a cell, but we want the concept of

25   the cell to be the subject matter of action.  Then you

1    shouldn't have been objecting to the reference to the term, the

2    Michael Lerma cell.

3                MR. FURMAN:  Your Honor, can I be heard on that?

4         I wrote that pretrial motion.  As I wrote in my response

5    to the government's opposition, we don't have any opposition to

6    talking about the enterprise, because that is what the

7    government has alleged, is that this is about the Michael Lerma

8    enterprise.

9         We specifically noted words like, "cell," were

10   prejudicial, but I don't think that changes the scope of what

11   the government's alleged and what they need to prove.

12               THE COURT:  What we're all talking about is the

13   activities that are -- alleges the overt acts in this case,

14   which are the murder, which are the attempted extortion,

15   insofar as the car is concerned, those things are going to be

16   the subject matter of this action.

17        So, you know, in other words, the RICO is a sub-portion

18   of the Mexican Mafia.

19        In other words, individual members, criminal activities,

20   as part of the overall Mexican Mafia, I guess, if you wanted to

21   call it, like, some people wanted to refer to it as the

22   franchise, it was the particular actions of a franchise.

23               MS. LUCAS:  I think, Your Honor, what the objection

24   is about, is about proving that enterprise, however you want to

25   phrase it, cell, enterprise, Michael Lerma enterprise, proving

1    it through the opinions of the lead law enforcement agent, who

2    obviously is of the opinion that the cell exists or the

3    enterprise exists, and all of the things in the indictment are

4    true, because he is the lead investigating officer who has been

5    investigating, who has come to that conclusion, otherwise we

6    wouldn't be sitting here.

7         But is his opinions, that we are highly concerned about.

8         No. 1, because it's opinions at all.

9         No. 2, they are being offered as expert opinions, and

10   applying facts to draw opinions when he's not designated as an

11   expert.  Even if he were, it would still be inappropriate to

12   do.

13         MR. KAHAN:  There is a distinction between expert

14   and lay opinion testimony.

15         I think the briefing that I provided this Court,

16   regarding Detective Self, actually highlights the key cases

17   that discuss this.

18         *United States verses Holguin,* 51 F.4th 841, talks about

19   how testimony of government lay opinion, in that case, a

20   summary witness for a gang, is typically backed up by testimony

21   regarding investigative activities that could have supported a

22   witness's lay opinion about who players are, their lay opinion

23   about a person's membership in a gang, so long as there is a

24   proper foundation, such as listening to hours of jail calls.

25         I believe that is *United States versus Gatson,* 763 F.3d.

1    1189.

2        The *United States versus Barragan*, 871 F.3d. 689, so

3    long as what my colleague has been doing, is laying the

4    foundation for, I have looked at all of these photographs of

5    cherries on these guys and Sureno on these guys.

6        I have listened to phone calls between Seferino Gonzalez

7    and Cheryl Perez and Jose Valencia Gonzalez, because I have

8    done this investigative techniques, which he has described, I

9    conform the lay opinion as to who fits in the structure, who is

10   part of a gang, that is proper lay opinion, so long as the

11   foundation has been laid, and that is what is present here.

12       *Holguin* explicitly allows for that.  The only real

13   distinction there is --

14           THE COURT:  Let me stop both sides.  This is very

15   educational.

16       I'm bringing the jury back in.

17       If you want a particular ruling, make it at a time when

18   I'm not keeping the jury waiting.

19           MR. KAHAN:  I'm not asking for a ruling, I'm

20   providing the Court --

21           THE COURT:  I didn't say you were.

22       I will entertain the rest of it at a break or something,

23   we're keeping the jury waiting.

24       I'm going to bring the jury back.

25           MS. LUCAS:  We should address it at a later point,

1   sir.

2        The point was, we didn't want to keep jumping up and

3   objecting, if we could get clarity on what he is or is not

4   allowed to do, for the record.

5             THE COURT:  Feel free to just make your record.

6             MS. LUCAS:  Thank you, Your Honor.

7             THE COURTROOM DEPUTY:  All rise.

8             (Jury enters the courtroom at 11:15 a.m.)

9             THE COURT:  All right.  We will continue with the

10  direct examination.

11            MR. GORN:  Thank you, Your Honor.

12  BY MR. GORN:

13  Q    Special Agent Talamantez, as part of your investigation

14  did you learn of a person by the name of William McCord?

15  A    Yes.

16  Q    And how do you know him?

17  A    I spoke to him, and I know that he was an inmate in the LA

18  County Jail.

19  Q    Was he an inmate in LACJ around June and July of 2013?

20  A    Yes.

21  Q    Now, as to William McCord, did he go by Bill McCord?

22  A    Yes.

23  Q    And is it true that William McCord died as a result of a

24  motorcycle cycle accident?

25  A    That's correct.

```
 1   Q    And that was after your investigation in this case,
 2   correct?
 3   A    That's correct.
 4   Q    I want to show you an exhibit, if you can refer to
 5   Exhibit 503.
 6   A    Okay.
 7   Q    Do you recognize the individual in that photograph?
 8   A    Yes.
 9   Q    Who is it?
10   A    It's William McCord.
11   Q    Is that a true and accurate photo of who you know, William
12   McCord or Bill McCord to be?
13   A    Yes.
14              Mr. GORN:  Your Honor, the government would ask to
15   move in 503 and publish.
16              MS. DERBY:  No Objection.
17              THE COURT:  Admitted.
18                (Exhibit 503 received into evidence.)
19              MR. GORN:  Publishing Exhibit 503.
20            Is that Bill McCord?
21              THE WITNESS:  Yes.
22   BY MR. GORN:
23   Q    Around June and July of 2013, do you know where he was
24   living?
25   A    Yes.
```

```
1   Q     Where was that?

2   A     The North County Correctional Facility of the LA County

3   Jail.

4   Q     Did you hear through jail calls, communications between

5   Bill McCord and Seferino Gonzalez?

6   A     Yes.

7   Q     Now, based on your knowledge of this investigation, 2013,

8   was Bill McCord ever part of a Sureno gang of any kind, as far

9   as you know?

10  A     Let me clarify.

11        I heard them speak on the phone together.  They weren't

12  calling each other, they were both inmates.

13  Q     Understood.

14  A     What was your question?

15  Q     Based on your knowledge of this investigation, in 2013,

16  was Bill McCord ever part of a Sureno gang?

17  A     No.

18  Q     As part of your investigation, when you were looking at

19  jail calls, did you pinpoint and focus in on jail calls from

20  Seferino Gonzalez?

21  A     I did.

22  Q     Did you review those jail calls?

23  A     Yes.

24  Q     In preparation of testifying today, did you previously

25  review Government's Exhibits 200 through 232?
```

```
 1   A    Yes.

 2   Q    Then did you also review Government's Exhibit 293 and 294?

 3   A    Yes.

 4   Q    Just briefly, what are those exhibits?  There might be two

 5   binders, actually.

 6   A    It's definitely two binders.  Without getting the numbers

 7   back again, they are essentially CDs that contain the clips of

 8   the phone calls.

 9   Q    And are those the exhibits from calls that were provided

10   to you by LASD Task Force Officer, Devon Self?

11   A    Yes.

12   Q    And as part of reviewing those exhibits, did you also

13   review transcripts for each of those calls that would be marked

14   as 200A through 232A, as well as 293A, through 294A?

15   A    Yes.

16   Q    And did you review all of the English portions of the

17   transcripts with those corresponding calls?

18   A    Yes.

19   Q    Were those transcripts, to your knowledge, and from your

20   review, were they true and accurate as they related to the

21   audio contained in all of the Exhibits 200 to 232, 233 and --

22   excuse me, 293 and 294?

23   A    As best as we could, yes.

24   Q    Is it fair to say that sometimes the quality of the jail

25   calls is not perfect?
```

```
1   A     That is very correct to say, yes.

2   Q     Why is that?

3   A     A lot of use inside of the jail, probably heavy use, not

4   taken the best care of, so there is a lot of noise inside of

5   custody.

6         You know, they are talking sometimes in the middle of

7   dorms.  There is a lot of background noise.

8   Q     Is it fair to say that it is not from a telephone booth?

9   A     That is correct.

10  Q     And when you reviewed Exhibits 200 through 232, as well

11  as, 293 and 294, were those true and accurate clips of the

12  audio calls that Devon Self provided to you?

13  A     Yes.

14        MR. GORN:  Your Honor, at this time, the government

15  would move in Exhibits 200 to 232, as well as, Exhibits 293 and

16  294?

17        THE COURT:  Any objection?

18        MR. KHOJAYAN:  Yes, there are several 403

19  objections, I would like Your Honor to consider.

20        One is, objection 403 and 207.  I would like Your Honor

21  to read the transcript.  207 is misleading and highly

22  prejudicial, especially given the charges in this case.

23        215 is also 403, it's misleading and involves a

24  completely different incident, not related to the VICAR counts.

25  It's misleading in that regard.
```

1          216, same thing, misleading, entirely different

2     incidents.

3               MR. GORN:  What number, counsel?

4               THE COURT:  216.

5               MR. KHOJAYAN:  216, 215, 217, 218 are all unrelated

6     to the VICAR counts and it's misleading, especially given the

7     dates that phone calls -- it gives the implication that it's

8     related to the VICAR counts, when it's not.

9               MR. GORN:  This is a speaking objection.  I would

10    oppose counsel's objection.

11              THE COURT:  Let me stop.  I understand the nature of

12    the objection.  What is the government's response?

13              MR. GORN:  I would ask it be conditionally admitted.

14    Counsel can make the relevant objections.

15              THE COURT:  Well, the problem is, if it's going to

16    be played, the bell will be rung.  It can't be un-rung.

17         Let me ask this, I presume there are a lot of other

18    transcripts -- why don't I look at those over lunch.

19         I will give you my ruling over lunch, you give me the

20    transcripts of those and I will take a look over the lunch.

21              MR. KHOJAYAN:  I have no objection to the others,

22    207, 215, 218, what I object --

23              THE COURT:  But give me the transcripts now.

24    Somebody give me the transcripts now.

25              MR. GORN:  Can we approach with the transcripts?

1          THE COURT:  Sure.  All right.  So, at this point in

2    time then, we will be playing transcripts?

3          MR. GORN:  We will be playing the audio calls, and I

4    would also ask, though, to move in the relevant transcripts,

5    for all of those exhibits as well.

6          THE COURT:  All right.

7          MR. GORN:  Those are inter laid with the audio calls

8    that will be published to the jury.

9          THE COURT:  Let me indicate to the jury a couple of

10   things.

11         First of all, these calls will be in English or in

12   Spanish, I can't remember.  There will be a combination, I

13   guess.

14         MR. GORN:  Most of them are in English.  There are

15   portions -- there are a few calls, only seven, that include

16   some limited Spanish.

17         THE COURT:  Let me indicate to the jury as to these

18   transcripts.

19         First of all, when the item is an exhibit, the exhibit

20   as to recordings in the English language, it's actually the

21   recordings themselves that are the evidence.

22         The transcript is simply provided as, like, an aid, or

23   an assistance to you.  If you hear something different than

24   what is in the transcript, what you hear is actually the

25   evidence.

1          So the evidence is what is actually spoken in the

2   recording, not the transcription.

3          However, if there is a recording of some material that

4   is in another language, and there is a translation that is

5   provided to you, the evidence at that point in time of the

6   foreign language, with the foreign language, is actually the

7   official translation.

8          So even though some of you may know the language that's

9   being spoken in the recording, you are not to use your own

10  interpretation, you are supposed to use the interpretation that

11  is provided in official translation.

12         But I will give you a following provision, if somebody

13  feels the translation is so botched and you know the language,

14  I will allow you to raise your hand and bring it to my

15  attention, that is something that is bothering you, and I will

16  attempt to resolve it with the parties.

17         But unless you have that situation again, any foreign

18  language, you have to rely on the official translation.

19         Do all of you understand that?  Okay.

20              MR. GORN:  As to that, though, the remaining

21  exhibits, are those moved into evidence at this time?

22              THE COURT:  Which ones?

23              MR. GORN:  That would be everything besides 207,

24  215, 216,217, 218.

25              THE COURT:  I didn't hear an objection to all of the

1    other recordings, so I presume the answer is yes.

2                    MR. NOVAK:  The recordings.

3                    MR. GORN:  Not the transcripts, but the Spanish

4    transcripts, the government would ask they be admitted, Your

5    Honor.

6                    MR. KHOJAYAN:  No objection.

7                    THE COURT:  So yes, they are admitted.

8                    MR. NOVAK:  And that is 207, through 215 --  207 and

9    215.

10                   MR. GORN:  207 and 215.

11                   THE COURT:  207, 215 are not admitted at this time.

12   I'm reviewing 207, 215 through 218.

13                   Mr. NOVAK:  Thank you, sir.

14                   MR. GORN:  Yes.

15                   THE COURT:  So are we ready?

16                   MR. GORN:  So directing your attention to

17   Exhibit 200 from July 27th, 2013, playing from the beginning to

18   ten seconds in.

19                       (Audio played in open court.)

20   BY MR. GORN:

21   Q    So were you able to hear the recording?

22   A    Yes.

23   Q    It is so loud I think all of us could.

24        This recording that says, this is a prepaid call from

25   Seferino.

1       Do you recognize who says the name, Seferino?

2   A   Yes.

3   Q   And based on your knowledge, who is the person saying the

4   name, Seferino?

5   A   Seferino Gonzalez.

6   Q   And where does the recording state that Seferino Gonzalez

7   is making the call from?

8   A   North County Correctional Facility.

9   Q   Based on your review of the jail calls, that LASDTFO Devon

10  Self provided to you, does this excerpt play on every single

11  outgoing call from every inmate call in the LASD facility?

12  A   Yes.

13  Q   So even though these excerpts that you review, don't have

14  this admonition, this came with every one of those calls,

15  correct?

16  A   Every call begins with the same admonition, and it's

17  periodically repeated throughout the phone call.

18  Q   As part of your investigation, around June and July

19  of 2013, did you learn any information that Seferino Gonzalez

20  fell into a financial debt?

21  A   Yes.

22  Q   And who did he become indebted to?

23  A   Cheryl Perez.

24  Q   How were you able to determine that specifically?

25  A   From listening to the jail calls of Seferino Gonzalez.

1    Q    Turning your attention to now, government's Exhibit

2    No. 201 from June 27th, 2013.

3         You reviewed that exhibit before coming in to court

4    today, correct?

5    A    Yes.

6    Q    We will just play that beginning and stop it.

7                   (Audio played in open court.)

8    BY MR. GORN:

9    Q    Do you recognize the male voice that says, what did Cheryl

10   say?

11   A    Yes.

12   Q    Who was that?

13   A    Seferino Gonzalez.

14   Q    Based on your listening to these calls, were you able to

15   determine who Seferino Gonzalez is referring to, when he said

16   Cheryl?

17   A    Yes.

18   Q    And who is that?

19   A    Cheryl Perez.

20   Q    From this call, were you able to determine who the woman's

21   voice belonged to?

22   A    Yes.

23   Q    Who is that?

24   A    Kelly Deshannon.

25   Q    When Ms. Deshannon says, I have about $2,000 that she gave

```
 1   us, who do you believe Kelly Deshannon was referring to?
 2              MS. DERBY:  Objection.  Calls for speculation.
 3              THE COURT:  I will sustain the objection.  You have
 4   to rephrase it.
 5              MR. GORN:  Sure.
 6   BY MR. GORN:
 7   Q    Did -- based on the call, did Ms. Deshannon reference who
 8   she was talking to?
 9   A    Yes.
10              MS. DERBY:  Objection.  The call can speak for
11   itself.
12              MR. GORN:  I could rephrase.
13   BY MR. GORN:
14   Q    As part of your investigation, Special Agent Talamantez,
15   from this call, did you believe that Seferino Gonzalez was in
16   debt?
17   A    Yes.
18   Q    And from this call, as part of your investigation, did you
19   believe that he was -- he was in debt to Cheryl Perez in part?
20   A    Yes.
21              MS. DERBY:  Objection.  There is no foundation.
22   Just play the call.
23              MR. GORN:  We did.
24              THE COURT:  Again, you are not wearing black like I
25   am.
```

```
 1            I don't think you can order that.  I understand your
 2     position.  Rephrase the question.
 3     BY MR. GORN:
 4     Q     In your opinion, from reviewing this jail call, do you
 5     believe that Kelly Deshannon was referring to Cheryl?
 6     A     Yes.
 7     Q     And that is Cheryl Perez?
 8     A     Yes.
 9     Q     When Ms. Deshannon references Swifty in the call, based on
10     your opinion, did you understand this to mean defendant, Jose
11     Valencia Gonzalez?
12     A     Yes.
13     Q     And can you just describe, based on your opinion, what was
14     the arrangement being described as it related to defendant,
15     Jose Valencia Gonzalez in this case?
16            MR. KHOJAYAN:  Object.  Speculation, lacks personal
17     knowledge.
18            THE COURT:  You need to lay a foundation for that.
19     BY MR. GORN:
20     Q     Was there anything, in particular, about this call, that
21     made you believe there was an arrangement between Jose Valencia
22     Gonzalez, Cheryl Perez, and Seferino Gonzalez?
23            MR. KHOJAYAN:  Objection.  Improper lay opinion,
24     speculation.
25            THE COURT:  Rephrase the question.
```

```
 1  BY MR. GORN:

 2  Q    As part of your investigation, did you look at this call

    as a call that showed a debt between Seferino Gonzalez and

 3  Cheryl Perez?

 4

 5  A    Yes.

 6  Q    As part of your investigation, did you note anything

 7  particular about defendant, Jose Valencia Gonzalez's

 8  involvement in this call?

 9  A    Yes.

10  Q    Did you make a determination or form an opinion based on

11  this call as to what defendant Jose Valencia Gonzalez

12  involvement was?

13           MR. KHOJAYAN:  Objection.  Improper lay opinion.

14           MS. DERBY:  Objection, calls for speculation.

15           THE COURT:  You can attempt to rephrase the

16  question.

17  BY MR. GORN:

18  Q    We will move to Exhibit 202 from July 1st, 2013.

19           Special Agent Talamantez, did you also review this call

20  before coming into court today?

21  A    Yes.

22  Q    And if we can just play the first ten seconds of this

23  call.

24                     (Audio played in open court.)

25  BY MR. GORN:
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     So sir, do you recognize the first man's voice in
 2   Exhibit 202?
 3   A     Yes.
 4   Q     And whose voice does that belong to?
 5   A     Seferino Gonzalez.
 6   Q     And is Seferino Gonzalez from this call, the individual
 7   that said Cheryl is going to put up the money, no matter what
 8   dude, the 4- to $5,000, the whole $5,000?
 9   A     Yes.
10   Q     And the woman's voice that followed, that said yes, and I
11   will agree to do it, whose voice does that voice belong to?
12   A     Kelly Deshannon.
13   Q     And we will keep playing now.
14                     (Audio played in open court.)
15   BY MR. GORN:
16   Q     Referring to the period where Seferino Gonzalez says that
17   car is not being sold for whatever reason.
18         Is part of your investigation, did you focus on a car
19   that Seferino Gonzalez was attempting to obtain?
20   A     Yes.
21   Q     And as part of this call, did you view that his statement
22   about this car not to be sold for whatever reason was going to
23   play a part in your investigation?
24              MS. DERBY:  Objection.  Calls for speculation, which
25   car.
```

```
 1              MR. KHOJAYAN:  Vague, Your Honor.
 2              THE COURT:  Rephrase the question.
 3  BY MR. GORN:
 4  Q    Referring to the period where Seferino Gonzalez states
 5  that the car is not to be sold for whatever reason, from your
 6  review of the jail calls in this case, what is Seferino
 7  Gonzalez talking about?
 8  A    In this call, he's talking about his car that he shares
 9  with Kelly Deshannon, a Chrysler, that they are providing the
10  pink slip for, as collateral.
11              MS. DERBY:  Objection.  Lack of foundation for that
12  opinion.
13              THE COURT:  You need to lay the foundation for his
14  response.
15  BY MR. GORN:
16  Q    Sure.  We will move to Exhibit 203.
17          For July 1st of 2013, if we can start from the beginning
18  and play until the end.  Thank you.
19                      (Audio played in open court.)
20  BY MR. GORN:
21  Q    The woman's voice in this call, are you able to identify
22  that woman's voice?
23  A    Yes.
24  Q    Who is it?
25  A    Kelly Deshannon.
```

1    Q    And the male voice?

2    A    Seferino Gonzalez.

3    Q    As part of your investigation, did you look at this phone

4    call?

5    A    Yes.

6    Q    And why did you look at this phone call as part of your

7    investigation?

8    A    To understand a debt that Seferino owed to Cheryl.

9         MS. DERBY:  Objection.  Calls for speculation, lacks

10   foundation.

11        THE COURT:  Overruled.  He's indicating why he

12   looked at it.

13   BY MR. GORN:

14   Q    And as part of your investigation, did you look at the

15   fact that Seferino Gonzalez stated that he was worried about

16   being quote, whacked?

17        MS. DERBY:  Objection.  Leading.

18        THE COURT:  I will sustain the objection.  Can you

19   rephrase the question?

20   BY MR. GORN:

21   Q    Around the time of this phone call in July of 2013,

22   July 1st, did you listen to jail calls where Seferino Gonzalez

23   indicated a plan by which he would pay Cheryl Perez back?

24   A    Yes.

25   Q    What was that plan based on your review of the jail calls?

1          MS. DERBY:  Objection.  The calls will speak for

2    themselves.

3          MR. GORN:  This is a summary witness, Your Honor.

4          THE COURT:  Well, let me put it this way, is that

5    conversation going to be played back?

6          MR. GORN:  Yes.

7          THE COURT:  Well, I will simply -- I will sustain

8    the objection, but at the time the recording is played back,

9    you can ask the witness, is that the recording that you were

10   referencing here.

11         MR. GORN:  Yes, Your Honor.

12         THE COURT:  Okay.

13   BY MR. GORN:

14   Q    We will go to Exhibit 224.

15                (Audio played in open court.)

16   BY MR. GORN:

17   Q    By July 14th, 2013, when this call was made, did you find

18   any information from the jail calls that a debt was repaid

19   already to Cheryl by Seferino Gonzalez?

20         MS. DERBY:  Objection.  Lack of foundation.

21         THE COURT:  I will allow him to answer that

22   question, yes, no, I do not understand the question as asked,

23   or I cannot answer the question as asked.  It's only those four

24   choices.

25                THE WITNESS:  Can you repeat?

```
 1    BY MR. GORN:
 2    Q    Up until July 2013, when you reviewed the jail calls, did
 3    you ever hear a call by which Seferino Gonzalez had paid back a
 4    debt to Cheryl Perez?
 5    A    No.
 6    Q    So on this call from July 14th, 2013, as part of your
 7    investigation, did you find any relevance as to the part of
 8    Seferino Gonzalez airing out that he thought he would end up
 9    dead?
10             MR. FURMAN:  Objection.  Calls for improper
11    testimony.
12             MS. DERBY:  Your Honor, there is no foundation.
13             MR. GORN:  It's been played.  His opinion is it
14    furthers his investigation.
15             THE COURT:  I will allow you to rephrase the
16    question, but we will see.
17    BY MR. GORN:
18    Q    Based on your investigation, your review of the phone
19    calls, and your knowledge of the individuals in this call, did
20    you form an opinion as to what Seferino Gonzalez is referring
21    to when he says he would end up dead?
22             MR. FURMAN:  Objection.  Improper opinion testimony.
23             MR. KHOJAYAN:  Speculation.
24             THE COURT:  Let me have counsel on sidebar.
25                       (Sidebar begins.)
```

```
 1              THE COURT:  For them, it's a walk in the park.

 2         Let me ask, are you going to be citing to other

 3    evidence?  I don't understand what basis this witness is going

 4    to give a response to that question, unless it's going to be

 5    referring to something else.

 6         If you have something else, why don't you refer to

 7    something else.

 8              MR. GORN:  We're talking about the jail calls here.

 9              THE COURT:  I understand that, but in other words,

10    you are asking this witness to give an explanation of this

11    comment.

12         I don't understand what the basis is for him giving a

13    further explanation of this comment, it says what it says.

14              MR. GORN:  No, but it talks about all this is about

15    the motivation of why he's about to steal the car and the

16    assault and everything that is going on, because he needs to

17    know --

18              THE COURT:  There is references to these recordings

19    about a debt.

20              MR. GORN:  Yes.

21              THE COURT:  Okay.  But all of the other stuff you

22    are talking about, I don't see the connection.

23         All it says, he is afraid of ending up dead, because

24    something has to be taken care of.

25              On what basis is this witness going to say, what it is
```

1    that this is going to be taking care of, unless you are going

2    to cite to something else, and it is going to come in the

3    evidence, in which case you can ask him about the other item --

4              MR. GORN:  The thing is about these calls, they are

5    cinched together, in terms of their relevance.

6          Your Honor can't look at one call, and say what does

7    this say.

8          It should be conditionally approved, to cinch to other

9    calls, that are coming in right after, about the car he's about

10   to steal.

11             THE COURT:  Well, refer to the other --

12             MR. GORN:  What I said, based on the calls.

13             THE COURT:  But he hasn't identified any of the

14   other calls.  I don't know what he's talking about.

15             MR. GORN:  We will play all of the calls.

16             THE COURT:  No, what you do is you play all of the

17   calls, then you go backwards and then you see this portion.

18         Does this statement here, relate to this statement here

19   and on what basis are you stating what it refers to.

20             MR. GORN:  We will streamline it.

21             THE COURT:  I don't know if it will streamline it,

22   but it will make more sense.

23             MR. GORN:  Okay.

24                     (Sidebar ends.)

25   BY MR. GORN:

```
 1   Q     Going to Exhibit 204 from July 14th, 2013, did you also

 2   review that exhibit?

 3   A     Yes.

 4   Q     And if we can just play.

 5                    (Audio played in open court.)

 6   BY MR. GORN:

 7   Q     Is the male voice in that call, are you able to identify

 8   that individual?

 9   A     Yes.

10   Q     Who is that?

11   A     Seferino Gonzalez.

12   Q     And the woman's voice in the call, who is that?

13   A     Kelly Deshannon.

14   Q     Now, as for context, when Seferino is talking about going

15   away for a long time, is he referring to another individual

16   that you know?

17   A     Yes.

18                MS. DERBY:  Objection.  Lacks foundation,

19   speculation.

20                THE COURT:  You can refer to some other transcript

21   or something like that, you know, but otherwise, I will sustain

22   the objection.

23                MR. GORN:  We will go to another exhibit,

24   Exhibit 205.  Did you review that exhibit before coming to

25   court today?
```

```
 1                THE WITNESS:  Yes.

 2   BY MR. GORN:

 3   Q    That is from July 6, 2014.  We can start playing here.

 4                     (Audio played in open court.)

 5   BY MR. GORN:

 6   Q    Now, the man's voice in this call, do you recognize who

 7   that is?

 8   A    Yes.

 9   Q    Who is that?

10   A    Seferino Gonzalez.

11   Q    And the woman in the call, do you know who that is?

12   A    Yes.

13   Q    Who is that?

14   A    Cheryl Perez.

15   Q    Now, did you also review Exhibit 206, a jail call from

16   July 6, 2013?

17   A    Yes.

18   Q    If we can just load that up and play it.

19                     (Audio played in open court.)

20   BY MR. GORN:

21   Q    So the first man's voice, is that Seferino Gonzalez?

22   A    Yes, it is.

23   Q    And later in the call, the individual that says, yeah,

24   yeah, yeah, 624.

25        Do you recognize that person's voice?
```

```
 1   A     Yes.

 2   Q     Who is that?

 3   A     William McCord.

 4   Q     And the woman in the phone call, do you recognize whose

 5   voice that is?

 6   A     Yes.

 7   Q     Who is that?

 8   A     Kelly Deshannon.

 9              MR. GORN:  If we can continue playing.

10                 (Audio played in open court.)

11   BY MR. GORN:

12   Q     The mention of Erica, from the context of this call, are

13   you able to determine who Erica is?

14   A     Yes.

15   Q     Is that part of your investigation?

16   A     Yes.

17   Q     And who is Erica?

18   A     Erica Newell.

19   Q     Now, I want you to just briefly step away from the call,

20   and if you can pull up Exhibit 500, if you have that binder.

21   A     Okay.

22   Q     Do you recognize Exhibit 500?

23   A     Yes.

24   Q     What is that an exhibit of?

25   A     Erica Newell.
```

```
 1   Q    Is that a photograph of Erica Newell?

 2   A    It is.

 3   Q    Is that a true and accurate photo of who you know Erica

 4   Newell to be?

 5   A    Yes.

 6   Q    Have you previously interacted with her?

 7   A    Yes.

 8             MR. GORN:  Your Honor, at this time government would

 9   move Exhibit 500 into evidence.

10             MR. KHOJAYAN:  No objection.

11             THE COURT:  All right.  It's admitted.

12             (Exhibit 500 received into evidence.)

13             MR. GORN:  If we could briefly publish.

14        Publishing to the jury, Exhibit 500, is that the person

15   you know as Erica Newell?

16             THE WITNESS:  It is.

17   BY MR. GORN:

18   Q    Have you spoken with her previously?

19   A    I have.

20   Q    Now, I want to go to Exhibit 208.

21        And you reviewed 208 before coming to court today?

22   A    Yes.

23   Q    That is another excerpt of a jail call?

24   A    Yes.

25   Q    From July 9th, 2013.  If we can play to the end.
```

1                        (Audio played in open court.)

2    BY MR. GORN:

3    Q    Exhibit 208, the man's voice in this phone call, who is

4    that?

5    A    Seferino Gonzalez.

6    Q    Excuse me, I misspoke.  This is from July 10th, 2013,

7    correct?

8    A    July 10th.

9    Q    And the woman's voice in that call, who does that voice

10   belong to?

11   A    Cheryl Perez.

12   Q    Moving on to government's Exhibit 209, from July 11th,

13   2013.

14        Did you also review that exhibit before coming to court

15   today?

16   A    Yes.

17   Q    Is that another excerpt from a jail call?

18   A    Yes.

19   Q    And if we can just play that?

20                        (Audio played in open court.)

21   BY MR. GORN:

22   Q    Sir, we stopped about 15 seconds into the call.

23        Do you recognize the male voice in this call?

24   A    Yes.

25   Q    Who is that?

1    A      Seferino Gonzalez.

2    Q      And the woman's voice in the call, who is that?

3    A      Kelly Deshannon.

4             MR. GORN:  You can continue playing.

5                 (Audio played in open court.)

6             THE COURT:  Would that be a good time to stop?

7             MR. GORN:  Can I identify the voices on the call?

8             THE COURT:  Sure.

9    BY MR. GORN:

10   Q      Special Agent Talamantez, did you recognize the male's

11   voice in this call?

12   A      Yes.

13   Q      Who is it?

14   A      Seferino Gonzalez.

15   Q      As for the woman's voice in Exhibit 209, do you recognize

16   who that is?

17   A      Yes.

18   Q      Who's that?

19   A      Kelly Deshannon.

20            MR. GORN:  Are we going to break for lunch?

21            THE COURT:  Let me ask the jury to come back at five

22   after 1:00.

23        Please do not talk about this case.

24        Have a very pleasant lunch, I will see you back at five

25   after.

```
1                    (Jury exits the courtroom at 12:00 p.m.)

2               THE COURTROOM DEPUTY:  You may be seated.

3                         (Lunch recess.)

4               THE COURTROOM DEPUTY:  Please be seated.  This

5     United States District Court is again in session.

6               THE COURT:  Let me ask counsel, have you resolved

7     any matters while I was at lunch?

8               MR. KAHAN:  No.

9               THE COURT:  That is to be expected.

10              MS. NG:  Your Honor, there is one matter, we had one

11    witness, FBI Trevor Twitchell, he's the government's interstate

12    nexus expert.

13         Unfortunately, he's unavailable for all next week, but

14    he is here today, and we have raised this with defense counsel

15    and we would ask for the Court's permission if we could

16    possibly have Agent Twitchell testify out of turn today and

17    even now?

18              THE COURT:  Sure.  Let me ask the defense counsel,

19    any problem?

20              MS. DERBY:  No objection.

21              MR. KHOJAYAN:  No objection, Your Honor.

22              THE COURT:  Let me ask, insofar as the objected to

23    transcripts, let me ask the government, what is the relevance

24    of 207, 215 and 216?

25              MR. GORN:  Can I have just one moment, Your Honor?
```

1          THE COURT:  Sure.

2          MR. GORN:  So, Your Honor, this is in regards to

3    getting the car and they are talking about Jose Valencia

4    Gonzalez.

5          THE COURT:  Which particular transcript are you

6    talking about?

7          MR. GORN:  I'm talking about 207A.

8          THE COURT:  It doesn't mention a car.

9          MR. GORN:  But the greater context of this and what

10   is happening, remember --

11         THE COURT:  Let me stop you.  I don't mind the

12   greater context, but again, it's not show here, and so when you

13   are talking about greater context, I suppose you are talking

14   about something else that links this conversation and puts it

15   in the context of the greater context.  So you have to tell me

16   what that item is, which I don't see, you haven't pointed it to

17   me, that is the problem I have.

18         MR. GORN:  If I could just have one moment.  So in

19   succession, because there is multiple days of these calls,

20   where Seferino Gonzalez is trying to get this car, Your Honor

21   has already heard that they're talking and discussing about

22   introducing defendant Jose Valencia Gonzalez into this, that is

23   Seferino's brother, they are talking about him -- inserting

24   into this to forcibly take the car.

25         THE COURT:  How do we know that the term "your

1    brother" means that brother?  He has more than one brother.

2              MR. GORN:  Because, Your Honor, what we have in the

3    jail calls, we're always talking about Jose Valencia Gonzalez.

4              THE COURT:  I'm glad you know that.

5              MR. GORN:  Carlos Gonzalez is not mentioned in the

6    calls that we're producing to the jury as to this.  The

7    evidence as it shows and as it plays out in all of the calls is

8    that defendant Jose Valencia Gonzalez is the individual that is

9    doing this.

10             THE COURT:  It might be something, but that's the

11   problem.  I can understand that is the contention, but you just

12   kind of say, "Oh, okay, it's this."

13        The way you know that is because you know everything, I

14   suppose, that is in the record.  The jury doesn't know anything

15   that's in the record at this point in time.

16        Therefore, the problem is that -- again, I have no

17   problem with if you have -- you lay a foundation for the answer

18   to this question, but you don't.  And that's the problem that

19   we're going over and over and over again, spending a horrendous

20   amount of time, because you're not laying the foundation for

21   this.  That is the problem.

22             MR. GORN:  Understood.  I can lay foundation,

23   though, that there aren't calls about Carlos Gonzalez about

24   this and --

25             THE COURT:  You can ask your witness, you know, the

1    word "brother" in this, in all of the phone conversations,

2    which you monitored and which you heard, was there any other

3    brother of Mr. Gonzalez other than this brother?  Okay.

4           So that helps.  I don't know if it establishes it

5    necessarily, but it helps.

6           MR. KHOJAYAN:  Your Honor, let me say something.  So

7    this call 207, the date is July 9th.  Jose Gonzalez is not

8    purportedly told or suggested to participate in this attempt to

9    get the Mercedes until July 12th.

10          This July 9th call -- and there's -- all these calls are

11   much more longer than the small snippets that have been

12   selectively chosen here.  This call --

13          THE COURT:  Let me stop you.  The defense could ask

14   for the other portions to be included.

15          MR. KHOJAYAN:  Well, not -- the other problem with

16   this call -- I would, and I'm thinking about that, but the

17   problem with this call, this is in reference to other activity,

18   not this alleged VICAR.

19          THE COURT:  How do you know that?

20          MR. KHOJAYAN:  Because the timing of it.  This is

21   July 9th, July 12th is when -- because they are about to play

22   it.  July 12th is where they suggest Swifty.

23          THE COURT:  But there is no indication in this that

24   anybody is asking the brother at that point in time to do

25   something now.

1          MR. KHOJAYAN:  Precisely.

2          THE COURT:  Yes, but it could be asked in the

3   future.

4          MR. KHOJAYAN:  That is going to come, but this --

5   the other problem with this phone call because it's not

6   referencing car, that we have all agreed, the language here,

7   "You know what he is capable of, I know what he's capable of."

8   He's being also charged with murder in this case, so that's

9   what this implies, he's capable of any violent crime of murder,

10  et cetera, it allows that argument -- it allows the jury to

11  speculate about that language.  There is something

12  significantly wrong, a 403 prejudice with this excerpt being

13  played.

14         THE COURT:  What is your response?

15         MR. GORN:  I'll take it in two parts.  Number 1 in

16  the government's trial brief we talked about conspiracies, and

17  the fact that this conspiracy -- even if counsel is correct,

18  that Defendant, Jose Valencia Gonzalez, did not come into the

19  scene until July 11th.

20       Your Honor, the litany of case law shows even before the

21  conspirator enters into the conspiracy evidence of this general

22  conspiracy can come in because all of this in July 9 is going

23  to define the role of defendant Jose Valencia Gonzalez when

24  he's clearly part of the conspiracy in the very jail calls that

25  we play later.

1        The trial memorandum from the government has included

2   that.

3        What the government has also included in the trial

4   memorandum is that up until this point -- and this is the first

5   time the government has heard this, is that now the defense is

6   considering bringing in additional statements for context,

7   which was never the defendants' plan, it was never notified to

8   the government, and that's the first time we're hearing about

9   that.

10       MR. KHOJAYAN:  Well, the government's exhibits keep

11  changing and they are getting shorter and shorter, but really

12  the problem here, even if it is for context, this context, this

13  particular call is way too much.  "You know what he's capable

14  of," that's --

15       THE COURT:  Let me stop you, I understand your

16  argument, I will make my decision in a second.

17            What is the relevance of 215, the same?

18       MR. GORN:  215 is completely different.  216 and 215

19  are completely different.  These go directly to the heart of

20  the structure evidence and the actual conspiracy itself.

21       In 215 what you hear is that Cheryl Perez as the senora,

22  because she's so high up other gangs are coming to her asking

23  her for things which she is referring to "toys," which are

24  firearms, Your Honor.  What you also --

25            THE COURT:  Let me stop you.  How do we know that?

1          MR. GORN:  I'm sorry?

2          THE COURT:  How do we know that?

3          MR. GORN:  It's common parlance in calls.  This

4    witness can testify as to from all of his experience using

5    coded language and the calls that he's heard in terms of

6    communications between individuals asking for firearms the term

7    "toys" is common parlance for firearms.

8          THE COURT:  Is he testifying that as an expert or is

9    he testifying as --

10         MR. GORN:  Lay opinion based on the conversations

11   he's overheard in the jail calls as to what they're talking

12   about.

13         Because the greater context of this in 215 is the

14   government's argument is that defendant Lerma, the brother, and

15   the Mexican Mafia, who is a 12th Street gang member, is

16   actually giving control to Cherryville.  But on the streets

17   when a 12th Street gang member, who they are referencing in

18   this 215 call is asking for guns from Cherryville -- a

19   Cherryville senora, that on the streets indicates problems and

20   that's really the greatest context of that call.

21         But it also shows that Cheryl Perez, as the senora, she

22   is fielding all of questions from the gang members in Pomona

23   and that's what this shows.

24         The second part of that call is talking about a brother.

25   And that is the statement which is Mike Lerma, brother in the

1   Mexican Mafia, the enterprise we're talking about, has given

2   control to Cherryville gangs, which is not his gang, it is

3   Cheryl Castaneda Perez's gang and her affiliation and she's the

4   senora, she's running the show.  That's why you have the

5   statements saying "because your brother would not have given up

6   anything if he didn't trust them."

7                THE COURT:  Javier, are the jurors all here?

8                THE COURTROOM DEPUTY:  Yes.

9                THE COURT:  Is that the same for 216?

10               MR. GORN:  216 is talking about taxing.  These

11   low-level drug dealers that are complaining about extorted and

12   taxed because Cheryl Castaneda Perez, the senora, as well as

13   Swifty, the defendant Jose Valencia Gonzalez, were running all

14   of the drug dealers and taxing them and this is a conversation

15   about that.  It directly goes into the enterprise and the

16   conspiracy.

17               THE COURT:  Let me ask defense counsel, what is your

18   objections to 17 and 18?

19               MR. KHOJAYAN:  The 17 and 18 -- 17 discusses Dopey,

20   and that discussion on 217 has nothing to do with the VICAR

21   that is charged.

22          The reason I bring these up, especially 215, 216, 217,

23   218, the timing of it and especially if the agent testifies

24   that toys are guns, which of course I object to improper lay

25   opinion, but if that comes in, then the implication is that

Dopey was going to be used for the attempt to get the

Mercedes -- even though that's not true, we know that is not

true, this is just other criminal activity that is being

discussed in the many phone calls and I don't want that false

implication to be given to the jury.  This misleading

impression that first they went to Dopey, Dopey with the toys

and then they come to Swifty for the Mercedes.

These are completely separate events and so for those

reasons I seek 215, 216, 217 -- and 218 discusses going to the

"compound" which, again, is not related to the VICAR.

I get it, they want to say it's related to Count 1 --

MR. GORN:  It's an overt act.  It's part of the

conspiracy.  The compound is referenced in the indictment, Your

Honor.

MR. KAHAN:  Sorry to barge in, Your Honor,

everything else regarding overall context or who was or not

involved in incidents, that can be explored on cross.  What we

have here is evidence of the nature of the enterprise, the

structure of the enterprise, the goals and methods of the

enterprise.

The government should be allowed to introduce all

aspects of how this enterprise operated, including in its

conspiracy and buildup to a vicious assault incident.

THE COURT:  Anything else from either side?

MR. KHOJAYAN:  Pardon?

```
1          THE COURT:  Anything else from either side on this?

2          MR. KHOJAYAN:  No, Your Honor.

3          THE COURT:  I will exclude 207.  I will allow 215 to

4    218.

5         Let's bring the jury in.

6          MR. GORN:  Are we going to call Twitchell, Your

7    Honor?

8          THE COURT:  If you want to, I said you could if you

9    wanted to and so I presume if you want to you can call him.

10         MS. NG:  Thank you, Your Honor.

11         THE COURT:  Am I not making myself clear?  Maybe I

12   don't want to know the answer to that question.

13         (Jury enters the courtroom at 1:38 p.m.)

14         THE COURTROOM DEPUTY:  You may be seated.

15         THE COURT:  Good afternoon, ladies and gentlemen.

16   We're going to take a witness out of turn, because that witness

17   would be otherwise unavailable, so we're going to take the

18   witness out of turn and then once that is completed, we will go

19   back to the witness that was on the stand.

20         MS. NG:  The government calls FBI Special Agent

21   Trevor Twitchell.

22         THE COURT:  All right.

23         THE COURTROOM DEPUTY:  Sir, stop there, raise your

24   right hand.

25         Do you solemnly swear that the testimony you shall give
```

1    in the cause now before the Court, shall be the truth, the

2    whole truth and nothing but the truth, so help you God?

3              THE WITNESS:  I do.

4              THE COURTROOM DEPUTY:  Thank you, have a seat.

5    Please watch your step.  Thank you.

6         Sir, spell your name -- I'm sorry, state your name and

7    spell your last name for the record.

8              THE WITNESS:  My name is Trevor Twitchell,

9    T-W-I-T-C-H-E-L-L.

10                         TREVOR TWITCHELL,

11                    having been duly sworn,

12                    testified as follows:

13         MS. NG:  May I proceed?

14         THE COURT:  Yes.

15                    DIRECT EXAMINATION

16   BY MS. NG:

17   Q    Good afternoon, Agent Twitchell.

18   A    Good afternoon.

19   Q    Where do you work?

20   A    The FBI.

21   Q    What is your title?

22   A    Special Agent.

23   Q    How long have you been a Special Agent with the FBI?

24   A    For ten years.

25   Q    Can you briefly describe your training to become a Special

```
 1   Agent?
 2   A     Yeah.  To become a Special Agent we receive basic agent
 3   training at FBI academy in Quantico, Virginia.
 4   Q     What are your duties as a Special Agent?
 5   A     I'm currently assigned to the violent criminal
 6   investigation squad in Orange County.
 7   Q     Do you have any specialized training with respect to
 8   firearms and ammunition?
 9   A     I do.  On top of the --
10   Q     Can you describe that?
11   A     Yes.  On top of the month's worth of firearms training we
12   received at Quantico, I became a FBI firearms instructor and in
13   2020 I also got my accreditation as a firearm specialist.
14   Q     And do you handle the identification and classification
15   and determination of origin for any firearms --
16   A     I do.
17   Q     -- and for ammunition?
18         Are you familiar with the term "Interstate Nexus
19   Analysis"?
20   A     I am.
21   Q     What does interstate nexus refer to?
22   A     The interstate nexus refers to what the government needs
23   to have in order to have the ability to investigate a case with
24   regard to firearms and traveling between interstate -- or
25   between two different states.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     So, interstate nexus referring to firearms and ammunition

 2   moving across state lines.

 3         How do you determine where a gun was manufactured?

 4   A     During my training and experience we have a database, and

 5   other agents that we work with that have identified where those

 6   manufacturers have done their manufacturing.

 7   Q     Is that the same for -- how do you determine where

 8   ammunition is manufactured?

 9   A     The same way.

10   Q     Okay.  And approximately -- throughout your career,

11   approximately how many nexus examinations have you done for

12   firearms?

13   A     I've examined hundreds of firearms and thousands of rounds

14   of ammunition.

15   Q     Have you previously testified as an expert witness in

16   federal court?

17   A     I have form.

18   Q     Approximately how many times?

19   A     I have only testified one time, I have been called as a

20   witness several times, but usually it's stipulated to.

21         MS. NG:  Your Honor, at this time the government

22   moves to qualify Special Agent Twitchell as an expert on the

23   definition of firearms and ammunitions, the manufacturers, and

24   their travel in interstate and foreign commerce.

25         THE COURT:  Any objection?
```

1              MR. NOVAK:  No.

2              THE COURT:  He's so submitted.

3   BY MS. NG:

4   Q     Agent Twitchell, in basic terms what is a firearm?

5   A     A firearm is any weapon that will or is designed to or can

6   readily be converted to something that can expel a projectile

7   using an explosive action.

8   Q     Did you analyze three firearms in this case?

9   A     I did.

10             MS. NG:  Your Honor, may FBI Special Agent Minh Tran

11  approach the witnesses with Government's Exhibit 275, which has

12  been rendered safe?

13             THE COURT:  All right.

14        I assume there is no objection?

15             MS. DERBY:  No objection.

16             MS. LUCAS:  No objection.

17             THE COURT:  All right.

18             THE WITNESS:  May I open it?

19             MS. NG:  Yes.

20             THE WITNESS:  All right.

21  BY MS. NG:

22  Q     Do you recognize Government's Exhibit 275?

23  A     I do.

24  Q     Did you perform an interstate nexus test on Exhibit 275?

25  A     I did.

```
 1   Q     Could you please describe Government's Exhibit 275?
 2   A     Yes.  This is a Colt, Mark IV Series 80 Mustang, which is
 3   a 380-caliber pistol.
 4   Q     Can you identify the serial number from that position in
 5   the box?
 6   A     I can, hold on.  It is Mary Uniform 58634.
 7   Q     And who manufactured this gun?
 8   A     Colt.
 9   Q     How do you know that?
10   A     It's my training and experience.
11   Q     Where was Exhibit 275 manufactured?
12   A     In Connecticut.
13   Q     How do you know that?
14   A     Training and experience.
15   Q     To your knowledge, in what state was Exhibit 275 recovered
16   by law enforcement?
17   A     In California.
18   Q     So did Exhibit 275 affect commerce?
19   A     It did.
20   Q     How so?
21   A     It was manufactured outside the state of California and
22   found inside the state of California and at some point had to
23   have crossed state lines.
24   Q     So let's move on to the next firearm.
25              MS. NG:  Your Honor, permission for Agent Tran to
```

```
 1    approach the witness to retrieve Government's Exhibit 275 and

 2    to replace it with Government's Exhibit 400.

 3              THE COURT:  Let me just ask, my understanding is

 4    that these particular exhibits will not be going to the jury

 5    room?

 6              MS. NG:  No, they will not, Your Honor.

 7              THE COURT:  Are you going to show the jurors at this

 8    point in time each one or how are you going to have them see

 9    it?

10              MS. NG:  Actually, before I ask Agent Tran to go

11    back to the stand may I ask Agent Twitchell to please raise

12    Government's Exhibit 275 to show to the jury?

13              THE WITNESS:  Yes.

14              MS. NG:  Let the record reflect that Agent Twitchell

15    is showing Exhibit 275 to the jury.

16              THE COURT:  All right.

17              MS. NG:  May I now ask if special Special Agent Tran

18    can retrieve 275 and replace it with Exhibit 400, which has

19    also been rendered safe?

20              THE COURT:  Yes, you may.

21    BY MS. NG:

22    Q    Do you recognize Government's Exhibit 400?

23    A    I do.

24    Q    Did you perform an interstate nexus analysis on

25    Exhibit 400?
```

1    A    I did.

2    Q    Could you please describe Exhibit 400?

3    A    This is a Walther PPK/s it's a 9 millimeter kurz/.380ACP

4    caliber pistol and the serial number is 060360.

5    Q    Agent Twitchell, can I ask you to show Government's

6    Exhibit 400 to the jury?

7    A    Yes.

8    Q    Thank you.  Who manufactured this firearm?

9    A    Walther Arms.

10   Q    How do you know that?

11   A    By training and experience.

12   Q    Was Exhibit 400 manufactured in California?

13   A    It was not.

14   Q    To your knowledge in what state was Exhibit 400 recovered

15   by law enforcement?

16   A    In California.

17   Q    So did Exhibit 400 affect commerce?

18   A    It did.

19   Q    How so?

20   A    It was manufactured outside the state of California, it

21   was found or recovered inside the state of California, so that

22   had to have crossed state lines at some point.

23   Q    Moving on to the last firearm.

24         MS. NG:  Permission for Agent Tran to approach the

25   witness to retrieve Government's Exhibit 400 and replace it

1    with Government's Exhibit 317.

2              THE COURT:  Yes.

3              MS. NG:  Okay.

4    BY MS. NG:

5    Q    Do you recognize Government's Exhibit 317?

6    A    I do.

7    Q    Did you perform an interstate nexus test on Exhibit 317?

8    A    Yes, I did.

9    Q    Could you please describe Government's Exhibit 317?

10   A    Yeah.  This is a 22-caliber pistol made by Rohm, it's a

11   model RG12 with the serial number 52469.

12   Q    And can you -- I think you have alluded to this, but can

13   you identify who manufactured the gun?

14   A    Rohm.

15   Q    Where was Exhibit 317 manufactured?

16   A    It was manufactured in either Florida or internationally.

17   Q    How do you know that?

18   A    By training and experience.

19   Q    To your knowledge, in what state did law enforcement

20   recover Exhibit 317?

21   A    California.

22   Q    Did Exhibit 317 affect interstate -- or affect commerce?

23   A    It did.

24   Q    How so?

25   A    This was manufactured outside the state of California and

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | found or recovered inside the state of California and had to |
| 2 | have crossed over state lines to get here. |
| 3 | Q    And before I ask the agent to retrieve the exhibit, could |
| 4 | you please show it to the jury? |
| 5 | A    Yes. |
| 6 | Q    I'd like to ask you about ammunition now. |
| 7 |      In basic terms what is ammunition? |
| 8 | A    Ammunition is ammunition in cartridge casings, bullets, |
| 9 | powder, primers, anything with regard to that design to be |
| 10 | expelled through a firearm. |
| 11 | Q    Did you analyze any ammunition in this case? |
| 12 | A    I did. |
| 13 |      MS. NG:  Your Honor, permission for Agent Tran to |
| 14 | retrieve Exhibit 317 and replace it with Government's Exhibit |
| 15 | 318. |
| 16 |      THE COURT:  All right. |
| 17 |      THE WITNESS:  Okay. |
| 18 | BY MS. NG: |
| 19 | Q    Did you perform an interstate nexus test on Exhibit 318? |
| 20 | A    I did. |
| 21 | Q    Can you please describe Exhibit 318? |
| 22 | A    Yeah.  These are 22-caliber pistol bullets -- or, sorry, |
| 23 | bullets, with a head stamp with it looks like a cursive "W" on |
| 24 | them. |
| 25 | Q    Who manufactured this ammunition? |

1    A    Winchester.

2    Q    How do you know that?

3    A    Based on my training and experience.

4    Q    Was Exhibit 318 manufactured in California?

5    A    It was not.

6    Q    To your knowledge in what state did law enforcement

7    recover Exhibit 318?

8    A    In California.

9    Q    Did Exhibit 318 affect commerce?

10   A    It did.

11   Q    How so?

12   A    It was manufactured in another state and found or

13   recovered in California, and thus had to have crossed state

14   lines to get here.

15   Q    Could you also show Exhibit 318 to the jury?

16   A    Yeah, these ones are small.  22-caliber small bullets.

17   Q    Just to confirm, and how many rounds of ammunition are in

18   Exhibit 318?

19   A    Six rounds.

20   Q    Thank you.

21        MS. NG:  Your Honor, permission for Agent Tran to

22   approach the witness to retrieve Government's Exhibit 318 and

23   to replace with Government's Exhibit 276.

24        THE COURT:  All right.

25        THE WITNESS:  Okay.

```
 1   BY MS. NG:

 2   Q    Did you perform an interstate nexus test on Exhibit 276?

 3   A    I did.

 4   Q    Can you please describe Government's Exhibit 276?

 5   A    I can.  This is seven rounds -- I'll just hold it up here.

 6   This is seven rounds of 380-caliber ammunition manufactured by

 7   Winchester.

 8   Q    Where was Exhibit 276 -- or was Exhibit 76 manufactured in

 9   California?

10   A    It was not.

11   Q    To your knowledge, in what state was Exhibit 276 recovered

12   by law enforcement?

13   A    The state of California.

14   Q    Did Exhibit 276 affect commerce?

15   A    It did.

16   Q    How so?

17   A    It was manufactured outside the state of California and

18   found or recovered inside the state of California and had to

19   have crossed across state lines.

20   Q    Let's move on to more ammunition.

21        MS. NG:  Your Honor, permission for Agent Tran to

22   approach the witness to retrieve Government's Exhibit 276, and

23   to replace it with Government's Exhibit 401.

24        THE COURT:  Yes.

25        THE WITNESS:  Okay.
```

```
 1   BY MS. NG:

 2   Q    Can you please describe Government's Exhibit 401?

 3   A    Yeah.  This is seven rounds of 380 auto caliber Winchester

 4   ammunition.

 5   Q    I think you just mentioned they were manufactured by

 6   Winchester?

 7   A    That's true, yes.

 8   Q    How do you know that?

 9   A    My training and experience.

10   Q    Were the rounds in Exhibit 401 manufactured in California?

11   A    They were not.

12   Q    To your knowledge, in what state were these rounds

13   recovered in?

14   A    California.

15   Q    Did Exhibit 401 affect commerce?

16   A    It did.

17   Q    How so?

18   A    It was manufactured outside the state of California, and

19   found or recovered inside the state of California, and as such,

20   had to be transferred across state lines.

21   Q    And let's turn to the final set of ammunition.

22        MS. NG:  Your Honor, permission for Agent Tran to

23   approach the witness to retrieve Government's Exhibit 401 and

24   to replace it with Government's Exhibit 402.

25        THE COURT:  Yes.
```

```
 1              THE WITNESS:  Okay.
 2   BY MS. NG:
 3   Q    Did you perform an interstate nexus test on Exhibit 402?
 4   A    I did.
 5   Q    Could you please describe Exhibit 402?
 6   A    Yeah.  So this is one round of 380-caliber ammunition,
 7   with a head stamp which says CCI.
 8   Q    And when you say "CCI," who was the manufacturer?
 9   A    Cascade Cartridge Inc.
10   Q    Where was Exhibit 402 manufactured?
11   A    In Minnesota or Idaho.
12   Q    To your knowledge, in what state was this bullet recovered
13   in?
14   A    California.
15   Q    So did Exhibit 402 affect commerce?
16   A    It did.
17   Q    How so?
18   A    It was manufactured outside the state of California and
19   found inside the state of California and at some point had to
20   cross state lines.
21              MS. NG:  Your Honor, permission for Agent Tran to
22   retrieve Exhibit 402 from the witness.
23              THE COURT:  Yes.
24              MS. NG:  Your Honor, the government has no further
25   questions for this witness.
```

```
 1              THE COURT:  Any cross-examination?

 2              MS. DERBY:  None for Mr. Lerma.

 3         MR. KHOJAYAN:  No.

 4         MS. LUCAS:  Briefly, Your Honor.

 5         THE COURT:  All right.

 6                   CROSS-EXAMINATION

 7   BY MS. LUCAS:

 8   Q    Good afternoon, Agent Twitchell.

 9   A    Good afternoon.

10   Q    Now, you weren't suggesting that any defendant carried any

11   of those firearms or ammunition under -- across state lines,

12   personally, right?

13   A    I was not.

14   Q    Okay.  And in your expertise with firearms and ammunition,

15   do you know whether DNA can be retrieved from a firearm such as

16   Exhibit 317, the Rohm?

17              MS. NG:  Objection.  Outside the scope.

18              THE COURT:  I will sustain the objection.

19   BY MS. LUCAS:

20   Q    Do you know, in your expertise, whether or not

21   fingerprints could be recovered from a firearm like Exhibit

22   317, the Rohm revolver?

23              MS. NG:  Objection.  Outside the scope.

24              THE COURT:  I will sustain the objection.

25              MS. LUCAS:  Thank you very much.
```

**UNITED STATES DISTRICT COURT**

```
1              THE COURT:  Any other defense counsel?

2              MR. NOVAK:  No, thank you.

3              MS. LUCAS:  No, Your Honor.

4              THE COURT:  The witness can be excused, but watch

5   the first step.

6              THE WITNESS:  Thank you.

7              THE COURT:  All right.

8              MR. GORN:  May we recall the government's prior

9   witness?

10             THE COURT:  Yes.

11             MR. GORN:  So at this time, Your Honor, the

12  government would now recall Special Agent Joseph Talamantez.

13             THE COURT:  All right.

14                      JOSEPH TALAMANTEZ,

15                 having been previously sworn,

16                   testified as follows:

17                DIRECT EXAMINATION (resumed)

18  BY MR. GORN:

19  Q    Good afternoon, again, Special Agent Talamantez.

20  A    Good afternoon.

21  Q    So we left off -- we were at Exhibit 210.

22       Did you review Exhibit 210, prior to your testimony

23  today?

24  A    Yes.

25             MR. GORN:  And I will now ask to play Exhibit 210, a
```

```
 1   July 12th, 2013, call.
 2                      (Audio played in open court.)
 3                  MR. GORN:  Stop right there.
 4   BY MR. GORN:
 5   Q    The male voice that you heard there, are you able to
 6   identify that person?
 7   A    Yes.
 8   Q    And who is that?
 9   A    Seferino Gonzalez.
10   Q    And the woman's voice that responded, are you able to
11   identify that person?
12   A    Yes.
13   Q    Who is that?
14   A    Cheryl Perez.
15   Q    Now, in regards to your investigation of an assault in
16   Covina that we talked about, what was the date of that assault?
17   A    July 14th.
18   Q    And this call is about July 12th?
19   A    Correct.
20                  MR. GORN:  Can we continue playing.
21                  THE WITNESS:  Of 2013.
22                      (Audio played in open court.)
23   BY MR. GORN:
24   Q    Now, this second woman's voice that says, "Yeah, I'm
25   trying," are you able to identify that woman's voice?
```

```
 1    A    Yes.

 2    Q    Who is that?

 3    A    Kelly Deshannon.

 4    Q    Now, is this a three-way phone call?

 5    A    I don't believe so.

 6    Q    What is this call?  How are three people on the line?

 7    A    It's kind of a -- it sounds like it might be a relay to

 8    where Kelly Deshannon appears to have two phones and she's

 9    relaying a conversation.

10              MR. GORN:  Can we continue playing?

11                  (Audio played in open court.)

12    BY MR. GORN:

13    Q    As part of your investigation, did you look into seeing

14    whether Bill McCord had a Mercedes?

15    A    Yes.

16    Q    And did you, by listening to jail calls or talking to

17    anyone, learn about a Mercedes that Bill McCord owned?

18    A    Yes.

19    Q    And what did you learn?

20    A    That he did own a Mercedes.

21    Q    Now, in this call, it's referenced an Indian Hill address.

22    And that general area, are you familiar with that area that is

23    being discussed in this call?

24    A    Yes.

25    Q    And why is this area discussed in this call, per your
```

UNITED STATES DISTRICT COURT

1    investigation?

2    A    It's in the general area of the Hendrix street address

3    that Bill McCord passed earlier with the address.

4    Q    Based on your investigation, did you know where the --

5    Bill McCord's Mercedes was around July 12th, 2013?

6    A    Yes.

7    Q    And where was it?

8    A    Based on the phone calls, it appeared to be at 624

9    Hendrix.

10   Q    I'd like to now direct your attention to government's

11   Exhibit No. 211 from July 12th, 2013.

12              MR. GORN:  Can we just begin playing the beginning?

13                   (Audio played in open court.)

14              MR. GORN:  Stop right there.

15   BY MR. GORN:

16   Q    So we're stopping at the woman that says "yeah" in this

17   call.  Are you able to identify who that is?

18   A    Yes.

19   Q    Who is that?

20   A    Cheryl Perez.

21   Q    And the male voice in the call, are you able to identify

22   that person?

23   A    Yes.

24   Q    Who is that?

25   A    Seferino Gonzalez.

```
 1   Q     Are you familiar with the term "roll these fools up"?

 2   A     Yes.

 3   Q     From listening to jail calls, have you heard that term

 4   used previously?

 5   A     In this case, yes.

 6   Q     And are you able to -- based on your belief, what is your

 7   opinion, based on the jail calls and hearing the term roll them

 8   up, what does that mean?

 9   A     It means that they were assaulted so they had to leave the

10   dorm.

11              MR. GORN:  Can we continue playing?

12                  (Audio played in open court.)

13   BY MR. GORN:

14   Q     Regarding the conversation in Exhibit 211, with the

15   statement call Swifty, call Swifty, call Swifty, who, based on

16   your knowledge of the monikers we have described previously,

17   who is "Swifty" referring to?

18   A     Jose Valencia Gonzalez.

19   Q     As part of your investigation in this case as to the

20   assault that happened in Covina, did you also look into seeing

21   whether Bill McCord had any other vehicles or property?

22   A     Yes.

23   Q     And did Bill McCord, from your investigation and listening

24   to jail calls and speaking with individuals, did Bill McCord

25   have another vehicle?
```

**UNITED STATES DISTRICT COURT**

1    A    He indicated that he did, yes.

2    Q    Do you know what that vehicle was?

3    A    A Jeep and then a boat.

4    Q    Now, in the call there is also reference to a white girl

5    who had the keys.  Based on your knowledge of all the jail

6    calls that were discussed as to a white girl and in relation to

7    a car, do you know who Seferino Gonzalez is referring to?

8    A    Yes.

9    Q    Who is Seferino Gonzalez referring to?

10   A    Erica Newell.

11   Q    In your investigation of the assault, were you able to

12   determine whether Erica Newell had keys to a Mercedes around

13   July 12th, 2013?

14   A    Yes.

15   Q    And were you able to, from your investigation, determine

16   whether Erica Newell had the keys to a Mercedes that belonged

17   to Bill McCord?

18   A    Yes.

19   Q    And was that also around July 12th, 2013?

20   A    Yes.

21   Q    Now, are you familiar with the term "I you will get down

22   if I need the fucking keys," based on your review of the jail

23   calls in this case and the context in which it was given?

24              MR. KHOJAYAN:  Objection.  Improper lay opinion.

25              THE COURT:  Lay a foundation for his response.

```
 1                MR. GORN:  Sure.
 2   BY MR. GORN:
 3   Q    In listening to jail calls, are you privy to, essentially,
 4   vernacular and slang as you listen to those calls?
 5   A    Lots of slang, yes.
 6   Q    And when you listen to jail calls, are you able to
 7   determine the certain meaning of slang that maybe you don't
 8   know initially but through the context of those calls?
 9   A    Context and subsequent things that take place, yes.
10   Q    So in this case, if an individual was to state, "I'll get
11   down," and you overhear that call, in the greater context of
12   the calls in this case, as well as who you spoke to, and in
13   your investigation of the assault later in Covina, what is your
14   opinion as to what "I will get down" means?
15                MR. KHOJAYAN:  Objection.  Improper 701.
16                THE COURT:  Overruled.  He can answer the question.
17                THE WITNESS:  That they are escalating their efforts
18   to obtain the keys and violence is now an option.
19   BY MR. GORN:
20   Q    Now, I want to direct your attention to Exhibit 212.
21   Another call from July 12th, 2013.
22                MR. GORN:  If we can just play the first ten
23   seconds, I will tell you when to stop.
24                     (Audio played in open court.)
25                MR. GORN:  We can stop right there.
```

1    BY MR. GORN:

2    Q    So, approximately ten seconds into that call, the woman's

3    voice in the beginning that says "am I -- " excuse me, "you

4    want me to get Swifty," are you able to identify the woman in

5    that call?

6    A    Yes.

7    Q    Who is that?

8    A    Cheryl Perez.

9    Q    And just to get to it, in terms of Swifty, based on your

10   investigation and listening to all of the calls in this case,

11   as well as this one in the context in which it was given, who

12   do you believe and what is your opinion as to who Swifty is?

13   A    Jose Valencia Gonzalez.

14   Q    And the male individual who says, "yes, ma'am, please,"

15   are you able to identify who that is?

16   A    Yes.

17   Q    Who is that?

18   A    Seferino Gonzalez.

19            MR. GORN:  And just to continue playing there now.

20                (Audio played in open court.)

21   BY MR. GORN:

22   Q    Special Agent Talamantez, did you hear the term "gabacha"?

23   A    Yes.

24   Q    And in terms of listening to many calls and the context of

25   those calls, as well as slang, are you able to determine what

**UNITED STATES DISTRICT COURT**

1    that means?

2    A    Yes.

3    Q    And what does, "gabacha," mean and what is your opinion on

4    that?

5    A    It's slang for "a white girl."

6    Q    Based on the context of this phone call, as well as all of

7    the jail calls that you reviewed in your investigation as to

8    this and the assault, do you believe that the "gabacha"

9    referred to here, is it your opinion that is Erica Newell?

10   A    Yes.

11   Q    Also as part of your investigation, did Bill McCord's

12   Mercedes, around July of 2013, did it start?  Did it work?

13   A    I don't believe so, no.

14   Q    Can we now -- I would like to direct your attention to

15   Government's Exhibit 213.

16            MR. GORN:  If we can just begin with the first ten

17   seconds again.

18                  (Audio played in open court.)

19   BY MR. GORN:

20   Q    Starting with the first male voice that we hear in this

21   call, "it's not your fault, dude," are you able to identify the

22   male speaker in this call?

23   A    Yes.

24   Q    Who is that?

25   A    Seferino Gonzalez.

```
 1   Q    And the woman's response, "I will try hard every day for
 2   you," are you able to identify who that is?
 3   A    Yes.
 4   Q    Who is that?
 5   A    Kelly Deshannon.
 6            MR. GORN:  Can you continue playing.
 7                    (Audio played in open court.)
 8   BY MR. GORN:
 9   Q    As part of your investigation into the Mexican Mafia as
10   well as street gangs, are you familiar from listening to jail
11   calls speaking with individuals as well as cooperators about
12   discipline?
13   A    Yes.
14   Q    And based on all of that information and your information
15   that you learned in this case and the investigation, are you
16   able to explain, in terms of the context of the Mexican Mafia
17   as you understand it, what "discipline" is?
18            MR. KHOJAYAN:  Objection.  Improper 701, 702.
19            MR. GORN:  Your Honor.
20            THE COURT:  Yes.  What was the last question?
21            MR. GORN:  It was the opinion as to discipline.
22            THE COURT:  Read the last question.
23                    (Record was read.)
24            THE COURT:  Have him lay the foundation for the
25   answer and then I will allow it in if it's a proper foundation
```

```
 1  laid.
 2  BY MR. GORN:
 3  Q     In speaking with street gang members, Surenos, or
 4  associates of the Mexican Mafia, have you ever discussed the
 5  concept of discipline?
 6  A     Yes.
 7  Q     And have they explained in their own words what discipline
 8  is in the context of the Mexican Mafia?
 9  A     Yes.
10  Q     And in listening to jail calls in your investigations, do
11  you also listen to calls about discipline as it's concerning
12  the Mexican Mafia?
13  A     Yes.
14  Q     And after all of your investigations and speaking with
15  individuals as well as jail calls, do you have an understanding
16  of what discipline is within the Mexican Mafia?
17  A     Yes.
18  Q     What is discipline in the context of Mexican Mafia?
19            MR. KHOJAYAN:  Objection.  Improper 701, 702.
20            THE COURT:  You are going to have to tie it in with
21  the investigation here.
22            MR. GORN:  Sure.
23  BY MR. GORN:
24  Q     Furthermore, as part of this investigation, did you also
25  hear calls or interview individuals as they have explained
```

1    discipline within the Mexican Mafia?

2    A    Yes.

3    Q    And did you also understand and learn about discipline

4    from those conversations and from those calls?

5    A    Yes.

6    Q    And as it relates to this investigation, in terms of

7    discipline within the Mexican Mafia, are you able to explain

8    what discipline is?

9    A    Yes.

10   Q    And what is it?

11             MR. KHOJAYAN:  Improper, 701.

12             THE COURT:  Overruled.

13             THE WITNESS:  Discipline is consequence for breaking

14   a rule.  In this case he is indicating that it would be

15   violence, in the form of a stabbing, for holding money.

16             MR. GORN:  Can we continue playing?

17                 (Audio played in open court.)

18   BY MR. GORN:

19   Q    So you have already discussed about discipline with

20   stabbings, but in the line from Seferino Gonzalez, "I will take

21   couple fucking ass whoopings, a couple of stab wounds, and I'll

22   be all right," based on your opinion in the investigation in

23   this case, as well as the jail calls and who you have spoken

24   with, are you able to have an opinion as to whether that line

25   is in reference to discipline?

1    A    Yes.

2    Q    Is it?

3    A    It is.

4    Q    What do you base that on?

5    A    The context of this phone call where he is indicating that

6    if he cannot pay this money, that that is going to be one of

7    the consequences that he will face.  The other being that it

8    damages what he refers to as his "career," referring to his

9    gang career.

10    Q    You can continue playing?

11                    (Audio played in open court.)

12              MR. GORN:  Stop right there.

13    BY MR. GORN:

14    Q    When Seferino Gonzalez states, "because that's what would

15    happen if I don't pay her her money," in your investigation in

16    this case, did you develop opinions as to what that would mean

17    in the terms of Seferino Gonzalez and what he is explaining in

18    this call?

19              MS. DERBY:  Objection.  The transcript speak for

20    themselves.

21              THE COURT:  Overruled.

22              MR. GORN:  You can answer the question.

23              THE WITNESS:  It's again referring to the money that

24    he owes Cheryl Perez and the consequences that would go with

25    not repaying it.

1          MR. GORN:  Can we continue playing.

2                (Audio played in open court.)

3    BY MR. GORN:

4    Q    Seferino Gonzalez, when he states, "everybody should kiss

5    your ass, dude, all right," Based on your investigation and

6    listening to the jail calls in this case and who you spoke with

7    in terms of interviews and follow-up investigation, were you

8    able to determine the role that Kelly Deshannon played in

9    relation to Seferino Gonzalez?

10   A    Yes.

11   Q    And what was that role?

12   A    Secretary.

13   Q    And what is a secretary?

14   A    A secretary is -- essentially what we have been listening

15   to here -- is she is helping him to continue his activity on

16   the outside while he's inside of custody.  In this case, it's

17   acquiring the Mercedes.

18   Q    By being Seferino Gonzalez's secretary, does that give

19   Kelly Deshannon power?

20   A    Yes.

21   Q    Based on your investigation in this case, the review of

22   this jail call, as well as all of the other jail calls in this

23   case, and in speaking with witnesses, are you able to determine

24   and give an opinion as to who Seferino Gonzalez is and his

25   role?

```
1    A      Yes.

2    Q      And what is his role?

3    A      He is the key holder to the city of Pomona at this point.

4            MS. DERBY:  Objection.  Lack of foundation.  Motion

5    to strike.

6            MR. KHOJAYAN:  Improper 701.

7            THE COURT:  I will sustain the objection.  I will

8    strike the last answer.

9    BY MR. GORN:

10   Q      In speaking -- excuse me, in reviewing jail calls in this

11   case and -- have you heard orders that Seferino Gonzalez has

12   given to others in those calls?

13   A      Yes.

14   Q      And have you heard others give Seferino Gonzalez orders in

15   those calls?

16           MR. FURMAN:  Asked and answered.

17           MR. KHOJAYAN:  Objection.  Hearsay.  Confrontation

18   clause, and he's a lay witness.

19           THE COURT:  I will allow him to use -- reference to

20   the specific calls that he's referencing.

21   BY MR. GORN:

22   Q      In this call is Seferino Gonzalez talking about having to

23   pay back Cheryl Perez?

24   A      Yes.

25   Q      Based on this call and the fact that he has to pay back
```

```
 1   another person, is Seferino Gonzalez's role less, equal, or
 2   more than -- excuse me, than Cheryl Perez?
 3   A     Seferino is under Cheryl Perez.
 4   Q     How are you able to determine that in this investigation
 5   based on the jail calls and the investigation that you have
 6   done?
 7   A     Based on Seferino's conversations with Cheryl, and based
 8   on Seferino's conversations with other people regarding Cheryl.
 9   Q     And from your investigation, are you able to determine the
10   role that Seferino Gonzalez had?
11              MR. KHOJAYAN:  Objection.  Asked and answered.
12              THE COURT:  Overruled.
13   BY MR. GORN:
14   Q     What is his role?
15   A     He states it.  He is the key holder of the city of Pomona.
16              MR. FURMAN:  Objection, lack of foundation, improper
17   expert opinion, and move to strike.
18              THE COURT:  I will sustain the objection.
19              MR. GORN:  Can we play Exhibit 214.  Excuse me, I'm
20   sorry, keep playing 214.
21                   (Audio played in open court.)
22   BY MR. GORN:
23   Q     I want to direct your attention now to Government's
24   Exhibit 214.  Excuse me, 215.  No, I'm sorry, it's not 215.
25   It's 214.
```

1         Sir, did you, before coming to court today, review

2   Government's Exhibit 214?

3   A     Yes.

4         MR. GORN:  I will ask to play the first ten seconds.

5             (Audio played in open court.)

6         MR. GORN:  Stop right there.

7   BY MR. GORN:

8   Q     The male voice that says "you fool are my ears and

9   everything in there," who is that?

10  A     Seferino Gonzalez.

11  Q     And the woman's voice saying "yeah, yeah," are you able to

12  identify who that is?

13  A     Yes.

14  Q     Who is that?

15  A     Cheryl Perez.

16  Q     Now in the context of this call, as well as the jail calls

17  that you reviewed in your investigation, as well as all of the

18  individuals that you have interviewed and learned about, are

19  you able to determine from this call a specific role that

20  Seferino Gonzalez plays?

21        MR. FURMAN:  Objection, improper foundation,

22  improper opinion evidence.

23        MR. GORN:  It's a lay opinion, Your Honor.

24        THE COURT:  I will allow him to answer if he can

25  explain the answer.

```
1              BY MR. GORN:
2    Q    Are you able to answer and explain your answer?
3    A    I think so.
4    Q    Go ahead.
5    A    He is explaining that he needs people to be his eyes and
6    ears on the street because he's locked up inside of prison and
7    doesn't have the ability to do that on his own.
8         So he's referring to people helping him on the outside
9    to continue what he's doing.
10   Q    The fact he has outside people helping him, does that also
11   further him having a higher-up role than other individuals?
12   A    Yes.
13   Q    Would that mean that he has a role higher than Kelly
14   Deshannon?
15   A    Yes.
16   Q    But would that mean that he has a role higher than Cheryl
17   Perez?
18   A    No.
19   Q    And based on your investigation in this case, what is your
20   opinion as to Seferino Gonzalez's role as it relates between
21   Cheryl Castaneda Perez and Kelly Deshannon?
22   A    That Seferino works for Cheryl Perez and Kelly Deshannon
23   works for Seferino.
24              MR. GORN:  Can we continue playing, please.
25                    (Audio played in open court.)
```

```
 1    BY MR. GORN:
 2    Q    The comment from Seferino Gonzalez saying "you just called
 3    my people and asked them motherfuckers to give you half an
 4    ounce and shit," do you have an opinion as to what half an
 5    ounce means in the context of this call?
 6    A    Yes.
 7    Q    What does it mean?
 8    A    It's referring to drugs, half an ounce of drugs.
 9    Q    Can you just discuss payments as it relates -- and
10    payments and transfers of money as it would relate between
11    Seferino Gonzalez and Kelly Deshannon from your review of the
12    jail calls and as part of your investigation in this case?
13    A    That Kelly is doing things to help make money for
14    Seferino.
15    Q    And would she be compensated for that?
16    A    Yes.
17    Q    And how would she be compensated for that?
18               MS. DERBY:  Objection, lack of foundation.
19               THE COURT:  Lay a foundation for his response.
20    BY MR. GORN:
21    Q    Going to what is in front of us, saying "give you half an
22    ounce and shit," is that a form of payment that would be
23    intended from Seferino Gonzalez to Kelly Deshannon in the
24    context of this call based on your investigation?
25    A    Yes.
```

```
 1              MR. GORN:  Could we play it to the end.
 2                     (Audio played in open court.)
 3  BY MR. GORN:
 4  Q    In listening to this call in terms of the time before the
 5  assault in Covina in 2013, were you able to determine who is
 6  Seferino Gonzalez and Cheryl Castaneda talking about?
 7  A    They are talking about Erica's boyfriend, Mohammed
 8  Alsairwan.
 9  Q    Can you just describe who is Mohammed Alsairwan?
10  A    That is Erica Newell's boyfriend, who was at the time I
11  believe living at Erica's residence.
12  Q    Was that in Covina?
13  A    Covina.
14              MR. GORN:  Can we go to Government's Exhibit
15  No. 219, July 14th, 2013, call.
16               BY MR. GORN:
17  Q    Special Agent Talamantez, July 14th is the date of the
18  Covina assault, correct?
19  A    Correct.
20  Q    But in reviewing Government's Exhibit 219 at 2:33 p.m. is
21  that before the assault took place?
22  A    Yes.
23              MR. GORN:  Can we begin playing for the first ten
24  seconds, please?
25                     (Audio played in open court.)
```

```
 1                    BY MR. GORN:
 2   Q    The first woman's voice, are you able to identify that in
 3   Government's Exhibit 219?
 4   A    Yes.
 5   Q    Who is that?
 6   A    Kelly Deshannon.
 7   Q    And the male voice in response is he -- "he's spending my
 8   money," is that Seferino Gonzalez?
 9   A    Yes.
10           MR. GORN:  Can you continue playing, please.
11               (Audio played in open court.)
12           MR. GORN:  Stop right there.
13   BY MR. GORN:
14   Q    Based on your investigation, your review of this call
15   compared to all of the other jail calls that you reviewed as
16   part of this case, the reference to "Swifty," do you have an
17   opinion as to who Swifty is that's referenced by Seferino
18   Gonzalez?
19   A    Yes.
20   Q    Who is that?
21   A    Jose Valencia Gonzalez.
22           MR. GORN:  Continue playing.
23               (Audio played in open court.)
24               BY MR. GORN:
25   Q    As part of your investigation did you look into a
```

1    residence at 183 Cypress in Covina?

2    A    Yes.

3    Q    What is the relevance of that address?

4    A    That is Erica Newell's address and it's where Mohammed

5    Alsairwan was staying, and it was the site of the incident that

6    occurred on July 14th of 2013.

7                    (Audio played in open court.)

8    BY MR. GORN:

9    Q    Based on your investigation of the case, did defendant

10   Jose Valencia Gonzalez, Cheryl Perez, as well as Trisha Perez

11   go to the 183 Cypress address?

12   A    Yes.

13   Q    And following the incident did they speak with Seferino

14   Gonzalez on the same date of the assault?

15   A    Yes.

16   Q    Now directing your attention to Exhibit 220, a call from

17   July 14, 2013.

18              MR. GORN:  Can we just play this.

19                    (Audio played in open court.)

20              MR. GORN:  Stop right there.

21   BY MR. GORN:

22   Q    The woman's voice that says, "we just went by Erica's

23   house to get that key," are you able to identify who that is?

24   A    Yes.

25   Q    Who is that?

1    A    Kelly Deshannon.

2    Q    And the man's voice asking "how are you doing," who is

3    that?

4    A    Seferino Gonzalez.

5                    (Audio played in open court.)

6    BY MR. GORN:

7    Q    That last woman -- excuse me, the woman that states, "he

8    said don't give up his keys," are you able to identify who that

9    is?

10   A    Yes.

11   Q    Who is that?

12   A    Cheryl Perez.

13              MR. GORN:  Can we continue playing.

14                    (Audio played in open court.)

15              MR. GORN:  Can you stop right now.

16   BY MR. GORN:

17   Q    Based on your investigation and listening to the jail

18   calls in this case, as well as just your background, training,

19   and experience as law enforcement officer, have you ever heard

20   the term "poppin" before?

21   A    Yes.

22   Q    And as it's referenced in this call, do you have an

23   opinion as to what it means to say "and it gots to poppin"?

24   A    Yes.

25   Q    And what is your opinion, based on the investigation and

UNITED STATES DISTRICT COURT

1   the evidence in this case, what does that mean?

2   A    That a shooting occurred.

3            MR. GORN:  Continue playing.

4                (Audio played in open court.)

5            MR. GORN:  Stop there.

6   BY MR. GORN:

7   Q    Based on your investigation in the case, do you have an

8   opinion as to from this jail call and the other jail calls, who

9   Seferino Gonzalez is referring to when he states, "I'm going to

10  smack him, I'm going to smack the grill off him, because he got

11  fake teeth and shit"?

12  A    Yes.

13  Q    Who is that?

14  A    William McCord.

15  Q    Why is Seferino Gonzalez, based on this context of this

16  call and the other jail calls, why is Seferino Gonzalez saying

17  he was going to smack the grill off of Bill McCord?

18           MS. DERBY:  Objection, Your Honor, it calls for

19  speculation.  The transcript speaks for itself.

20           THE COURT:  I will sustain the objection.  Try to

21  lay a foundation for his response.

22  BY MR. GORN:

23  Q    Based on your investigation of the case, did you

24  investigate and/or hear jail calls or speak with any

25  individuals that would form the basis of your opinion that

1    Seferino Gonzalez wanted to use violence against Bill McCord?

2    A    Yes.

3    Q    And based on the context of this call, what we just talked

4    about, "I'm going to smack him," do you have an opinion as to

5    what Seferino Gonzalez meant when he was talking about Bill

6    McCord?

7    A    Yes.

8    Q    What that is opinion?

9              MS. DERBY:  Same objection.

10             THE COURT:  Overruled.

11   BY MR. GORN:

12   Q    What is that opinion, sir?

13   A    That he was going to assault Bill McCord because they were

14   having a hard time recovering this vehicle.

15             MR. GORN:  Continue playing.

16                  (Audio played in open court.)

17   BY MR. GORN:

18   Q    Based on your investigation and the jail calls, as well as

19   this call, do you have an opinion as to who Cheryl Perez is

20   referring to when she says, "yeah, if he makes it there."  Who

21   is "he"?

22   A    She's referring to Mohammed Alsairwan who was just shot.

23                  (Audio played in open court.)

24   BY MR. GORN:

25   Q    When Kelly Deshannon is saying "I'm going to call him

```
 1   right now, actually, and take all that shit too," based on your

 2   investigation of the case do you have an opinion as to who

 3   Kelly Deshannon is referring to?  Or what she is referring to?

 4   A    She is referring going back to the house and taking all of

 5   the property that belongs to Bill McCord.

 6             MR. GORN:  Can we just play it to the end.

 7                  (Audio played in open court.)

 8   BY MR. GORN:

 9   Q    I would like to direct your attention now to Government's

10   Exhibit 221 from July 14, 2013.

11             MR. GORN:  Can we just play that the first ten

12   seconds.

13                  (Audio played in open court.)

14             MR. GORN:  Stop right there.

15   BY MR. GORN:

16   Q    So the man's voice saying, "I got a friend that works at

17   AAA" are you able to identify who that is for this call?

18   A    Yes.

19   Q    Who is that?

20   A    Seferino Gonzalez.

21   Q    And the woman's voice who says, "we need to do this a

22   whole different way," are you able to identify who that is?

23   A    Yes.

24   Q    Who is that?

25   A    Cheryl Perez.
```

```
 1                    (Audio played in open court.)

 2              MR. GORN:  Stop there.

 3                 BY MR. GORN:

 4    Q     When Seferino Gonzalez refers to "Swifty, just go in there

 5    and tie the motherfuckers down with duct tape," based on your

 6    investigation in the case and listening to the jail calls, what

 7    is your opinion as to who Swifty is?

 8    A     Jose Valencia Gonzalez.

 9    Q     And what is your opinion as to who the individuals are

10    that he's talking about that would be duct taped?

11    A     The individuals at the Cypress address where they are

12    trying to recover all of William McCord's property.

13              MR. GORN:  Can we continue playing.

14                    (Audio played in open court.)

15    BY MR. GORN:

16    Q     I would like to direct your attention to Government

17    Exhibit 222 from July 14, 2013.

18              MR. GORN:  Play the first ten seconds.

19                    (Audio played in open court.)

20              MR. GORN:  Can you stop right there.

21    BY MR. GORN:

22    Q     The woman who states, "you know that motherfucker hit me

23    in my nose, huh," are you able to identify who that is?

24    A     Yes.

25    Q     Who is that?
```

1    A    Cheryl Perez.

2    Q    And the man's voice who says "who did," who was that?

3    A    Seferino Gonzalez.

4            MR. GORN:  You can continue playing.

5                (Audio played in open court.)

6            MR. GORN:  Stop right there.

7    BY MR. GORN:

8    Q    Based on your investigation and listening to the jail

9    calls, do you have an opinion as to who "Mohammed" is that

10    Seferino Gonzalez is referring to?

11    A    Yes.

12    Q    Who is that?

13    A    That is Mohammed Alsairwan, the individual that was shot.

14    Q    In Covina?

15    A    Yes.

16            MR. GORN:  Continue playing.

17                (Audio played in open court.)

18            MR. GORN:  Stop there.

19    BY MR. GORN:

20    Q    The male voice that just said, "I shot his ass," do you

21    know who that is?

22    A    Yes.

23    Q    Who is that?

24    A    Jose Valencia Gonzalez.

25    Q    How are were you able to know that?

1    A    Prior context from identifying information inside of this

2    phone call, and the conduct that occurred.

3    Q    When you talk about "the conduct that occurred," and you

4    are using it as the basis of your opinion, can you just

5    describe the conduct you are referencing?

6    A    The conduct would be the three of them -- or Kelly

7    Deshannon, Cheryl Perez, Trisha Perez, and Jose Valencia

8    Gonzalez going to the Cypress address, confronting Erica, and

9    Mohammed and Mohammed being shot.

10              MR. GORN:  Can we go to Government's Exhibit 229, a

11    call from July 24th, 2013, before we play that.

12              BY MR. GORN:

13    Q    After the incident in July of 2014, did law enforcement

14    investigate a shooting at the 183 Cypress address?

15    A    Yes.

16    Q    Was evidence collected?

17    A    Yes.

18    Q    Were interviews conducted?

19    A    Yes.

20    Q    And by the point of July 24th, 2013, was the investigation

21    well underway?

22    A    Yes.

23    Q    And was law enforcement looking at that particular time at

24    any suspects?

25    A    By July 24th, yes.

1   Q    Who was law enforcement, local or federal, looking at in

2   terms of suspects for the Covina shooting?

3   A    Kelly Deshannon and Jose Valencia Gonzalez.

4            MR. GORN:  I want to play the first ten seconds.

5                (Audio played in open court.)

6            MR. GORN:  Stop right there.

7                BY MR. GORN:

8   Q    So the woman's voice that seems to say, "you know, uh, you

9   know, um, all, that, that happened over there," who is that?

10  A    Cheryl Perez.

11  Q    And the male voice before that, who is that?

12  A    Seferino Gonzalez.

13  Q    Can you describe the conduct in this call, are you

14  familiar with coded language?

15  A    Yes.

16  Q    What is coded language?

17  A    Coded language is an attempt to disguise the actual

18  meaning of whatever you are conversing about.

19  Q    Does that mean you use different words?

20  A    It could mean a bunch of different things.  It could mean

21  you use different words, it could mean you talk in incomplete

22  sentences, it could mean you have different meanings for

23  different words.

24            MR. GORN:  Continue playing.

25                (Audio played in open court.)

1          MR. GORN:  Stop right there.

2    BY MR. GORN:

3    Q    Cheryl Perez, based on the context of this conversation as

4    well as what you know from the investigation involved in the

5    Covina shooting, do you have an opinion as to what Cheryl Perez

6    is referring to when she says "is he dead or alive"?

7    A    She's referring to Mohammed Alsairwan.

8          MR. GORN:  Do you want to continue playing?

9               (Audio played in open court.)

10   BY MR. GORN:

11   Q    Based on the investigation, did you form an opinion as to

12   what Cheryl Perez is talking about when they are talking about

13   "Mohammed"?

14   A    Yes.

15   Q    And what's your opinion as to what she is referencing

16   about Mohammed?

17   A    She is trying to figure out if Mohammed Alsairwan survived

18   the shooting or not.

19          MR. GORN:  Can we play Government's Exhibit 225,

20   please.  That is a call from July 18th, 2013.

21        Just start the ten seconds.

22               (Audio played in open court.)

23   BY MR. GORN:

24   Q    The male voice in this call, who is that?

25   A    Seferino Gonzalez.

```
 1   Q     And the woman's voice, who is that?

 2   A     Cheryl Perez.

 3   Q     And based on your investigation in the case and the

 4   context of this call, as well as your investigation of the

 5   Covina shooting, what is your opinion as to the brother that

 6   Seferino Gonzalez is referring to?

 7   A     Jose Valencia Gonzalez.

 8                MR. GORN:  Continue playing.

 9                    (Audio played in open court.)

10   BY MR. GORN:

11   Q     Is it your opinion that Cheryl Castaneda Perez is

12   discussing kind of the -- is she describing the actual incident

13   of the Covina assault?

14   A     Yes.

15   Q     Why is it your opinion -- well, do you have an opinion as

16   to why Seferino Gonzalez appears to be worried about his

17   brother's face being seen?

18   A     Yes.

19   Q     What is your opinion?

20   A     He is wondering if the victims can identify his brother as

21   a subject.

22   Q     Around this time, from this call and your investigation in

23   the case, did it appear that Seferino Gonzalez was nervous

24   around this time about his brother's identity being discovered?

25   A     Yes.
```

1   Q    Can we focus on Government's Exhibit 226 from July 21st,

2   2013.

3        Special Agent Talamantez, did you also review this

4   exhibit before coming into court today?

5   A    Yes.

6              MR. GORN:  If we can just play this one call.

7                   (Audio played in open court.)

8   BY MR. GORN:

9   Q    Let me stop right there.  Do you recognize this voice?

10  A    Yes.

11  Q    Who is it?

12  A    Jose Valencia Gonzalez.

13  Q    Is this part of a -- is this part of a greater call?

14  A    Yes.

15  Q    But at this time had law enforcement interviewed or tried

16  to reach out to Kelly Deshannon, Cheryl Perez, or Jose Gonzalez

17  by July 21, 2013?

18  A    Not Cheryl Perez, but Kelly Deshannon and Jose Valencia

19  Gonzalez.

20  Q    And because of that conversation and listening to these

21  jail calls, did you form an opinion as to the context of this

22  call from defendant Jose Valencia Gonzalez?

23  A    Yes.

24  Q    And what is your opinion as to the context of what he is

25  saying here?

1   A    He's relaying what a detective accused him of doing.

2   Q    What is your opinion as to why Jose Valencia Gonzalez was

3   worried about what the detective was saying?

4   A    Because he is trying to figure out how he would have been

5   identified as the shooter.

6   Q    Taking your attention now to Government's Exhibit 227.

7        Did you also review Government's Exhibit 227, which is a

8   July 28th, 2013, jail call?

9   A    Yes.

10       MR. GORN:  And could we just play the first ten

11   seconds.

12                  (Audio played in open court.)

13   BY MR. GORN:

14   Q    The first male voice said, "yeah, okay, watch," are you

15   able to identify who that is?

16   A    Yes.

17   Q    Who is that?

18   A    Seferino Gonzalez.

19   Q    The next male voice that says "the only thing that they

20   found that I'm glad they found," who is that?

21   A    Jose Valencia Gonzalez.

22                  MR. GORN:  Can we play it until the end.

23                  (Audio played in open court.)

24   BY MR. GORN:

25   Q    Based on your investigation in this case and your review

1    of the evidence, were .22 bullets found during the course of

2    this investigation?

3    A    At some point, yes.

4    Q    But what is your opinion as to why Jose Gonzalez talking

5    about .22 bullets?

6    A    Why is he talking about .22 bullets being recovered?

7    Q    Yes.

8    A    He's referring to a search warrant that occurred at his

9    residence in which law enforcement recovered 22-caliber

10   bullets.

11   Q    When Jose Gonzalez later says, "is throwing them, fool,"

12   what does he mean by that, what is your opinion on that?

13   A    That it's a different caliber of bullet that was used

14   during the Covina assault.

15   Q    Based on your investigation, do you know the type of round

16   or caliber that was used during the Covina assault?

17   A    It's a 380.

18   Q    And based on your investigation, was a 380 round

19   recovered?

20   A    There actually was a 380-round recovered in the search

21   warrant as well.

22   Q    At the scene of the Covina shooting, were there any shell

23   casings that were recovered at the scene?

24   A    Yes.

25   Q    And from those shell casings -- from your investigation

1    was a caliber determined from that shell casing?

2    A    Yes.

3    Q    What was that caliber.

4    A    380.

5    Q    Going now to Government's Exhibit 227, a July 28th, 2013,

6    call.

7         Excuse me.  I'm sorry.

8         I want to change the direction and ask you about your

9    background, training, and experience as it relates to "taxing"

10   within the context of the Mexican Mafia.

11        Is that a term you are familiar with?

12   A    Yes.

13   Q    What is taxing, based on the course of this investigation

14   that you have done, what is it?

15   A    In this investigation, from reviewing the phone calls and

16   talking to individuals, "taxing" was money that was collected

17   from people that were committing crimes in areas that were

18   controlled by the defendants.

19        MS. DERBY:  Objection as to the last comment, that

20   who it was on behalf of.

21        THE COURT:  I will strike the last portion unless he

22   can lay a foundation for the response.

23        MR. GORN:  Of course.

24   BY MR. GORN:

25   Q    In terms of taxing, is that, based on your opinion or your

UNITED STATES DISTRICT COURT

1   understanding, is that just another form of extortion?

2   A    Yes.

3   Q    And taxing, can you just briefly describe from your

4   experience investigating this case, how taxing is done as part

5   of the Mexican Mafia, and how it was relevant to the

6   investigation and the evidence that you were trying to look

7   for?

8   A    Yes.  It was -- if somebody was found to be selling drugs

9   or committing illegal activity, they would be contacted and a

10  portion of their proceeds would be taken as an extortion or tax

11  for the right to commit the activity in the City of Pomona.

12  Q    Is there a certain amount or percentage that would be

13  taken?

14  A    A lot of times it's a third.  And other times it was an

15  amount that was agreed upon.

16         MR. FURMAN:  Lack of foundation as to this case.

17  Move to strike.

18         THE COURT:  I will strike unless you lay a

19  foundation for his response.

20         MR. GORN:  Sure.

21  BY MR. GORN:

22  Q    In your investigation in this case, did you hear from jail

23  calls the terms "thirds"?

24  A    Yes.

25  Q    And even in these jail calls, was thirds actually

1  explained in the call themselves?

2  A    It was explained, yes.

3  Q    And from your understanding of those calls and your

4  background, training, and experience as a law enforcement

5  officer, what does a "third" mean?

6  A    They explained it as it's a third of whatever profit you

7  are generating.

8          MR. FURMAN:  Objection.  Vague as to "they."  Move

9  to strike.

10         THE COURT:  Lay a foundation for that portion of the

11 response.

12         MR. GORN:  Okay.

13 BY MR. GORN:

14 Q    When you were listening to jail calls, was there a

15 specific individual, as part of your investigation, that talked

16 about thirds?

17 A    Yes.

18 Q    Who was that person?

19 A    Seferino Gonzalez.

20 Q    And who did he explain thirds to in the jail calls that

21 you listened to?

22 A    Jose Valencia Gonzalez.

23 Q    And what, in that call, did Seferino Gonzalez explain to

24 defendant Jose Valencia Gonzalez what a third was?

25 A    A third of the profit from people selling drugs in the

```
 1   City of Pomona.
 2   Q    I want to direct your attention to Exhibit 216, a call
 3   from July 12th, 2013.
 4        Did you review that exhibit before coming to Court
 5   today?
 6   A    Yes.
 7           MR. GORN:  Can we play the first ten seconds?
 8                (Audio played in open court.)
 9           MR. GORN:  Stop right there.
10   BY MR. GORN:
11   Q    The woman's voice that starts this call, who is that?
12   A    Cheryl Perez.
13   Q    And the man that responded, who is that?
14   A    Seferino Gonzalez.
15   Q    Can you explain from your investigation and the calls that
16   you listened to, were you able to determine whether the term
17   "rabbit" -- is that a moniker?
18   A    It appears to be a moniker, yes.
19   Q    Is that an individual that in the context of this call and
20   from what you described as taxing, was that an individual that
21   was being taxed?
22   A    Yes.
23   Q    And what is it about this call that makes it clear that
24   this individual named Rabbit was being taxed?
25   A    They talk about it.
```

| | |
|---|---|
| 1 | Q    So when Rabbit -- apparently, from Cheryl Perez -- is |
| 2 | saying, "he ain't going to do it," is it your opinion that this |
| 3 | person, Rabbit, was not going to pay the thirds tax? |
| 4 | A    I don't think he would have said it just in that way |
| 5 | because of the consequence, but he's trying to avoid paying the |
| 6 | tax, yes. |
| 7 | MR. GORN:  Can you keep playing? |
| 8 | (Audio played in open court.) |
| 9 | MR. GORN:  Stop right there. |
| 10 | BY MR. GORN: |
| 11 | Q    We begin talking about Rabbit, but based on the context of |
| 12 | this phone call and your general investigation in this case, as |
| 13 | well as your knowledge of the Pomona area and the gangs that |
| 14 | are present there, do you have an opinion as to what it means |
| 15 | to say, "send rabbit to the other side"? |
| 16 | A    Yes. |
| 17 | Q    What does that mean to you? |
| 18 | A    To the other side of the railroad tracks, meaning from |
| 19 | Cherryville territory to Pomona 12th Street territory. |
| 20 | Q    Why is it, your opinion, that Seferino was saying that at |
| 21 | this time? |
| 22 | A    Kind of as a disrespect to Rabbit.  He is saying that you |
| 23 | are going to have to go to the other side and deal with 12th |
| 24 | Street now. |
| 25 | Q    Is that a threat? |

**UNITED STATES DISTRICT COURT**

1    A    It's not good.

2    Q    When they are saying "let them shake him up," are you

3    familiar with the term "shake him up"?

4    A    Yes.

5    Q    What does that mean to you?

6    A    To basically rough him up, to hassle him.

7              MR. GORN:  Can we continue playing?

8                  (Audio played in open court.)

9              MR. GORN:  Can you stop right there.

10   BY MR. GORN:

11   Q    There is a reference to a person named Dopey.

12             Based on your review of the jail calls in this case, the

13   context, as well as your overall investigation, do you know who

14   Dopey is?

15   A    I do.

16   Q    Who is Dopey?

17   A    Dopey is Frank Herrera, a Pomona 12th Street gang member.

18   Q    At this point in time -- so, we're talking July 12th,

19   2013 -- were you able to determine what Dopey's role was as it

20   related to Cheryl Perez and Seferino Gonzalez and taxing?

21   A    Yes.

22   Q    What was his role?

23             MS. DERBY:  Objection.  Lack of foundation.

24             THE COURT:  Lay the foundation for the response.

25             MR. GORN:  Okay.

BY MR. GORN:

Q    Did you hear information from jail calls as to what Dopey's role was?

A    Yes.

Q    What did you learn from jail calls at -- what role Dopey had?

A    In the phone calls, they identified Dopey as a tax collector.

        MR. GORN:  Can you continue playing, please.

            (Audio played in open court.)

BY MR. GORN:

Q    Are you familiar from your background, training, and experience as well as your work in the investigation in this case and listening to the jail calls, are you familiar with the term "feria"?

A    Yes.

Q    Or is it "fedia"?

A    It's supposed to be an "r."

Q    And when Seferino Gonzalez is saying "I'll send you to the other side and you have to pay," what does that mean, and what is your opinion as to what that means in context of taxing?

A    It's kind of like I explained where they are sending him to the other side, meaning to the 12th Street territory, and he's going to have to pay his taxes to 12th Street.  And he is saying that it doesn't matter because all of the money is going

1    to be collected by Cherryville and Cheryl regardless.

2    Q     Were you familiar, based on your investigation as to --

3    Cheryl Perez's role, in terms of managing the taxes?

4    A     Yes.

5    Q     Did you learn that from jail calls in this case as well as

6    speaking to individuals in the Pomona area?

7    A     Yes.

8    Q     And around July of 2013, what is your opinion as to what

9    Cheryl Perez's role was in the Pomona area?

10             MR. FURMAN:  Objection.  Lack of foundation.

11             THE COURT:  Lay the foundation.

12   BY MR. GORN:

13   Q     Sure.  Did you hear jail calls referencing or giving you

14   information as to Cheryl Perez's position in Pomona?

15   A     Yes.

16   Q     And did Cheryl Perez also -- in jail calls -- indicate

17   what her position was or what her role and responsibilities

18   would be as it related to taxing and narcotics?

19   A     Yes.

20   Q     And what is Cheryl Perez's role, in your opinion, based on

21   the information that you learned from Cheryl Perez in her jail

22   calls?

23   A     She was the individual that was collecting all of the tax

24   money in Pomona.

25   Q     Is there a specific term or role she had?

**UNITED STATES DISTRICT COURT**

1    A    She was the senora.

2    Q    And what would, then, would Seferino Gonzalez be below

3    her?

4    A    He would be the key holder to the city.

5    Q    Now playing --

6         MR. GORN:  Can we continue playing Exhibit 216?

7              (Audio played in open court.)

8    BY MR. GORN:

9    Q    Okay.  Can we now -- I would like to direct your attention

10   to Government's Exhibit 217, a call from July 12th, 2013.

11        MR. GORN:  Can we just play the first ten seconds.

12             (Audio played in open court.)

13        MR. GORN:  Can you stop right there.

14   BY MR. GORN:

15   Q    The first male individual that says he's going to handle

16   the whole south side, who is that?

17   A    Dopey, the same one they were referring to.

18   Q    I'm saying -- I'm sorry.  The male voice?

19   A    Oh.  Seferino Gonzalez.

20   Q    And then the follow-up voice, the male voice that says

21   "yeah," whose voice is that?

22   A    Jose Valencia Gonzalez.

23   Q    Breaking this down, when Seferino Gonzalez is referring to

24   an individual named Dopey, is that the same Dopey or is it your

25   opinion that is the same Dopey from Government's Exhibit --

1    excuse me -- 216?

2    A      Same Dopey.

3    Q      And can you just describe, in your opinion, what does it

4    mean for Dopey to handle the whole south side?

5    A      Same thing I have explained, where Pomona 12th Street

6    controlled the south side of the tracks, so they are explicitly

7    saying that Dopey is the person in control of the south side.

8    Q      Do you understand, in terms of from these calls and your

9    investigation, how Pomona was divided up between gangs, and

10   also the drug distribution and the taxing?

11   A      Generally, yes.

12   Q      And what's your opinion as to how that was formed in the

13   City of Pomona?

14   A      Well, it was divided essentially by railroad tracks for

15   the two biggest gangs, which is Pomona 12th Street and

16   Cherryville.  Cherryville is on the north end.  Pomona 12th

17   Street is on the south end.  But ultimately, all of the taxes

18   that are collected from the criminal activity goes to the same

19   place, which at this time, is Cheryl Perez.

20             MR. GORN:  May I continue playing.

21                  (Audio played in open court.)

22             MR. GORN:  Stop there.

23   BY MR. GORN:

24   Q      So the individual that says "the fool says he doesn't want

25   to sell anymore," who is that?

```
 1    A     Jose Valencia Gonzalez.

 2    Q     And based on your listening to your call, as well as all

 3    of the jail calls in this case, and your complete

 4    investigation, do you have an opinion to what Jose Valencia

 5    Gonzalez, the defendant, is referring to when he says, "I got

 6    in the team right now."

 7          What does he mean?

 8    A     That he -- he got somebody that is taxing.

 9    Q     And when he is talking about "he gave me 200 bucks," do

10    you have an opinion as to what that 200 bucks is for?

11    A     Tax money for selling drugs.

12    Q     And then when Jose Valencia Gonzalez, the defendant,

13    refers to "Wolf," from your investigation in this case and the

14    jail calls, were you able to form an opinion as to who Wolf is?

15    A     Yes.

16    Q     And who is Wolf?

17    A     A gang member from San Dimas named Anthony Rivas.

18             MS. DERBY:  I'm sorry, could you say that one more

19    time?

20             THE WITNESS:  What was that?

21             MS. DERBY:  Objection, Your Honor.  I did not hear

22    the name.  Could we have it repeated one more time?

23             MR. GORN:  It's not an objection, Your Honor.

24             THE COURT:  She's asking him to repeat the name.

25             MR. GORN:  I can ask him again.
```

```
 1   BY MR. GORN:

 2   Q     Could you repeat the name of Wolf?

 3   A     It's a San Dimas based gang member named Anthony Rivas.

 4   Q     And for Wolf, based on the context of this call, are you

 5   able to determine what role he was playing in terms of taxes?

 6   A     Wolf was being taxed.

 7   Q     And the role that defendant Jose Valencia Gonzalez is

 8   describing, by getting 200 bucks, are you able to have an

 9   opinion, or do you have an opinion, based on your investigation

10   and this call, as to what role defendant Jose Valencia Gonzalez

11   had in terms of taxing?

12   A     He was the one collecting the tax from Wolf.

13              MR. GORN:  Can we continue playing.

14                   (Audio played in open court.)

15   BY MR. GORN:

16   Q     When defendant Jose Valencia -- excuse me, when Seferino

17   Gonzalez references Popeye, based on your investigation in this

18   case, as well as the context of this call and the jail call, do

19   you form an opinion as to who Popeye is that Seferino Gonzalez

20   is referring to?

21   A     Yes.

22   Q     And who is that individual?

23   A     Carlos Gonzalez.

24   Q     Is that the defendant to my left?

25   A     Yes.
```

**UNITED STATES DISTRICT COURT**

1          MR. GORN:  Can we continue playing?

2                    (Audio played in open court.)

3          MR. KHOJAYAN:  Your Honor, may we take a break at

4     some point.

5          THE COURT:  All right.  Why don't we take a break

6     and come back at 10 after 3.

7          MR. KHOJAYAN:  Thank you, Your Honor.

8                    (Afternoon recess.)

9          (Jury enters the courtroom at 3:12 p.m.)

10         THE COURTROOM DEPUTY:  You may be seated.

11         THE COURT:  All right.  Good afternoon, ladies and

12    gentlemen.  I just want to let you know, on Monday we're going

13    to be starting at 10:30 because I have a major item in my

14    morning calendar.

15         We're going to start at 10:30 on Monday.

16         All right.  Let's continue with the examination.

17         MR. GORN:  Thank you.

18    BY MR. GORN:

19    Q    Special Agent Talamantez, did you review Government's

20    Exhibit 218 -- another jail call from July 14th, 2013 -- before

21    coming into court today?

22    A    Yes.

23         MR. GORN:  Can we pull up 218.  Thanks.

24         Can we play the first ten seconds, please.

25                   (Audio played in open court.)

```
 1              MR. GORN:  Stop right there.
 2   BY MR. GORN:
 3   Q     So, the first voice that says, "you know of a place called
 4   the compound," who is that?
 5   A     Seferino Gonzalez.
 6   Q     And the male response that says, "a what?"  Who is that?
 7   A     Jose Valencia Gonzalez.
 8              MR. GORN:  Can we keep playing?
 9                   (Audio played in open court.)
10   BY MR. GORN:
11   Q     Have you been to the compound?
12   A     I have.
13   Q     And where is it?
14   A     It's essentially where they explain it, but describing it
15   as a place that rents cars is generous.
16   Q     What is it actually?
17   A     A big empty field that has a bunch of people living in
18   cars, and transients and things.  And there is a bunch of
19   people selling drugs there.
20   Q     Based on your investigation and the jail call that we're
21   listening to here, as well as other jail calls for context, do
22   you have an opinion as to what Seferino Gonzalez is referring
23   to when he says the compound?
24   A     Referring to that location.
25   Q     And is that -- excuse me, is that in Pomona?
```

1    A    Yes, it's in Pomona.

2    Q    And that location that you described for drugs, is there

3    something in this call based on your investigation that

4    references drug dealing or drug sales?

5    A    Yes.

6    Q    And what is the language used in this call that indicates

7    that?

8    A    One, they refer to it "all day, every day, 24/7."  And

9    then they follow that up with saying "nickels, dimes, and

10   twenties," referring to denominations of drugs that are being

11   sold.

12   Q    Based on your investigation, did you learn about Seferino

13   Gonzalez and Jose Valencia Gonzalez's attempts to, quote, take

14   over, or to take over the compound?

15   A    Yes.

16   Q    And based on your opinion, what did Seferino Gonzalez and

17   Defendant Jose Gonzalez do from your listening of the jail

18   calls?

19   A    From these phones calls, they are planning to go to the

20   compound to taxing drug dealers that are paid there.

21   Q    You mean taxing, do you mean extortion?

22   A    Yes.

23             MR. GORN:  Can we continue.

24                  (Audio played in open court.)

25   BY MR. GORN:

**UNITED STATES DISTRICT COURT**

1  Q    Based on your opinion and listening to this call, your

2  knowledge of the Pomona area, and what you previously referred

3  to as the railroad tracks, is it your opinion that the railroad

4  tracks that Seferino Gonzalez refers to in this case is in

5  Pomona?

6  A    Yes.

7  Q    And this location of the compound, is the location where

8  the compound is in a Cherryville or a 12th Street area?

9  A    It is.  I don't recall which one, but it's in Pomona by

10  the tracks.

11  Q    Okay.  And the directions that Seferino Gonzalez -- is

12  that reasonably accurate enough to the location that you

13  visited that you know to be the compound?

14  A    Yes.

15  Q    And I want to talk to you about Gloria.

16       Based on your investigation in this case, and listening

17  to jail calls, and your further investigation as to visiting

18  the compound, do you have an opinion as to who Gloria is?

19  A    Yes.

20  Q    Who is Gloria?

21  A    I believe her last name is Pacheco.  But it's Gloria, I

22  think, Pacheco.

23  Q    And what is your opinion as to what Gloria Pacheco's role

24  is in reference to the compound?

25  A    She was, like, the person who kind of ran the compound.

1    Q    And when you say "ran," what did she run?

2    A    She, kind of, took care of and tried to keep everybody in

3    line of all of the people that were selling there.

4    Q    And is it your opinion that when Seferino Gonzalez and

5    when Jose Gonzalez are talking about taxing earlier in the

6    call, is that the individual, based on your opinion, that they

7    would tax?

8    A    They would tax everybody that was at compound; that's who

9    they were going to contact to make it happen.

10              MR. GORN:  Can we continue playing.

11                  (Audio played in open court.)

12              MR. GORN:  Can you stop right there.

13    BY MR. GORN:

14    Q    When Seferino refers to Spooky, based on your opinion and

15    your knowledge and speaking with Seferino Gonzalez, do you know

16    who Spooky is that he is referring to?

17    A    Yes.

18    Q    And who is that?

19    A    That is Seferino Gonzalez referring to himself in the

20    third person, by his moniker.

21    Q    And when Seferino says, "tell her that Spooky sent you on

22    behalf of Bill," do you also have an opinion as to who Bill is

23    based on the context of this call, as well as the other calls

24    that we had referencing Bill McCord?

25    A    Yes.

1   Q     And what is your opinion?

2   A     That it's Bill McCord, and they have kind of referenced

3   this previously.

4   Q     And based on your investigation, do you know what Bill

5   McCord's connection was at the time, in 2013, to the compound?

6   A     Based on these phone calls, it appears that Bill McCord

7   was the supplier of drugs to the people at the compound.

8   Q     Did Bill McCord's role change in your opinion once

9   Seferino Gonzalez and Jose Gonzalez attempted to tax the

10  compound?

11  A     Well, it changed for a couple of reasons.  One, he was in

12  jail and unable to supply the drugs.  And he made the mistakes

13  of telling Seferino where it was.

14  Q     In your opinion, why did he tell Seferino Gonzalez where

15  it was?

16  A     To gain favor, or what he thought would be favor, at the

17  time.

18  Q     Did that work out for him?

19  A     It did not.

20          MR. GORN:  Can you continue playing?

21              (Audio played in open court.)

22          MR. GORN:  Can you stop?

23  BY MR. GORN:

24  Q     When Seferino Gonzalez says "that woman, fool, sells the

25  other kind, fool," based on your investigation and your

```
 1   knowledge and background and experience as it relates to
 2   narcotics, do you have an opinion as to what Seferino Gonzalez
 3   is referring to?
 4   A    The black kind he's referring to is heroin.
 5   Q    Okay.  Why is it, in your opinion, that Seferino Gonzalez
 6   calls it "the other kind"?
 7   A    He's differentiating it from methamphetamine.  So, black
 8   and white.
 9             MR. GORN:  Can you play it.
10             (Audio played in open court.)
11   BY MR. GORN:
12   Q    So, stopping that call, when Seferino Gonzalez refers to
13   "you can get it from Cheryl, if you want," do you have an
14   opinion, based on your investigation, as to who is Seferino is
15   referring to when he mentioned Cheryl?
16   A    Cheryl Perez.
17             MR. GORN:  Can you continue.  Thank you.
18             (Audio played in open court.)
19   BY MR. GORN:
20   Q    Seferino Gonzalez mentions in this call that they pay the
21   third from there.  You previously opined and described the
22   meaning of what a third is.
23        Is it your opinion that Seferino Gonzalez is referring
24   to the third, which is a tax?
25   A    Yes.
```

```
 1  Q     And why do you believe that?

 2  A     From this investigation and the context.  And they are

 3  going to explicitly explain it in a phone call.

 4            MR. GORN:  Can you continue.

 5                  (Audio played in open court.)

 6            MR. GORN:  Stop there.

 7  BY MR. GORN:

 8  Q    Based on your opinion and your knowledge of this

 9  investigation and listening to all of the jail calls, are you

10  able to explain and give an opinion as to what Seferino

11  Gonzalez means "you keep one third of it, fool"?

12  A    He's talking about the extortion tax of keeping one third.

13            MR. GORN:  You can continue.

14                  (Audio played in open court.)

15  BY MR. GORN:

16  Q    Based on your investigation, is it your opinion that

17  Seferino Gonzalez and defendant Jose Valencia Gonzalez took

18  that compound over?

19  A     Yes.

20  Q     And how did they do that?

21  A     By going over there and collecting taxes and telling the

22  drug dealers that they would be required to pay.

23  Q    I'd like to direct your attention to Government's

24  Exhibit 223 from July 14, 2013.

25            MR. GORN:  Can we just play the beginning.
```

```
 1                    (Audio played in open court.)

 2              MR. GORN:  Stop there.

 3   BY MR. GORN:

 4   Q    The first male voice, do you know who that is?

 5   A    Yes.

 6   Q    Who is that?

 7   A    Seferino Gonzalez.

 8   Q    And the woman that responds after that, who is that?

 9   A    Kelly Deshannon.

10   Q    And based on your investigation and your review of the

11   calls in this case, as well as this particular call, do you

12   have an opinion as to who "Swifty" is that Seferino Gonzalez is

13   referencing from this call?

14   A    Yes.

15   Q    Who is that?

16   A    Jose Valencia Gonzalez.

17   Q    And Kelly Deshannon when she references "they want to pay

18   150 for a quarter though," based on your background, training,

19   and experience as it relates to drug distribution, as well as

20   your investigation in this case, do you have an opinion as to

21   what that is referencing?

22   A    $150 for quarter ounce of drugs.

23              MR. GORN:  Continue.

24                    (Audio played in open court.)

25   BY MR. GORN:
```

1    Q    Is it your opinion that based on this call that -- and the

2    investigation that you have conducted that Seferino Gonzalez is

3    explaining to Kelly about a drug distribution scheme?

4    A    Yes.  And the profits.

5    Q    Can we now look at Government Exhibit 228.  A call from

6    July 21st, 2013.

7            MR. GORN:  Can we just play the first ten seconds.

8                (Audio played in open court.)

9            MR. GORN:  Stop right there.

10               BY MR. GORN:

11   Q    The woman's voice that started that call, who is that in

12   Exhibit 228?

13   A    That is Cheryl Perez.

14   Q    And I should have asked you this before, but did Cheryl

15   Perez also go by "Castaneda" at all?

16   A    She did.

17   Q    And Seferino Gonzalez, do you hear his voice in the call?

18   A    Yes.

19   Q    Is that the other male in the call?

20   A    Yes.

21           MR. GORN:  If we can continue.

22               (Audio played in open court.)

23   BY MR. GORN:

24   Q    When Cheryl Castaneda Perez is talking about "two 8

25   balls," are you familiar with that term?

1    A    Yes.

2    Q    Based on your background, training, and experience as it

3    relates to narcotics and distributing quantities, do you know

4    what 8 balls means?

5    A    Yes.

6    Q    What is it?

7    A    One-eighth of an ounce or 3.5 grams.

8    Q    Is it your opinion, based on listening to this call so far

9    about the quantities they are discussing, is it about drug

10   distribution?

11   A    Yes.

12   Q    And earlier in the call there is a reference to "12th

13   Street."  Are you able to give context and have an opinion as

14   to why 12th Street is being referred to by Cheryl Perez in this

15   call?

16   A    Because she at this point is the senora so she's

17   collecting taxes from 12th Street.

18   Q    Is that presenting a problem for her?

19   A    She's irritated by something, but it's not -- there is a

20   problem she's dealing with.

21              MR. GORN:  Continue.

22                   (Audio played in open court.)

23   BY MR. GORN:

24   Q    When Cheryl Perez is talking about "it's not going to

25   happen like that," based on this call and the jail calls you

1  listened to in this case and your investigation, do you have an

2  opinion as to why Cheryl Perez is telling another individual

3  not to ask for drugs?

4  A    Yes.

5  Q    What is your opinion?

6  A    Cheryl has set the rules she wants everybody to follow,

7  which included not asking for drugs in the way this person did,

8  so Cheryl is voicing her displeasure to Seferino on what has

9  occurred.

10          MR. GORN:  Play.

11              (Audio played in open court.)

12  BY MR. GORN:

13  Q    Special Agent Talamantez, do you have an opinion based on

14  the investigation as to who Swifty is that Seferino Gonzalez is

15  referring to when he says "then like Swifty can do it"?

16  A    Yes.

17  Q    Who is that?

18  A    Jose Valencia Gonzalez.

19  Q    Now, when Seferino Gonzalez is referencing "a good

20  amount," versus "if he wants the other shit I can do it from

21  here" can you just describe what that means, in your opinion as

22  to what that means?

23          MR. KHOJAYAN:  Speculation, improper 701.

24          THE COURT:  Lay a foundation for the response.

25  BY MR. GORN:

```
 1   Q    Sure.  "A good amount" based on your background, training,

 2   and experience in drug distribution, do you have an opinion as

 3   to what that means versus Seferino offering what appears to be

 4   smaller quantities?

 5   A    Yes.  Based on this phone call they appear to be talking

 6   about larger amounts of drugs than 8 balls.

 7   Q    And because Seferino Gonzalez at this time is in custody,

 8   correct, is he limited in terms of the amounts that he can

 9   distribute because of his position inside custody?

10   A    Personally, yes.  He needs people to help him.

11   Q    Can we -- I'd like to direct your attention to

12   Government's Exhibit 232, a call from July 7, 2013.

13              MR. GORN:  And can we play the first ten seconds

14   again.

15                   (Audio played in open court.)

16              MR. GORN:  Can you stop right there.

17                 BY MR. GORN:

18   Q    The first male voice, are you able to identify who that

19   is?

20   A    That is Seferino Gonzalez.

21   Q    And the second male voice, are you able to identify who

22   that is?

23   A    Yes.

24   Q    Who is that?

25   A    William McCord or Bill McCord.
```

1              (Audio played in open court.)

2              MR. GORN:  Stop right there.

3    BY MR. GORN:

4    Q    Based on your investigation in this case, and your

5    background, training, and experience in the Pomona area, do you

6    have an opinion as to what Seferino Gonzalez means when he says

7    "my man has the keys to this city"?

8    A    Yes.

9    Q    What does that mean?

10   A    That he is the gang member that controls how the city

11   operates.

12   Q    Why does he say that in response to 12th Street in this

13   call?

14   A    He is explaining that if somebody from 12th Street goes

15   that she is to explain that she's with Seferino who is the

16   keyholder of the city, meaning that the 12th Streeters would

17   have to respect his influence and authority.

18              MR. GORN:  You can continue.

19              (Audio played in open court.)

20              MR. GORN:  I want to direct your attention now to

21   Government's Exhibit 215, another call from July 12th, 2013.

22   BY MR. GORN:

23   Q    From your investigation as it progressed were you able to

24   determine and form an opinion how the structure was formed

25   between Cheryl Castaneda Perez, Seferino Gonzalez, Kelly

```
 1   Deshannon, and defendant Jose Valencia Gonzalez?

 2   A     Yes.

 3   Q     And what is your opinion based on listening to these jail

 4   calls as to what that structure was?

 5               MR. KHOJAYAN:  Objection, improper 701.

 6               THE COURT:  Lay the foundation.

 7               MR. GORN:  Sure.

 8          Can we play the first ten seconds of Government

 9   Exhibit 215?

10                    (Audio played in open court.)

11               MR. GORN:  Can you stop.

12   BY MR. GORN:

13   Q     The male voice in this call, are you able to identify who

14   that is?

15   A     Yes.

16   Q     Who is that?

17   A     Seferino Gonzalez.

18   Q     And the woman on the line, are you able to identify who

19   that is?

20   A     Yes.

21   Q     Who is that?

22   A     Cheryl Perez.

23               MR. GORN:  Keep going.

24                    (Audio played in open court.)

25               MR. GORN:  Stop.
```

1           BY MR. GORN:

2    Q    Based on your investigation and your background, training,

3    and experience and listening to jail calls as well, have you

4    heard individuals refer to an item as a "toy" in code?

5    A    Yes.

6    Q    Based on your background, training, and experience and

7    what you have heard in this case, are you able to form an

8    opinion when Cheryl Perez and Seferino Gonzalez say "toys,"

9    what they are referring to?

10   A    Firearms.

11              (Audio played in open court.)

12           MR. GORN:  Can you stop right there.

13              BY MR. GORN:

14   Q    When Cheryl Perez references "going to strip the fuck up,"

15   is that code or slang for something else?

16   A    Yeah, I believe she probably means "strap the fuck up,"

17   but yes.

18   Q    Do you have an opinion as to what Cheryl Perez was

19   referencing when she said that?

20   A    I believe she's hesitant to supply guns to other gangs

21   because there is a chance that it could be used against them.

22   Q    You referenced earlier that it's your opinion that toys

23   refers to firearms; is that correct?

24   A    Correct.

25   Q    But you are now saying guns.  When you say "firearms" do

```
 1   you mean guns?

 2   A     Firearms is guns, yes.

 3   Q     One other question.

 4            When Cheryl Perez says, "he fucking looked all

 5   chunk," do you have an opinion or do you have knowledge as to

 6   what that means?

 7   A     I believe she's referring that he looked maybe on drugs.

 8                  (Audio played in open court.)

 9   BY MR. GORN:

10   Q     Based on your investigation and your background,

11   knowledge, and experience and listening to all of these jail

12   calls, did you form an opinion as to who Cheryl Perez was

13   referring to when she mentioned "brother"?

14   A     Yes.

15   Q     What is your opinion?

16   A     Mike Lerma.

17   Q     Why do you believe that?

18            MS. DERBY:  Objection, Your Honor, lack of

19   foundation, we have never even heard that name yet.

20            THE COURT:  Lay the foundation.

21   BY MR. GORN:

22   Q     In regards to the Mexican Mafia, are you familiar with the

23   title "brother"?

24   A     Yes.

25   Q     And what does that term mean to you?
```

1   A    It is one of the terms that is commonly used, referred to

2   a Mexican Mafia member.

3           MR. FURMAN:  Object to lack of foundation and move

4   to strike.

5           MR. KHOJAYAN:  Improper 701.

6           THE COURT:  Lay the foundation properly.

7   BY MR. GORN:

8   Q    Have you listened to jail calls in your investigation and

9   in this investigation that reference the term "brother"?

10  A    Yes.

11  Q    And from those calls, are you able to gain a context as to

12  what brother means in terms of the Mexican Mafia and the role

13  that it holds?

14  A    Yes.

15  Q    And from those calls and your overall investigation in

16  this case, are you able to give an opinion as to what you

17  believe the term entitled "brother" means as it relates to the

18  Mexican Mafia?

19  A    Yes.

20  Q    What does that mean to you?

21  A    It is a term that refers to a Mexican Mafia member.

22  Q    And when you are listening to the call from Cheryl Perez

23  here in Government's Exhibit 215, are you able to determine the

24  context similarly as to what brother means whether Cheryl Perez

25  says it?

```
 1   A    Yes.
 2   Q    What is your opinion that Cheryl Perez means or what do
 3   you believe Cheryl Perez means when she says "brother"?
 4            MS. DERBY:  Objection.
 5            MR. KHOJAYAN:  Lacks foundation.
 6            MS. DERBY:  As to there's 150 brothers we've been
 7   told.  So objection, no foundation.
 8            MR. KHOJAYAN:  Speculation.
 9            MS. DERBY:  And additionally, Your Honor, he has
10   three brothers, real biological brothers.
11            MR. GORN:  Your Honor --
12            THE COURT:  Let me stop.  I will overrule the
13   objections.  You can question him on the cross on the point.
14   BY MR. GORN:
15   Q    You can answer the question, what does Cheryl Perez mean
16   in your opinion when she refers to brother?
17   A    She's referring to Mike Lerma as a Mexican Mafia member.
18            MS. DERBY:  Objection, motion to strike, lacks
19   foundation.
20            THE COURT:  I will sustain the objection.
21   BY MR. GORN:
22   Q    I will ask it again with more background.
23            Did you listen to the entire context of this call?
24   A    Yes.
25   Q    Did you listen to other calls in this investigation where
```

1    Cheryl Perez spoke as to her role as a senora?

2    A    Yes.

3    Q    Were you able from her explaining her role in those jail

4    calls, as well as all of your investigation and speaking with

5    other individuals as to whether Cheryl Perez referred to Mike

6    Lerma as a brother of the Mexican Mafia?

7    A    Yes.

8    Q    And based on that, what is your opinion when Cheryl Perez

9    is saying in this call a brother?

10   A    She's referring to Mike Lerma.

11            MR. GORN:  Can you continue.

12                (Audio played in open court.)

13            MR. GORN:  Can you stop right there.

14            BY MR. GORN:

15   Q    When Seferino Gonzalez states "because your brother would

16   not have gave up anything if he didn't trust them fools" based

17   on your investigation and listening to the jail calls, do you

18   have an opinion as to what Seferino Gonzalez -- excuse me, who

19   Seferino Gonzalez is referring to when he says "your brother

20   would have not gave up anything."

21            MR. FURMAN:  Objection, improper -- lack of

22   foundation, calls for speculation.

23            THE COURT:  Let me have counsel on sidebar.

24                (Sidebar begins.)

25            THE COURT:  You know, I'm allowing you to question

1    this witness about his investigation.  Obviously when there are

2    terms that are utilized that may not be in the normal context

3    of what a person would understand, I'm allowing you to explain

4    through his investigation what those terms mean, but you keep

5    on asking him the ultimate questions on this, which is not

6    proper.  And I told you not to do it that way.

7              MR. GORN:  This is based on his investigation and

8    the context of this call.

9              THE COURT:  No.

10             MR. GORN:  It's not a broad question, it's a narrow

11   question.

12             THE COURT:  No.  You can ask him about what the term

13   brother means in this context of this particular call.  That's

14   not -- you asked him what does the term brother mean to refer

15   specific to Mike Lerma.  You basically asked him is Mike Lerma

16   a brother which means a member of the Mexican Mafia.  That is

17   exactly what you asked him.

18             MR. GORN:  No, I asked based on the investigation,

19   based on the call and the context of this call, what do you --

20   what's your opinion as to what Seferino Gonzalez is referring

21   to when he says brother.

22             THE COURT:  That's not the way you asked it.  You

23   said is Michael Lerma the brother that is being referred to.

24             MR. GORN:  I didn't say Michael Lerma.

25             MR. NOVAK:  Your Honor, the fact that he did an

UNITED STATES DISTRICT COURT

1    investigation, the fact that he's the case agent or the fact

2    that he's like the primary law enforcement officer doesn't mean

3    he can express opinions which are appropriate for designated

4    experts.

5             MR. GORN:  We have already been through this before.

6    It's not about naming Mike Lerma in that, it's the context of

7    the call that's what I'm asking him about and his

8    investigation.

9             THE COURT:  You didn't ask -- for example, what you

10   need to do when you do this sort of thing is you need to

11   reference a specific language of the call that refers to

12   brother, you say, "What does that mean?"

13            MR. GORN:  I started with that.

14            THE COURT:  Yes, and I didn't have any problem with

15   that.

16            MS. DERBY:  Your Honor, there has been no foundation

17   laid as to how he is labeling this brother with the wild leap

18   over to Michael Lerma, other than, well, I have listened to a

19   lot of phone calls.  There is no foundation made.

20            THE COURT:  You didn't object to the question prior

21   where he asked that, so if there wasn't an objection, there's

22   nothing for me to rule on on that one.

23        There was an objection to this latest one and I'm

24   sustaining the objection.  This is one of the Government

25   counsel's problems I'm having with this questioning.  What more

1    can I say.

2            MR. GORN:  Understood.

3                    (Sidebar ends.)

4            MR. GORN:  Can you continue playing.

5                 (Audio played in open court.)

6            MR. GORN:  Stop right there.

7               BY MR. GORN:

8    Q    Special Agent Talamantez, based on this call and the jail

9    calls you have reviewed in this case were you able to determine

10   and form an opinion as to who "Nato" is?

11   A    Yes.

12   Q    Who is Nato?

13   A    Donato Gonzales, goes by Nato, a influence Pomona 12th

14   Street gang member and Mexican Mafia member.

15   Q    What does it mean in the context of this call where he

16   would give it to Nato?  Do you have an opinion as to what that

17   means?

18   A    Yes.

19   Q    What is that opinion?

20   A    That he would have made -- that Lerma would have made Nato

21   the keyholder and not Seferino.

22            MR. FURMAN:  Calls for speculation and lacks of

23   foundation.  Move to strike.

24            THE COURT:  I will sustain that.

25            MR. GORN:  Okay.

```
 1   BY MR. GORN:
 2   Q    I would like to direct your attention now to Government's
 3   Exhibit 230.  Did you review Government's Exhibit 230 from
 4   July 28th, 2013?
 5   A    Yes.
 6   Q    What is that --
 7            MR. GORN:  Excuse me, can we just play the first ten
 8   seconds?
 9                 (Audio played in open court.)
10            MR. GORN:  Stop there.
11   BY MR. GORN:
12   Q    The first male voice in this call saying, "I talked to
13   Swifty today," can you identify that person?
14   A    Seferino Gonzalez.
15   Q    And the woman in the call, are you able to identify who
16   that is?
17   A    Yes.
18   Q    And who is that?
19   A    Cheryl Perez.
20            MR. GORN:  Can you continue.
21                 (Audio played in open court.)
22             BY MR. GORN:
23   Q    Based on your investigation and listening to this call,
24   when Cheryl Castaneda Perez states, "they want to go straight
25   through me" --
```

1          THE COURT:  Let me stop you, counsel, I think you

2    misheard his answer.

3          MR. GORN:  I'm sorry?

4          THE COURT:  I think you misheard his answer.  Maybe

5    I misheard his answer.  I thought you asked "and the woman

6    identified in the call, are you able to identify who that is?"

7    His answer is "yes."  You asked who is that and his answer was

8    "Cheryl Perez."

9          MR. GORN:  Yes.

10         THE COURT:  So then it's unclear what you are

11   referring to in the question.  In other words --

12         MR. GORN:  Oh, I'm sorry.  I can rephrase that.

13   Thank you, Your Honor.

14   BY MR. GORN:

15   Q    Special Agent Talamantez, did you hear at a point in the

16   conversation a speaker say, "they want to go straight through

17   me"?

18   A    Yes.

19   Q    And are you able to identify who that person is?

20   A    Yes.

21   Q    And who is that?

22   A    Cheryl Perez.

23   Q    Based on the context of this call, as well as the calls

24   you've listened to previously, as well as your investigation,

25   are you able to form an opinion as to what Cheryl Perez means

1    when she says "go straight through me"?

2    A     Yes.

3    Q     What is that opinion?

4    A     She's referring to gang members that have a problem going

5    straight to her with whatever their problem is.

6    Q     Why is that a problem --

7              THE COURT:  Let me have counsel on sidebar.

8                        (Sidebar begins.)

9              THE COURT:  Let me ask, according to the transcript

10   the person who's speaking is Cheryl Castaneda.

11             MR. GORN:  Yes.

12             THE COURT:  So you're saying she's Cheryl --

13             MR. GORN:  He clarified that.

14             THE COURT:  Is that for all of these or special

15   ones?  So, in other words, you clarified for purposes of this

16   one in particular.

17             MR. GORN:  No, no, she's always been Cheryl Perez.

18   We already got out that she also went by Cheryl Castaneda.

19   That came out earlier.  I'm sorry about the confusion.

20             THE COURT:  I thought they were separate for

21   something else.  Weren't they?

22             MR. GORN:  I'm sorry?

23             THE COURT:  I thought they were separate for

24   something else or does everybody agree that Cheryl Castaneda

25   has been always been Cheryl Perez?

UNITED STATES DISTRICT COURT

1          MR. NOVAK:  The problem is we heard -- we saw many

2    transcripts where it said Castaneda but they were using the

3    name Perez.  And then about a half an hour, maybe an hour ago,

4    I don't know, it was Perez Castaneda.  There is another Perez

5    but that is not this person.

6          THE COURT:  Well, maybe I'm just confused.  So why

7    don't we clarify it so the jurors are not misunderstanding.

8          MR. GORN:  I can do that.

9          THE COURT:  Okay, just do it again.

10                    (Sidebar ends.)

11          MR. GORN:  Let me just ask you -- I'm sorry,

12   counsel.

13   BY MR. GORN:

14   Q    Special Agent Talamantez, maybe we discussed this, if I

15   haven't, I'm sorry.  Cheryl Perez, did she also go by a

16   different last name?

17   A    Cheryl Perez Castaneda.

18   Q    Is that in this transcript saying Cheryl Castaneda, are

19   you still referring to the individual that you know as Cheryl

20   Perez?

21   A    Yes.  She goes by both names, I know her as Cheryl Perez

22   for a number of years.  I can try to refer to her as Cheryl

23   Castaneda, if you prefer.

24   Q    No, I'm just asking if there's a difference in the person?

25   A    It is the same person.

1    Q    So I will go back to my original question for you earlier.

2         In this call when Cheryl Perez references "they want to

3    go straight through me," based on the context of this call and

4    your investigation, are you able to opine and give an opinion

5    as to what she means whether she says that?

6    A    Yes.

7    Q    What does she mean based on your opinion?

8    A    She's referring to gang members that have a problem coming

9    directly to her with whatever that problem is.  And she doesn't

10   like it.  It's not her role.

11             MR. GORN:  Can you continue.

12                  (Audio played in open court.)

13   BY MR. GORN:

14   Q    Special Agent Talamantez, based on your investigation and

15   listening to the call in this case -- and the jail calls in

16   this case, did you form an opinion as to what Cheryl Perez was

17   speaking about when she said "it's my choice and my call"?

18   A    Yes.

19   Q    What is your opinion?

20   A    Her rule, that gang members with problems do not go

21   directly to her with whatever that problem is.

22   Q    And then when she continues and says, "you have a problem,

23   you go through him," also based on the investigation and this

24   call and jail calls that you have listened to in this case, do

25   you have an opinion as to who she's referring to?

1           MS. DERBY:  Objection, lacks foundation.

2           THE COURT:  Lay the foundation.

3   BY MR. GORN:

4   Q    Based on jail calls, did you get further context as to

5   Cheryl Castaneda -- excuse me, Cheryl Perez and what she would

6   mean when she said "if you can't answer, he'll call me, I'll

7   let him know"?

8           MS. DERBY:  Objection, calls for speculation.

9           THE COURT:  Lay the foundation.

10  BY MR. GORN:

11  Q    Based on the investigation in this case, did you determine

12  a structure in how Cheryl Perez would communicate with other

13  individuals in Pomona regarding criminal activity?

14          MR. FURMAN:  Objection, vague as to structure, and

15  communicate.

16          THE COURT:  Rephrase the question.

17  BY MR. GORN:

18  Q    During this call in July 28th, 2013, as referenced in

19  Exhibit 230, and your knowledge of this investigation are you

20  able to determine Cheryl Perez's role as a senora in Pomona?

21          MR. FURMAN:  Objection, asked and answered.

22          THE COURT:  I will sustain the objection.

23  BY MR. GORN:

24  Q    Based on your investigation and this call, are you able to

25  form an opinion as to what Cheryl Perez meant when she said "if

231

1    he can't answer, he'll call me"?

2    A    Yes.  She describes who is that in this call.  It's Jose

3    Valencia Gonzalez.

4    Q    And why do you form that opinion?

5    A    Because she says that she was talking to Swifty in this

6    call.

7    Q    Based on her statement that it was Jose Valencia Gonzalez

8    -- or excuse me, her inference that it was Jose Valencia

9    Gonzalez, are you able to determine what Defendant Jose

10   Valencia Gonzalez's role was in Pomona on July 28th, 2013,

11   based on this exhibit?

12          MR. KHOJAYAN:  Objection.  Improper 701.

13          THE COURT:  Rephrase the question.

14   BY MR. GORN:

15   Q    Sure.  Does Exhibit 230, in your opinion, explain what

16   defendant Jose Valencia Gonzalez's role would be in relation to

17   Cheryl Perez around July 28th, 2013?

18   A    Yes.

19   Q    And in your opinion, what would that role be?

20          MR. KHOJAYAN:  Objection.  Improper 701.  Vague.

21   Calls for narrative.

22          THE COURT:  There is just so much to choose from.

23          I will allow you one more opportunity to try to

24   rephrase the question.

25   BY MR. GORN:

1    Q    In this call in Exhibit 230, are you able to form an

2    opinion as to defendant Jose Valencia Gonzalez's role as it

3    relates to Cheryl Perez?

4              MR. KHOJAYAN:  Objection.  Improper 701.

5              THE COURT:  Overruled.

6              MR. GORN:  You can answer the question.

7              THE WITNESS:  Yes.  He works for Cheryl.

8    BY MR. GORN:

9    Q    I want to draw your attention now to Government's

10   Exhibit 231, a call from July 28th, 2013.

11             MR. GORN:  Can you play the first ten seconds.

12                  (Audio played in open court.)

13   BY MR. GORN:

14   Q    The woman that is speaking in this call that says "to me,

15   he is me," are you able to identify who that is?

16   A    Yes.  This is a continuation of the previous phone call.

17   She's still referring to Jose Valencia Gonzalez.

18   Q    My question for you is, is that woman -- is that Cheryl

19   Perez that is saying "to me, he is me"?

20   A    Yes.

21   Q    And Seferino Gonzalez, is that the man that is speaking in

22   the this call?

23   A    Same individual in the previous call, yes, Seferino

24   Gonzalez.

25   Q    Based on your investigation in this case and the context

1    of this call, and also in comparison to Government's

2    Exhibit 230, are you able to determine or form an opinion as to

3    what Cheryl Perez is referring to when she says "he is me"?

4    A    Yes.  It's a continuation of the previous phone call where

5    she was referring to Jose Valencia Gonzalez.

6                MR. GORN:  Can you continue.

7                     (Audio played in open court.)

8                MR. GORN:  Stop there.

9    BY MR. GORN:

10   Q    Based on your investigation and the context of this call,

11   are you able to form an opinion as to what Seferino Gonzalez

12   means when he says "we're the homies, we're the fucking --

13   we're his eyes, we're his ears"?

14   A    Yes.

15   Q    And what is your opinion?

16                MR. KHOJAYAN:  Objection.  Improper 701.

17   Speculation.  Foundation.

18                THE COURT:  Lay a foundation for his response.

19                MR. GORN:  Sure.

20   BY MR. GORN:

21   Q    Have you listened to jail calls in this investigation and

22   in this case where individuals have referred to "we're his

23   eyes" and "we're his ears"?

24   A    Yes.

25   Q    Are you able to determine context when this statement is

1    made as to what that means?

2    A    Yes.

3    Q    And are those from people that you know and from people

4    whose role in gangs and in the Pomona area is one that you

5    already know?

6    A    Yes.

7    Q    And when those people say it, are you able to make a

8    determination as to what that means?

9    A    Yes.

10   Q    And when you look at this call, when you see Seferino

11   Gonzalez or hear Seferino Gonzalez state, "we're his eyes,

12   we're his ears," what does that mean to you?  Are you able to

13   form an opinion, based on your investigation?

14            MR. KHOJAYAN:  Objection.  Improper 701.  And then

15   704(b).

16            THE COURT:  Let me stop, I will allow him to discuss

17   in the prior references what they were referring to.

18            MR. GORN:  Okay.

19            THE COURT:  His understanding.  And I will allow you

20   to ask him whether or not, in his understanding, that is the

21   same capacity.

22            MR. GORN:  Okay.

23   BY MR. GORN:

24   Q    In the prior calls you referenced where you have heard

25   "we're his eyes, we're his ears," were you able to make a

1  determination as to what that meant?

2  A    Yes.  We have listened to it.  It was when Seferino was

3  referring to Kelly Deshannon being his eyes and ears because in

4  that instance Seferino was in LA County jail and he needed

5  Kelly to tell him what was going on in the city.  This is

6  similar to that but different.

7  Q    How is it different?

8  A    Because it's referring to a different individual who they

9  are being the eyes and ears for within the City of Pomona.

10 Q    Based on your investigation and in this call and in the

11 jail calls you have listened to, are you able to form an

12 opinion as to how it's different?

13 A    Yes.

14 Q    And how is it different?

15 A    Because in this instance, they are talking about the

16 person who is in control of the city, being Mike Lerma, instead

17 of Seferino being in LA County Jail and having Kelly describe

18 it for him.

19        MS. DERBY:  Objection.  Motion to strike, lacks

20 foundation.

21        MR. FURMAN:  Speculation.

22        THE COURT:  I will sustain it unless you can lay the

23 foundation for his response.

24 BY MR. GORN:

25 Q    Well, you referenced it the last time in the call that we

1    heard that "we're his eyes and we're his ears" was in a context

2    between Seferino Gonzalez and Kelly Deshannon, correct?

3    A    Yes.

4    Q    And what was the role that was being described when that

5    was said in the prior call that we heard?

6    A    In the prior call she was his secretary and acting as his

7    eyes and ears.

8    Q    And in the context of Seferino Gonzalez and Cheryl Perez,

9    is that context different?

10   A    Slightly but a lot of it's the same, yes.

11   Q    Okay.  Same in terms of role, or different in terms of the

12   role that these individuals hold?

13   A    The roles are higher in this case, than they were in the

14   other case.

15           MR. FURMAN:  Objection.  Speculation.  Lack of

16   foundation.  Move to strike.

17           THE COURT:  Overruled.

18   BY MR. GORN:

19   Q    So when Seferino Gonzalez says "we're his eyes and we're

20   his ears," does that indicate and do you form an opinion that

21   that refers to a different person?

22   A    Yes.

23   Q    Why does it refer to a different person?

24   A    One is because in this context, he's speaking to Cheryl

25   Perez, so they are the eyes and ears for a different person

1     than Kelly would be for them.

2           MR. FURMAN:  Objection.  Lack of foundation and

3     speculation.  Move to strike.

4           THE COURT:  Overruled.

5     BY MR. GORN:

6     Q    So based on your prior knowledge as to the context of this

7     statement "we're his eyes, we're his ears," in the context of

8     Seferino Gonzalez and Cheryl Castaneda, do you form an opinion

9     as to what that means?

10    A    Yes.

11    Q    And what is that opinion?

12    A    That they are --

13          MS. DERBY:  Objection.  Lack of foundation.

14          THE COURT:  I will sustain the objection unless you

15    can lay a foundation for that response.

16          MR. GORN:  Can we continue.

17            (Audio played in open court.)

18          MR. GORN:  Stop right there.

19    BY MR. GORN:

20    Q    Special Agent Talamantez, Cheryl Perez in her statement

21    that he knows what I say, it's my choice and it goes.  Does

22    that assist you in determining what role Cheryl Perez plays as

23    a senora?

24    A    Yes.

25    Q    And in your opinion, based on your investigation, and

```
 1   based on the context of this call, Cheryl Perez -- are you able

 2   to determine and form an opinion as to who Cheryl Perez is

 3   referring to when she says "does your brother know" and "I said

 4   yes," "he knows what I say is my choice"?

 5   A    Yes.

 6   Q    In your opinion, who is Cheryl Perez referring to?

 7             MS. DERBY:  Objection.  Lacks foundation.

 8             THE COURT:  I will sustain the objection.  Let me

 9   have you on sidebar for just real quick moment.

10                      (Sidebar begins.)

11             THE COURT:  Is there anywhere in the -- any of the

12   transcripts where Ms. Perez -- or Ms. Gonzalez -- I'm sorry,

13   Ms. Castaneda identifies Lerma as the brother?

14             MR. GORN:  It's only in code.  What we have is

15   obviously the JPEG records.  We have everything else -- the

16   12th Street and all of that.  They talk about "he would be

17   giving up the keys" and everything like that.  But hearing the

18   actual name, no.

19                  Part of that is what Your Honor heard about

20   expert testimony which is --

21             THE COURT:  I will allow him to testify as to

22   reference to the brother, by reference to those things you are

23   talking about, but not by name if his name is never used.

24             MR. GORN:  Okay.

25             THE COURT:  But you have to cite to those portions
```

**UNITED STATES DISTRICT COURT**

1    of the other exhibits that you are proffering as to -- to draw

2    that connection.

3                MR. GORN:  Understood.

4                    (Sidebar ends.)

5    BY MR. GORN:

6    Q    The term -- when we previously spoke about "my eyes" and

7    "my ears," is that in reference to, from your experience, the

8    role of a secretary?

9    A    Yes.

10   Q    Okay.  Can that also be the role of a senora?

11   A    Yes.

12   Q    And based on your personal knowledge and background, what

13   does a senora do?

14   A    They act on behalf of a Mexican Mafia member.

15   Q    Okay.  And when Cheryl Perez makes a comment that -- or

16   indicates "we're his eyes, we're his ears," is there a specific

17   role that she's indicating by saying that?

18   A    Yes.

19   Q    And what is that role?

20   A    That she's the senora.

21   Q    Now --

22               MS. DERBY:  Objection.  In this transcript, she does

23   not say that.

24               MR. GORN:  But in the context --

25               THE COURT:  Don't argue with each other.

```
 1              MR. GORN:  Let's see.
 2   BY MR. GORN:
 3   Q    Now, based on your review --
 4              THE COURT:  You need to refer again to the
 5   portion --
 6              MR. GORN:  Oh, of course.
 7              THE COURT:  -- of the transcript, so I will sustain
 8   the objection.
 9              MR. GORN:  Okay.
10   BY MR. GORN:
11   Q    In this call between Seferino Gonzalez and Cheryl Perez,
12   when they are discussing the eyes and the ears, is that
13   reference to a specific role?
14   A    Yes.
15   Q    And what is that role?
16   A    That Cheryl Perez is the senora.
17   Q    And what is it, based on your investigation in this case,
18   that makes you believe that Cheryl Perez is the senora for
19   defendant Mike Lerma?
20              MR. FURMAN:  Objection.  Calls for speculation and
21   lack of foundation.
22              THE COURT:  I will sustain the objection for lack of
23   foundation.
24   BY MR. GORN:
25   Q    As part of your investigation, did you look at JPay links
```

**UNITED STATES DISTRICT COURT**

```
 1   between Cheryl Perez and defendant Mike Lerma?

 2   A     Yes.

 3   Q     And what did you find in those JPay records?

 4   A     That she placed money on his JPay account.

 5   Q     Now, is that a role that a senora would have for a Mexican

 6   Mafia brother?

 7              MR. FURMAN:  Objection.  Calls for speculation.

 8   Lack of foundation.

 9              MR. GORN:  I will withdraw the question, Your Honor.

10              THE COURT:  Okay.

11   BY MR. GORN:

12   Q     I'd like to take your attention to, now, Government's

13   Exhibit 293, from July 6, 2013.

14              MR. GORN:  Can we just play that?

15                   (Audio played in open court.)

16              MR. GORN:  Stop.

17   BY MR. GORN:

18   Q     The first male speaker in this call in Exhibit 293, do you

19   know who that is?

20   A     Yes.

21   Q     Who is that?

22   A     Jose Valencia Gonzalez.

23   Q     The second male speaker, who is that?

24   A     Seferino Gonzalez.

25   Q     Now at the same time period back in July of 2013, did you
```

**UNITED STATES DISTRICT COURT**

```
 1   also retrieve jail calls relevant -- excuse me, did you also

 2   review jail calls relevant to defendant Juan Sanchez?

 3   A    Juan Sanchez's phone calls, I don't believe so.

 4   Q    Juan Sanchez, do you know him as "Squeaks"?

 5   A    Yes.

 6   Q    And looking at the call that we just played on

 7   Exhibit 293, do you see an individual here referenced by

 8   defendant Jose Gonzalez as "Squeaks" or "Squeaky"?

 9   A    Yes.

10   Q    And the context of this call that you were listening to

11   and the relationship from your investigation between defendant

12   Jose Gonzalez and defendant Juan Sanchez, do you have an

13   opinion as to who Squeaky is in this call?

14            MR. LASTING:  Objection, Your Honor.  The phone call

15   does not appear -- misstatement of the evidence.

16            THE COURT:  Rephrase your question.

17   BY MR. GORN:

18   Q    Based on your investigation in the case and listening to

19   this call, do you have an opinion as to who Squeaks is in this

20   call?

21   A    Yes.

22   Q    And based on your investigation, what is your opinion as

23   to who is Squeaky is?

24   A    That it's Juan Sanchez.

25   Q    If we can go to Exhibit 294.
```

```
 1              Starting with the first ten seconds.
 2                    (Audio played in open court.)
 3              MR. GORN:  Stop.
 4   BY MR. GORN:
 5   Q    The first male caller in that call, do you know who that
 6   was?
 7   A    Yes.
 8   Q    Who was it?
 9   A    Jose Valencia Gonzalez.
10   Q    And the second male caller, do you know who that was?
11   A    Yes.
12   Q    Who was it?
13   A    Seferino Gonzalez.
14              MR. GORN:  Can we continue playing?
15                    (Audio played in open court.)
16   BY MR. GORN:
17   Q    Based on your investigation, and listening to this call
18   and the other jail calls, were you able to determine back in
19   July 6, 2013, what defendant Juan Sanchez's relationship was
20   with Seferino Gonzalez and Jose Gonzalez?
21   A    Yes.
22   Q    What was that role?
23   A    A fellow Cherryville gang member.
24   Q    And specifically in this call, are you able to glean,
25   based on your background, training, and experience, indicia or
```

1    elements of drug distribution in this case?

2    A    Yes.

3    Q    And what is it about this call that makes you believe

4    that?

5    A    They specifically say that there are people selling for

6    them and they should listen to Squeaks.

7    Q    And Squeaks -- based on your investigation, do you have an

8    opinion in this call as to who that is?

9    A    Yes.

10   Q    And who is that?

11   A    Juan Sanchez.

12   Q    As part of your investigation, did you also attempt to

13   obtain cell phone location data of defendant Jose Gonzalez and

14   Cheryl Perez as it related to the assault in Covina on

15   July 14th, 2013?

16   A    Yes.

17            MR. GORN:  Actually, if I could have a moment, Your

18   Honor.  I believe that Exhibits 215, 216, 217, and 218 were

19   only provisionally admitted.  I would ask at this point that

20   they be moved into evidence.

21            THE COURT:  All right.

22            MR. KHOJAYAN:  I renew my objection.

23            THE COURT:  I will overrule the objections.  I will

24   admit them.

25            MR. GORN:  Thank you.

1          THE COURT:  Obviously, the objections are reserved.

2          MR. KHOJAYAN:  Thank you.

3      (Exhibits 215, 216, 217, and 218 received into evidence.)

4    BY MR. GORN:

5    Q    Going back to the cell site evidence.  As part of your

6    investigation, did you obtain cell site data for defendant Jose

7    Gonzalez and Cheryl Perez as it pertains to July 14th, 2013?

8    A    Yes.

9    Q    Can you just explain, what is cell site data?  Briefly.

10   A    Cell site data is information -- when you make a phone

11   call, your phone hits off of a cell tower that is in the area

12   that is designated at that time.

13        So if you obtain cell site data for a phone, it shows

14   you what towers are being used at specific times for your

15   phone.

16   Q    How do you go about obtaining cell site data?

17   A    A couple of different ways.

18        You can have a court order if you were to do it

19   federally, or you can write a search warrant for it if you are

20   going to acquire it through state.

21   Q    And is it helpful in your investigation?

22   A    It is helpful.

23   Q    And were you able to obtain the subscriber information for

24   both Cheryl Perez as well as Jose Valencia Gonzalez as it

25   pertained to the incident in Covina?

```
 1   A     Yes.
 2   Q     Did an agent -- did you or an agent working with you make
 3   a request for those records belonging to a specific cell phone
 4   carrier?
 5   A     Yes.
 6   Q     Was that Sprint?
 7   A     Yes.
 8   Q     Okay.  Now, is it fair to say that -- I believe T-Mobile
 9   has since taken over Sprint?
10   A     Yes, I believe that's correct.
11   Q     Okay.  And did you make a records request to Sprint,
12   though, back in maybe 2014 to provide you with records with
13   certified copies?
14   A     Yes.
15   Q     Okay.  And can you briefly review Exhibits 277 through 284
16   in the binder in front of you?
17   A     They appear to be cell phone records.
18   Q     Do you recognize those exhibits?
19   A     Yes.
20   Q     And what are they?
21   A     They are cell phone records.
22   Q     And are these the accurate records that were sent to you?
23   A     Yes.
24   Q     Okay.
25              MR. GORN:  Your Honor, at this time the government
```

```
1    would move to admit Exhibits 277 through 278 based on the

2    902(11) certification from the records custodian that is

3    attached as one of those exhibits.

4            MR. KHOJAYAN:  No objection, Your Honor.

5            THE COURT:  All right.  They are admitted.

6        (Exhibits 277 through 278 received into evidence.)

7    BY MR. GORN:

8    Q    Based on your investigation, were you able to look at the

9    cell phone or cell site data in this case?

10   A    Yes.

11   Q    And as part of your investigation in summary, were you

12   able to determine anything from that data?

13   A    Yes.

14   Q    And what, if anything, did you determine?

15   A    That the cell phones of Cheryl Perez and Jose Valencia

16   Gonzalez were in the area of the Covina shooting, at around the

17   approximate time that the Covina shooting happened.

18   Q    Now, shortly after the assault in Covina, did Covina law

19   enforcement conduct surveillance of defendant Jose Valencia

20   Gonzalez?

21   A    Yes.

22   Q    And on July 17, 2013, did you review reports as part of

23   your investigation to see what, if any, cars defendant Jose

24   Valencia Gonzalez was driving at that time?

25   A    I reviewed reports from that day, yes.
```

1   Q     And did -- based on your investigation, did a Covina

2   police officer stop that car?

3   A     Yes.

4   Q     And from that traffic stop back on July 17, 2013, were you

5   able to determine who the driver was of that car?

6   A     Yes.

7   Q     And was that car a white GMC Terrain SUV?

8   A     Yes.

9   Q     As part of your investigation, did you review reports as

10  to any search of that GMC Terrain SUV on October 30th, 2013?

11  A     Yes.

12  Q     And what, if anything, did you learn to further your

13  investigation as to the assault in Covina?

14  A     That a firearm was found concealed in the roof area of the

15  vehicle.

16  Q     Now, as part of your investigation, did you also look into

17  a search warrant from a residence located at 9638 Helena Avenue

18  in Montclair?

19  A     Yes.

20  Q     How is that residence significant to your investigation in

21  this case?

22  A     That was the residence of Jose Valencia Gonzalez.

23  Q     And as part of that search warrant, did you find or did

24  you review any reports that indicated items of relevance to

25  your investigation?

```
 1   A     Yes.

 2   Q     What, if anything, did you find?

 3   A     Bullets were located.

 4   Q     As far as you know, from your review, was a .380 round

 5   located at that residence?

 6   A     Yes.

 7   Q     When you referenced the jail call earlier, where you

 8   previously testified that Jose Valencia Gonzalez mentioned .22

 9   bullets, was that in reference to, in your opinion, the search

10   warrant that was executed at the Helena Avenue address?

11   A     I believe so, yes.

12   Q     And are you aware of, pursuant to your investigation,

13   where Jose Valencia Gonzalez was living in July of 2013?

14   A     Yes.

15   Q     Where was he living?

16   A     I believe he was the Helena address.

17   Q     As part of your investigation into twenty -- into 2013

18   drug distribution, referenced in the jail call about the

19   compound, did you find any arrests pertinent to that

20   investigation?

21   A     To the compound?

22   Q     Excuse me, to taxation, around that time in 2013 of July?

23   A     Yes.

24   Q     Okay.  And did you know an individual with the initials,

25   or excuse me, by the name of Jose Martinez?
```

1   A     Yes.

2   Q     And did you know him also by his moniker of Slim?

3   A     Yes.

4   Q     Have you personally met with Jose Martinez?

5   A     Yes.

6   Q     And can you just briefly describe how do you know Jose

7   Martinez?

8   A     Previous contacts in the City of Pomona and in a

9   investigation.

10  Q     And speaking with him, did he ever admit his prior gang

11  affiliation to you?

12  A     Yes.

13  Q     And what was it?

14  A     Big Hazard.

15  Q     Based on your background, training, and experience as to

16  the gangs in Los Angeles, do you know the general area where

17  Big Hazard is in Los Angeles?

18  A     Eastern Los Angeles.  East Los Angeles.

19  Q     As your investigation develops in 2013, did you obtain any

20  information regarding Jose Martinez and his drug distribution

21  at that time?

22  A     Yes.

23  Q     And what did you learn, if anything?

24  A     That he had been contacted and arrested with drugs, a gun,

25  and a pay/owe sheet taxing ledger.

**UNITED STATES DISTRICT COURT**

```
 1   Q    In your own words, what role did Jose Martinez play in
 2   your investigation into the -- into your investigation of the
 3   Pomona area in 2013?
 4              MS. DERBY:  Objection, overbroad.
 5              THE COURT:  Rephrase your question.
 6   BY MR. GORN:
 7   Q    As part of your investigation, did you find any pertinent
 8   information regarding defendant Jose Martinez and his ties to
 9   an enterprise activity in Pomona?
10   A    Yes.
11   Q    What, if anything, did you find is pursuant to your
12   investigation?
13   A    That he was collecting taxes and selling drugs in the City
14   of Pomona.
15   Q    As part of your investigation did you develop --
16              MR. GORN:  Excuse me, if I can have one moment.
17              THE COURT:  All right.
18   BY MR. GORN:
19   Q    As part of your investigation did you also investigate a
20   traffic stop from May 8, 2015?
21   A    Yes.
22   Q    Was that traffic stop in regards to Carlos Gonzalez?
23   A    Yes.
24   Q    Did you review reports based on that traffic stop?
25   A    Yes.
```

1    Q     Where did that occur?

2                MR. NOVAK:  Objection, hearsay.

3                THE COURT:  Overruled.

4    BY MR. GORN:

5    Q     Where did that occur?

6    A     The May 8, 2015, traffic stop occurred in the City of

7    Pomona.

8    Q     And did you look at that traffic stop as part of your

9    investigation?

10   A     Yes.

11   Q     And can you tell me, based on your investigation of those

12   reports, did you see whether Carlos Gonzalez was with another

13   defendant in this case?

14               MR. NOVAK:  Objection, hearsay, no personal

15   knowledge.  Police reports are not -- contents of police

16   reports are not admissible through a third party.

17               MR. GORN:  It's for a different purpose as part of

18   his investigation in the summary.

19               MR. NOVAK:  That is irrelevant.

20               THE COURT:  I will sustain the objection.

21   BY MR. GORN:

22   Q     So were the defendants in this case eventually arrested

23   around 2018 for conduct described that you are testifying to

24   today, at least in part?

25               MR. NOVAK:  Objection, overbroad and irrelevant when

```
 1    any particular defendant was arrested.  Not relevant.
 2              MR. GORN:  It's getting into MDC, Your Honor.
 3              THE COURT:  No.  Are you trying to inquire as to the
 4    point in time whether or not this witness knows whether or not
 5    the individuals went into MDC?
 6              MR. GORN:  Yes.
 7              THE COURT:  You can ask him the direct question as
 8    to whether or not he knows and how is the basis that he knows.
 9              MR. GORN:  Sure.
10    BY MR. GORN:
11    Q    Based on your investigation in the case did you come
12    across information that defendant Michael Lerma, defendant
13    Carlos Gonzalez, defendant Juan Sanchez, and defendant Jose
14    Valencia Gonzalez were housed together in Metropolitan
15    Detention Center in 2020?
16    A    Yes.
17    Q    And how did you learn that?
18    A    From investigating a murder.
19    Q    Now, when you said -- you referenced a murder, I want to
20    show you an exhibit.  Can you turn to Exhibit 167.
21    A    My 167 is blank.
22    Q    Before June 28th, 2020, was an individual named Steven
23    Bencom ever a part of your investigation?
24    A    Did you say prior to June 28th?
25    Q    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1  A    He was not.

 2  Q    Did that change?

 3  A    Yes.

 4  Q    Why did that change?

 5  A    Because he was murdered in MDC.

 6        MR. NOVAK:  Excuse me, objection, relevance.  What's

 7  the relevance of the general scope of this witness'

 8  investigation to the facts in dispute?

 9        THE COURT:  Well, let me -- well, let me ask the

10  government counsel, did this particular witness investigate the

11  murders is what you are saying?

12        MR. GORN:  Yes.

13        THE COURT:  Let me ask the defense counsel, why is

14  that background -- the background a question?

15        MR. NOVAK:  Why is it a background question?

16        THE COURT:  Why isn't it a background question.  Now

17  you may have objections to subsequent questions, but as to that

18  question I don't know why you are objecting to it.

19        MR. NOVAK:  I will withdraw it.  We will see what

20  happens next.

21        MR. GORN:  Do you have Exhibit 167?  It wasn't in

22  the binder, but can I show counsel and approach the witness?

23        THE COURT:  Sure.  You have to show all counsel.

24        MR. KHOJAYAN:  We have that.

25        MR. GORN:  May I approach the witness?
```

```
 1              THE COURT:  Yes.
 2  BY MR. GORN:
 3  Q    Do you recognize -- sir, I just gave you what has been
 4  marked as Exhibit 167.  Do you recognize that exhibit?
 5  A    Yes.
 6  Q    And what is that exhibit of?
 7  A    It's a photograph of Steve Bencom.
 8  Q    Is that a true and accurate photo of Steven Bencom as you
 9  knew him and as part of your investigation?
10  A    Younger, but yes.
11  Q    As part of your investigation, did you also interview
12  individuals after June 28th, 2020, regarding the murder of
13  Steven Bencom?
14  A    Yes.
15  Q    Did you speak with inmates that were there?
16  A    Yes.
17  Q    Were some of those inmates Jose Martinez?
18  A    Yes.
19  Q    Andrew Jackson?
20  A    Yes.
21  Q    Ryan Tawa?
22  A    Yes.
23  Q    Joe Jordan?
24  A    Yes.
25  Q    Based on your investigation, were you able to determine
```

```
 1   where all four defendants were housed on June 28th, 2020?

 2            MR. NOVAK:  Objection, calls for hearsay.  It's the

 3   best evidence rule, relevance.

 4            THE COURT:  I will sustain the objection.  Let me

 5   just ask counsel.

 6            MR. GORN:  Yes.

 7            THE COURT:  Well, I presume you have the records of

 8   the inmates of the particular institution, don't you?

 9            MR. GORN:  We do.

10            THE COURT:  Why wouldn't that be offered?

11            MR. GORN:  We can offer that.

12            THE COURT:  All right.

13            MR. GORN:  I'm sorry, Your Honor, I forgot to admit

14   167.

15            THE COURT:  Any objection to 167?

16            MR. KHOJAYAN:  No.

17            MS. DERBY:  No, Your Honor.

18            THE COURT:  It's admitted.

19              (Exhibit 167 received into evidence.)

20            MR. GORN:  Thank you.

21   BY MR. GORN:

22   Q    Did you review records and were you able to determine from

23   Bureau of Prison and MDC records where all four defendants were

24   housed on June 28th, 2020?

25   A    Yes.
```

```
 1   Q    And based on the records that you reviewed where were the

 2   defendants housed?

 3              MR. NOVAK:  Calls for hearsay, best evidence rule.

 4              MS. DERBY:  Also lacks foundation.

 5              THE COURT:  I will sustain the objection.

 6   BY MR. GORN:

 7   Q    Have you been to --

 8              MR. GORN:  Excuse me, if I could just have a moment,

 9   Your Honor?

10              THE COURT:  Yes.

11              MR. GORN:  Your Honor, I don't have any more

12   questions at this time.

13              THE COURT:  All right.  Cross?

14              MR. NOVAK:  I have no questions on behalf of

15   Mr. Carlos Gonzalez for this witness at this time, based on the

16   examination so far.

17              THE COURT:  Any other?

18              MR. KHOJAYAN:  No questions for Jose Gonzalez.

19              MR. LASTING:  No questions from Juan Sanchez, Your

20   Honor.

21              MS. DERBY:  Your Honor, I need a moment because I'm

22   trying to think about the relevance.

23              THE COURT:  You don't need to explain.  If you ask

24   for time, I will give you time to think about it for a moment.

25              MS. DERBY:  No, I have a question.
```

```
 1                THE COURT:  You do have a question?

 2                MS. DERBY:  Yes, can I cross-examine him.

 3                THE COURT:  All right.

 4                          CROSS-EXAMINATION

 5   BY MS. DERBY:

 6   Q    Good afternoon Officer -- Agent Talamantez.

 7         You testified earlier that there were -- you have

 8   investigated 5 to 10 Mexican Mafia members, meaning not just

 9   associates, the actual members.  Who are those 5 to 10?

10   A    Jose Landa-Rodriguez.

11   Q    What is his moniker?

12   A    Fox.

13                Michael Lerma, "Pomona Mike," a defendant here.

14                Luis Vega, "Little One" Vega.

15                Robert Ruiz, "Peanut Butter."

16                Donato Gonzales, "Nato."

17                James Godoy, "Husky."

18                Manuel Quintero, "Snuffy."

19                Michael Torres, "Fly" or "Mosca."

20                That is already eight right there.

21   Q    Okay.  So you have been an agent regarding Pomona that

22   since 2007, correct?

23   A    I'm an agent with the FBI.  I have run a task force that

24   is based in Pomona since 2010, but I have been on the task

25   force since about 2008.
```

```
 1   Q    I thought you said 2007.
 2        So you have been involved in Pomona then since 2008.
 3   A    A long time, yes.  Probably before that, it's a long time
 4   if that is your point.
 5   Q    Okay.  And you testified about a call -- a call 231.
 6   Could you go back to that call?  Actually start with 230,
 7   sorry, 230.
 8        Now in this call, you testified about "you call, if he
 9   can't answer, he'll call me," that is a statement from Cheryl
10   Castaneda Perez, correct?
11   A    Yes.
12   Q    All right.  And you are saying that is in relation to Jose
13   Valencia Gonzalez, correct?
14   A    Yes.
15   Q    Okay.  And so the statement is, "I told them it was my
16   call, my choice and no, you have a problem, you go through him.
17   If he can't answer, he'll call me.  I'll let him know and
18   that's the way it's going to work," correct?
19   A    Yes.
20   Q    Okay.  So you are saying -- what does that mean to you?
21   A    What does it mean?
22   Q    Yeah.  What does that mean?
23   A    It means that Cheryl is dictating her rules as the senora
24   for the City of Pomona, meaning that gang members that have a
25   problem are not going to go through her, that's her choice,
```

```
 1   that's her rules, that they need to go through Jose Valencia
 2   Gonzalez.
 3        If Jose Valencia Gonzalez does not know the answer, then
 4   she will answer it.
 5   Q    Okay.  Go to 231.
 6        If you go to 231, the last -- this is the comment where
 7   you were saying "eyes and ears," correct?  Is this the -- yes.
 8   So Seferino says, "we're the effing -- we're his eyes, we're
 9   his ears, we're everywhere and everything, you know?"  Do you
10   see that part?
11   A    I do.
12   Q    And then go down to the last part of Cheryl Castaneda, and
13   she says, "yeah, he was like, well, does your brother know?  I
14   said yes, he knows what I say.  It's my choice, and it goes.
15        He says, oh, okay.  Well, we didn't know.
16        And I'm like, I told you already, I couldn't, and I
17   don't want to have to tell you again."
18        Your testimony was you were trying to infer that she's
19   making a statement about a Mexican Mafia member, correct?
20   A    Yes, would you like me to explain?
21   Q    Well, I want to ask, when does a secretary say "I told you
22   already and I don't want to have to tell you again."
23   A    When she's a senora.
24   Q    Can a senora say that to a Mexican Mafia member?
25   A    She's not referring to speaking to the member in this,
```

**UNITED STATES DISTRICT COURT**

```
 1    she's referring to the person she's having a problem with.
 2    Q    Okay.  I think we just beg to differ on that
 3    interpretation.
 4              MR. GORN:  Objection, Your Honor, counsel is
 5    testifying.  There is no question before the witness.
 6              THE COURT:  Well, I have already indicated that
 7    questions and statements of attorneys are not evidence so.
 8              MR. GORN:  Thank you.
 9              THE COURT:  I understand your objection, but it's
10    not necessary.
11          So let me ask you, are you done with the questioning?
12              MS. DERBY:  No, I have one more.
13              THE COURT:  Okay.
14    BY MS. DERBY:
15    Q    If you can go to 232.  Who is "Pete"?
16    A    I don't know who the Pete is in this call.
17    Q    All right.
18              MS. DERBY:  Your Honor, I would just request that
19    this witness remain under -- or we should be able to use the
20    government's subpoena so that we can call him as our witness.
21              THE COURT:  Let me ask the government, what is your
22    response to that?
23              MR. GORN:  I believe that now is the time to ask on
24    cross-examination, Your Honor.
25              THE COURT:  I would agree.
```

1              MS. DERBY:  Your Honor, the witness -- it would be

2    way beyond the scope of the direct.

3              THE COURT:  So sorry, you named him as your own

4    witness as well is what you are saying?

5              MS. DERBY:  Yes.

6              THE COURT:  Let me just ask, if they named him as a

7    witness for their defense, I presume as the case agent he's

8    going to be present during the course of the trial?

9              MR. GORN:  That's fine, Your Honor.

10             THE COURT:  Okay.

11             MS. DERBY:  Thank you.

12             THE COURT:  Anything else from anybody or does the

13   government wish to redirect?

14             MR. GORN:  Yes, Your Honor.

15             THE COURT:  Okay.  You are going to redirect just on

16   the cross that was conducted?

17             MR. GORN:  Excuse me, on Exhibit 231.

18             THE COURT:  Okay.

19                         REDIRECT EXAMINATION

20   BY MR. GORN:

21   Q    Special Agent Talamantez, on cross-examination, counsel

22   referred you to Exhibit 231.  Do you remember that exhibit?

23   A    I do.

24   Q    She specifically mentioned "we're his eyes, we're his

25   ears," and asked if you were inferring, correct?

```
 1   A     Yes.

 2   Q     Based on counsel's question to you, are you inferring?

 3   A     I think they are clearly explaining what they are doing

 4   and what their role is.

 5   Q     In your words what is happening when --

 6              MR. GORN:  Can you go up?

 7   BY MR. GORN:

 8   Q     What is your opinion when Seferino Gonzalez says, "we're

 9   his eyes, we're his ears"?

10              MS. DERBY:  Objection, Your Honor, the witness said

11   it speaks for itself, so let it speak for itself.

12              MR. GORN:  Counsel cross-examined on him on an

13   inference.  I can ask what that inference means.

14              THE COURT:  I will allow the question.

15   BY MR. GORN:

16   Q     Sir, you can answer.

17   A     Can you repeat it one more time?

18   Q     You were asked what you are inferring from counsel when

19   you were discussing "we're his eyes, we're his ears"?

20   A     Yes.  Based on the individuals that are speaking, being

21   the keyholder and the senora, I inferred that they were working

22   on behalf of Mike Lerma, based on their roles and the context

23   of the calls.

24              MR. FURMAN:  Lack of foundation and speculation.

25              THE COURT:  I will strike the answer as far as it
```

1    identifies anyone, but I won't strike the answer in terms of

2    what it means to be the eyes and ears.

3    BY MR. GORN:

4    Q    Sir, you were asked about any inferences you made as it

5    regards "we're his eyes, we're his ears."

6         Can you explain further when you said you would like to

7    explain what if any inferences you were making that counsel

8    referred to?

9    A    The role and the individual they were talking to based on

10   their positions in what they're talking about.

11        So, Seferino has already indicated in a phone call that

12   he's the keyholder.

13        He's taking direction from Cheryl Perez who is a senora.

14   So in this instance, I'm inferring they are talking about being

15   the eyes and ears for the Mexican Mafia member that they are

16   working for.

17             MR. GORN:  Nothing further.

18             MS. DERBY:  Your Honor, I have one other question.

19                       RECROSS EXAMINATION

20   BY MS. DERBY:

21   Q    You testified about these JPay records, correct?

22   Exhibit 350.

23             MR. GORN:  Objection, outside the scope.

24             THE COURT:  I will sustain the objection.  That

25   wasn't addressed in the redirect.

```
 1            MS. DERBY:  I can bring it up in my own examination.
 2   Can I request just reopen momentarily?  It's two questions.
 3            THE COURT:  All right.  But only two questions.
 4   Literally two questions, means two questions.
 5         Attorneys two questions means ten questions.
 6            MS. DERBY:  I got it.  If you can scroll to the next
 7   page.
 8   BY MS. DERBY:
 9   Q    All right.  You are looking at Exhibit 350, correct?
10   A    Okay.
11   Q    And you testified that Cheryl Perez put money on the books
12   of Mr. Lerma on 2/8/12 and 9/11/12, correct?
13   A    Yes.
14   Q    Can you go to the next page?  The page following on that
15   exhibit shows that Ms. Perez also put money on Mr. Lerma's
16   books on July 24, 2010, correct?
17   A    Yes.
18   Q    It was $80?
19            MR. GORN:  Your Honor, that is more than two
20   questions.
21            MS. DERBY:  Okay, I'm done.
22   BY MS. DERBY:
23   Q    That was a "yes," correct?
24   A    That is a yes.
25            MS. DERBY:  Thank you.
```

266

```
 1            THE COURT:  I presume, no further follow-up?
 2            MR. GORN:  I have one question.  Regarding the 350
 3   exhibit that was just introduced, that wasn't part of my
 4   cross -- or excuse me, my redirect.
 5            THE COURT:  How many questions are you going to ask?
 6            MR. GORN:  One.
 7            THE COURT:  All right.  We will see.  Although I
 8   eventually think you are going to be able to name that tune in
 9   zero.
10                 FURTHER DIRECT EXAMINATION
11   BY MR. GORN:
12   Q    Special Agent Talamantez, the JPay records that are in
13   front of you in Exhibit 350, are the payments from Cheryl Perez
14   to defendant Mike Lerma consistent with what a senora would do
15   for a brother she's working for based on your opinion?
16            MS. DERBY:  Objection, beyond the scope of the --
17            THE COURT:  Overruled.
18   BY MR. GORN:
19   Q    You can answer the question.
20   A    Yes.
21            MR. GORN:  Nothing further.
22            THE COURT:  All right.  Ladies and gentlemen, at
23   this point in time we're closing for this evening.
24        We will start again at 10:30 on Monday.
25        Please remember, when you are on these breaks, do not
```

1    discuss this case with anyone.  Do not do any independent

2    research, visit websites, do things of that sort.

3         If anybody does approach you about this case, tell them

4    you can't talk about this case with them, and also report the

5    contact to me.

6         Drive very safely.  Have a very pleasant weekend.

7    10:30.

8              (Jury exits the courtroom at 4:51 p.m.)

9              THE COURT:  Let me have counsel, you guys back at

10   10:20 on Monday.  If you want to talk about stuff, I'm sure

11   over the weekend you guys will just think, think, think and

12   just have all sort of other questions you are going to raise,

13   the modus operandi.

14             MR. KAHAN:  There is still Detective Self's

15   lingering question.

16             THE COURT:  Yes, but I asked you guys to give me

17   some additional citations and you haven't given it to me yet, I

18   presume you are going to give it to me over the weekend?

19             MR. KAHAN:  In the same manner e-mailing --

20             THE COURT:  E-mailing Javier, at 8:00 o'clock.  Then

21   I will discuss it with you guys at 10:20 on Monday.

22             MR. KAHAN:  Understood, Your Honor.

23             THE COURT:  Thank you.

24             (The proceedings concluded at 4:52 p.m.)

25

**UNITED STATES DISTRICT COURT**

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6            I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 22nd day of March, 2025.

17

18

19                              /s/ TERRI A. HOURIGAN

20   _____
                     TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
21                         Federal Court Reporter

22

23

24

25

                      **UNITED STATES DISTRICT COURT**