CHARLES P. DIAMOND (SB # 56881)
LAW OFFICES OF CHARLES P. DIAMOND
cdiamond@omm.com
AMY R. LUCAS (SB # 264034)
alucas@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:  +1 310 553 6700
Facsimile:   +1 310 246 6779

RICHARD P LASTING (SB # 53950)
RICHARD P LASTING LAW OFFICES
richardplasting@sbcglobal.net
315 East 8th Street, Suite 801
Los Angeles, CA 90014
Telephone: +1 213-489-9025
Facsimile:  +1 310-626-9677

Attorneys for Defendant
JUAN SANCHEZ

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL LERMA, et al.,<br><br>Defendants. | Case No. 2: 18- CR-172-GW<br><br>**REPLY OF DEFENDANT JUAN SANCHEZ ON BEHALF OF ALL DEFENDANTS IN SUPPORT OF MOTION FOR A NEW TRIAL [ECF 1802]**<br><br>HEARING DATE: DEC. 8, 2025<br>TIME: 8:00 A.M.<br>COURTROOM: 9D<br>HON. GEORGE H. WU |

**TABLE OF CONTENTS**

Page

I. THE COURT ERRED IN EXCLUDING THE EXPERT TESTIMONY OF TIM GRAVETTE TO DEFENDANTS' PREJUDICE ............................. 1

II. THE COURT IMPROPERLY PRECLUDED CROSS EXAMINATION OF JOSE MARTINEZ REGARDING HIS "SPICE" USE AND DOCUMENTED INSTANCES OF PSYCHOTIC EPISODES IT CAUSED ........................................................................................................ 5

III. CONCLUSION ........................................................................................................ 9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*City of Pomona v. SQM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014) ................................................................................5

*Fair v. King Cnty*,
  2025 WL 1031274 (W.D. Wash. Apr. 7, 2025) .....................................................5

*Fowler v. Sacramento Cnty. Sheriff's Dep't*,
  421 F.3d 1027 (9th Cir. 2005) ................................................................................8

*Gibbs v. Covello*,
  996 F.3d 596 (9th Cir. 2021) ..................................................................................8

*Gordon v. United States*,
  344 U.S. 414 (1953) ................................................................................................7

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ..................................................................................5

*Smith v. Illinois*,
  390 U.S. 129 (1968) ................................................................................................6

*United States v. Alahmedalabdaloklah*,
  94 F.4th 782 (9th Cir. 2024) ...................................................................................7

*United States v. Brooke*,
  4 F.3d 1480 (9th Cir. 1993) ....................................................................................6

*United States v. Cazares*,
  788 F.3d 956 (9th Cir. 2015) ..................................................................................7

*United States v. Ray,*
  731 F.2d 1361 (9th Cir.1984) .................................................................................6

*United States v. Uramoto,*
  638 F.2d 84 (9th Cir. 1980) ................................................................................6, 7

## I. THE COURT ERRED IN EXCLUDING THE EXPERT TESTIMONY OF TIM GRAVETTE TO DEFENDANTS' PREJUDICE

Defendants have requested a new trial at which former BOP Associate Warden Roy ("tim") Gravette is allowed to testify. In opposition, the government offers the twisted logic that, because Corrections Officer Doralisa Alaniz was not credible in maintaining that she required inmates to stand for stand-up counts, no purpose would have been served by Gravette's testimony that BOP training and culture treats counts as "foundational," not as paper requirements to be ignored. *See* Opp. at 36 ("For there to be any value in Mr. Gravette's testimony regarding already admitted BOP policies on stand-up counts, it required the necessary defense witness, CO Alaniz, to be credible and for the jury to believe she conducted an accurate stand-up count in the first place.") That, of course, stands things on their head. Had the government not challenged Alaniz's credibility and the jury credited her testimony that, on her watch, inmates stood at stand-up counts, there would have been no need to call Gravette. Pretrial, this is precisely what the government led the Court to expect in order to prevent Gravette from testifying. Accordingly, the Court excluded Gravette's testimony only conditionally, saying if a "Bureau of Prisons person witness . . . testifies [the policies] are not taken seriously, then okay. I will allow you to call Mr. Gravette." Mot., Ex A (2/10/2025 Tr 54:1-3; 55:12-14).

Of course, at trial the government reversed course and relentlessly sought to chip away at CO Alaniz's testimony that she took the count seriously, pointing out her lack of scrupulousness in accurately recording the timing of various other required tasks. It secured her admission that she and other correctional officers frequently turned a blind eye to far less consequential rules, such as those prohibiting clotheslines and "girlie" pictures. While it offered no "Bureau of Prisons witness" to say directly that counts were not taken seriously, the government instead used dubious informant testimony to make that point. The government then underscored that point by eliciting the self-evident but irrelevant

1   REPLY IN SUPPORT OF SANCHEZ
    MOTION FOR A NEW TRIAL

1    testimony of former MDC-LA Warden Heriberto Tellez that count slips signed by
2    the COs who conducted them "aren't going to tell you" whether inmates were
3    required to stand. *See* Opp. at 38-39, quoting Tr. 2/14/25 at 113 [ECF 1719].
4         All of this was to build an inference—correctional officers do not take
5    seriously the rule that inmates be standing to be marked present for a stand-up
6    count—that defendants had specifically engaged Mr. Gravette to rebut. Had he
7    been permitted to testify, he would have marshalled his thirty-five years of
8    correctional experience, including twenty with the BOP, to explain that (1) by
9    virtue of their training and culture, BOP correctional officers take inmate counts
10   and other accountability procedures deadly seriously, (2) verifying the presence and
11   safety of inmates by requiring them to stand and/or show other signs of life is
12   foundational to maintaining the safety of the officers and prisoners at the
13   institution, and (3) the enforcement rigor applied to accountability rules, including
14   those bearing on the manner of conducting counts, cannot seriously be compared to
15   those addressing inmate titillation and housekeeping.
16        Without Gravette's testimony, at closing argument the government had a
17   field day exploiting his absence. Mr. Kahan told the jury that "BOP policies are not
18   the things that have been done, they are rather the things that should have been
19   done." Tr. 2025-03-26 Trial Day 22, at 150 (ECF 1829). Mr. Gorn also sounded
20   this theme: "The Bureau of Prison policies on paper, paint a good picture of how
21   things are supposed to operate. But as you have seen throughout this entire trial, in
22   reality that is far from the case." Tr. 2025-03-25 Trial Day 21, at 147 (ECF 1828).
23   He went on: "It's policy versus reality at the end of the stage." *Id.* at 159. Without
24   Gravette's testimony that count procedures are manifestly different than rules
25   barring pin-up girls, that they are instead understood to serve the BOP's core
26   mission, defense counsel simply had no come-back.
27        A critical issue in the trial was whether or not Mr. Bencom was standing for
28   the 4 pm and 9 pm counts, as BOP records reflect he was. The evidence left the

jury with a binary choice: death at the hands of the defendants at roughly 2:45 pm on the afternoon of Saturday, June 28, 2020; or death at the hands of inmate-informant Jose Martinez, Mr. Bencom's cellmate, who was high on spice, some fifteen hours later during the early hours of Sunday morning.  Mr. Martinez's account and other inmates' dubious testimony about supposed defense confessions cut in one direction.  Cutting in the other was forensic testimony of two medical examiners both discounting the government's account of the murder.  Though Dr. Nguyen hedged at trial (he could not determine a time of death), he had gone on record before trial that it was "not likely" that Bencom's death happened "at the beginning of th[e] fifteen hours [before the discovery of Bencom's body]," Ex. 4123, at 2:15-2:21, and he agreed with Dr. Melinek that it was "more likely" that the murder "occurred in the early morning hours of June 29th, and not the previous day." Tr. 2025-03-14 Trial Day 14 , at 19 (ECF 1719).[1]

      Had Mr. Gravette been allowed to testify, he would have confirmed the forensic testimony by elevating the reliability of counts slips signed by CO Alaniz and her partner that Bencom was standing at 4 pm on Saturday evening and again at 9 pm that evening.  The jury would have heard testimony also indisputably supporting CO Alaniz's assertion that, as a matter of her training and practice, during stand-up counts she made "sure that the inmates are all standing, lights on, and [would] go door by door and count every inmate in each cell."  Tr. 2025-03-17 Trial Day 15 , at 48 [ECF 1720].  Gravette's testimony about BOP indoctrination and training would have been particularly pertinent since CO Alaniz testified she was a BOP newcomer, not a jaded veteran who made up her own rules.  She testified she had been on the job less than two months at the time of the Bencom

---

[1] Dr. Melinek's conclusion rested not only on the states of rigor and livor mortis at the time Mr. Bencom's body was discovered, at the on-site examination by the Medical Examiner's investigator, and at autopsy the following day but also on the mechanism of death, the controlled temperature environment at the MDC and the resuscitation efforts that were made when Bencom's body was discovered Sunday morning.  See Tr. 2025-03-14 Trial Day 14 at 18-25 [ECF 1719].

1  murder, had just finished BOP training at Glynco, Georgia, and had taken a two-
2  week familiarization course at the MDC-LA.  *See* Tr. 2025-03-14 Trial Day 14, at
3  269-70 [ECF 1719].

4     The government's fallback is that even if expert testimony concerning
5  training and attitudes within the BOP about the count were relevant, the Court was
6  justified in excluding Gravette because he had retired from the BOP fifteen years
7  before the Bencom murder and had never worked at the facility where it was
8  committed.  But defendants rebutted that argument in opposition to the
9  government's motion in limine, successfully enough that the Court agreed
10 conditionally to allow Mr. Gravette to testify.  *See* Ex A 2/10/2025 Tr 54:1-3;
11 55:12-14 ("If you get a Bureau of Prisons person witness who testifies they are not
12 taken seriously, then okay. I will allow you to call Mr. Gravette at that situation.")

13     The Court was indubitably correct that Gravette was qualified to render the
14 opinions he proffered.  Though the MDC-LA was not one of the eight BOP
15 facilities at which he worked (though two were administrative facilities like the
16 MDC-LA), Gravette explained that the BOP is a top-down organization, like the
17 military, with a uniform culture and set of rules that apply throughout the
18 organization.  *See* Supp. Declaration of Roy T. Gravette In Opposition To Mil #5,
19 ¶¶ 3-4 [ECF 1501].  After his BOP retirement, Gravette remained active and hands-
20 on in corrections, "closely connected with the BOP and its facilities throughout the
21 Country," both as an independent contractor and as an expert witness in dozens of
22 cases involving BOP institutions.  *Id.* ¶ 5.  Courts around the country have accepted
23 his testimony about prison administration, including at facilities where he never
24 worked given the uniform operation of the BOP.  *Id.* ¶¶ 9-10.  In the past two years,
25 two judges of this District permitted Gravette to testify as an expert on the expected
26 level of inmate supervision at two federal correctional facilities he never even
27 visited.  *Id.* ¶ 11.

28     As demonstrated in our opening memorandum, concerns regarding

Gravette's lack of employment in MDC-LA and any staleness because he retired from the BOP go to the weight of the testimony, not its admissibility. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). This rule overcomes objections both as to timing and lack on direct working experience at the MDC-LA. *See* Supp. Declaration of Roy T. Gravette In Opposition To Mil #5, ¶¶ 7-8 [ECF 1501]. It clearly applies here: As the court in *Fair v. King Cnty* held, "the location of [the expert's] correctional experience goes to the weight of his testimony, not to its admissibility." 2025 WL 1031274, at *10 (W.D. Wash. Apr. 7, 2025). Excluding Gravette was prejudicial error—the government makes no argument that it was harmless—and it requires a new trial.

## II. THE COURT IMPROPERLY PRECLUDED CROSS EXAMINATION OF JOSE MARTINEZ REGARDING HIS "SPICE" USE AND DOCUMENTED INSTANCES OF PSYCHOTIC EPISODES IT CAUSED

Relying on a distorted, one-sided view of the trial evidence, the government argues that defendants suffered no prejudice as the result of counsel's inability to cross-examine the government's principal informant—and the likely murderer of Steve Bencom—Jose Martinez. The government's rendition ignores medical forensic evidence, discussed earlier, that tipped sharply in favor of the defense. Similarly, it asks the Court to ignore as not credible inmate-count testimony by CO Alaniz that Bencom was alive and standing for two separate stand-up counts after Martinez claims defendants murdered him. The government's rendition also fails to account for the contradictory versions of events surrounding the Bencom murder that Mr. Martinez offered. On that basis, the government insists the Court properly

shielded the jury from evidence, documented in official reports produced by the government during trial, that discredited Martinez' testimony that spice simply made him "sleepy."  Tr. 2025-03-12 Trial Day 12, at 277 [ECF 1717].  As a result, the jury never benefitted from the cross-examination of Martinez on official reports containing probative and convincing accounts that, under the influence of that drug, Martinez actually became aggressive and behaved in bizarre ways.

      The right to confront and cross-examine witnesses is a pillar of our criminal justice system, and its abridgement requires that the defendants be tried again.  As the Ninth Circuit has stated time and again, "The Supreme Court has declared repeatedly that a denial of the right of cross-examination is 'constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" *United States v. Uramoto*, 638 F.2d 84, 87 (9th Cir. 1980) (citing *Smith v. Illinois*, 390 U.S. 129, 131 (1968)) (granting a new trial for failure to provide a full opportunity to cross-examine a government witness).  In cases turning on witness credibility, particularly self-interested witnesses with potentially compromised independence, broad and searching cross-examination is the rule, not the exception:

> "We have previously pointed out that ***[w]hen the case against a defendant turns on the credibility of a witness, the defendant has broad cross-examination rights.*** *We cannot overemphasize the importance of allowing full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case*. Out of necessity, the government frequently relies on witnesses who have themselves engaged in criminal activity and whose record for truthfulness is far from exemplary. ***These witnesses often have a major personal stake in their credibility contest with the defendant. Full disclosure of all relevant information concerning their past record and activities through cross-examination and otherwise is indisputably in the interests of justice***. Ordinarily, such inquiries do not require the expenditure of an inordinate amount of time, and courts should not be reluctant to invest the minimal judicial resources necessary to ensure that the jury receives as much relevant information as

possible. Nor should unwarranted fear of juror confusion present any impediment. Federal jurors, who are expected to follow the complex testimony and even more intricate instructions that are presented in many of our criminal cases, such as multiple conspiracy prosecutions, are unlikely to be confounded by a defendant's inquiry into the bias and credibility of a key government witness. In any retrial, the district court should afford [the defendant] a full and fair opportunity to question [the government's witness] regarding any of his past activities that are probative as to the credibility of his testimony or as to any bias that may underlie it."[2]

Though the trial court "has wide latitude in the control of cross-examination, 'this principle cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.'" *Uramoto,* 638 F.2d at 86 (quoting *Gordon v. United States*, 344 U.S. 414 (1953)). Rather, the Ninth Circuit has "emphasized the policy favoring expansive witness cross-examination in criminal trials, because the Sixth Amendment commands that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *United States v. Alahmedalabdaloklah*, 94 F.4th 782 (9th Cir. 2024) (cleaned up).

The government suggests no error arose from prohibiting cross-examination of Martinez on prior instances of his spice use, even to undermine his testimony that it only made him sleepy, since "defendants were allowed to adduce testimony of [his] spice use and its mind-altering effects and capacity to induce paranoia through multiple witnesses." Opp. at 39. That other evidence is, of course, irrelevant in assessing the limitation of Martinez's cross-examination. Aside from being generalized, in the Ninth Circuit, "[t]he adequacy of a defendant's opportunity for cross-examination therefore turns on the scope of the cross examination that the trial court permitted; a restriction on cross-examination cannot

---

[2] *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993) (emphasis added).

be justified by reference to other evidence a defendant presented." *Gibbs v. Covello*, 996 F.3d 596, 602 (9th Cir. 2021).

Under Federal Rule of Criminal Procedure 33, when cross-examination is impermissibly restricted, a new trial is required when the "interest of justice" requires one. Granted, this requires consideration of factors beyond the exclusion itself, including "[1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross examination otherwise permitted, and, of course, [5] the overall strength of the prosecution's case." *Fowler v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027, 1041-42 (9th Cir. 2005). But these factors cut in favor of a new trial, not denying one.

Martinez was critical to the government's murder case. Aside from dubious jailhouse admissions offered by inmates looking for favorable treatment from the government in their own cases, Martinez provided the only account tying defendants to the Bencom murder. The 6-North videos, which the government touts as damning evidence corroborating Martinez's testimony, show movement that was equally consistent with the innocent explanation Martinez offered: that defendants had procured sugar within the jail that they were inviting Bencom to cook into prison wine, which he regularly made at 6 North and which they partook with him.³ Other than what defense counsel unsuccessfully tried to elicit, the jury heard no evidence of the effects of spice on Martinez other than his claim that, on

---

³ Martinez testified that his cellmate "had a reputation for making Pruno for other individuals at 6 North," that he made this "jailhouse liquor" with "a lot of apples," plus "fireballs, Jolly Ranchers, anything sweet"; that the defendants regularly came "down to drink Pruno" with Bencom; and that on June 28, 2020 Sanchez asked him to summon Bencom back to the cellblock so that Sanchez "could give him that sugar" with which to cook up some Pruno; and that as photographs confirm, at the time of Bencom murder, he had a larder of ingredients from which to make Pruno. Tr. 2025-03-12 Trial Day 12, at 198-200, 206–207, 292 [ECF 1717]; Tr. 2025-03-13 Trial Day 13, at 10-11 [ECF 1718].

8   REPLY IN SUPPORT OF SANCHEZ MOTION FOR A NEW TRIAL

him, it worked like a sedative. They certainly heard nothing to suggest that spice made Martinez belligerent and unpredictable; the government's objections made sure of that. This is even more prejudicial given evidence that has now emerged that Martinez was lying, and confessed to two separate individuals that in fact he murdered Bencom while "having a bad 'trip'." *See* ECF 1803.

It is simply unfathomable that the government would argue that the exclusion of evidence casting doubt on Martinez's account of the murder, and his likely hand in committing it after admittedly smoking spice for hours, could not have resulted in a serious miscarriage of justice. Here, each of the two competing narratives at trial were possible. As the government admits, their own expert witness, Dr. Nguyen, was ambiguous as to the time of Bencom's death, at least at trial. Opp. at 9 fn.6. Dr. Nguyen testified that, unlike defense expert, Dr. Melnick, he was not able to determine the time of death, but conceded that Dr. Melnick's different conclusion—that the murder occurred at a time when Martinez, and only Martinez, could have committed it—was "within the realm of possibility." Tr. 2025-03-06 Trial Day 8, at 125 [ECF 1713]. Importantly, as noted earlier, prior to trial he agreed with her that a murder at a time only Martinez could have committed it was more likely than the counter-narrative. In short, the government's own scientific evidence regarding the time of death failed to eliminate reasonable doubt as to time of death and thus the identity of Bencom's killer. As Dr. Nguyen conceded, it was certainly within the realm of possibility that Bencom was murdered at a time when only Martinez could have done it, and evidence that he acted bizarrely and aggressively while under the influence of spice—which he admittedly was—would have made that alternative all the more likely. Its exclusion alone resulted in a miscarriage of justice. When taken in conjunction with the exclusion of Mr. Gravette's expert testimony, the conclusion becomes inescapable.

### III. CONCLUSION

For the foregoing reasons, Mr. Sanchez and his co-defendants are entitled to

a new trial on Counts 1, 7 and 8, and his co-defendants Lerma and J.V. Gonzales on Count 10.[4]

Dated: November 22, 2025

Respectfully submitted,

RICHARD P. LASTING
CHARLES P. DIAMOND
AMY R. LUCAS

By: */s/ Charles P. Diamond*

Charles P. Diamond
Attorneys for Defendant Juan Sanchez

---

[4] A fulsome cross-examination of Martinez would have seriously undermined his credibility, calling into question not only his testimony about the murder but also of the drug-dealing conspiracy alleged in Counts 1 and 10. *See* Opp. at 24 (Martinez "describe[d] defendant Lerma as leader of the Sureños in 6N and controlled everything from who was allowed to be an orderly, who sold the drugs, and who ordered the disciplines."),