TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
KYLE W. KAHAN (Cal. Bar No. 298848)
KELLYE NG (Cal. Bar No. 313051)
JASON A. GORN (Cal. Bar No. 296179)
Assistant United States Attorneys
    1400/1300/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2238/8408/7962
    Facsimile: (213) 894-0142
    E-mail:   kyle.kahan@usdoj.gov
               kellye.ng@usdoj.gov
               jason.gorn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>JUAN SANCHEZ,<br>   aka "Squeaks,"<br><br>      Defendant. | No. CR 2:18-00172(A)-GW-7<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT JUAN SANCHEZ; DECLARATION OF KELLYE NG; EXHIBITS<br><br>Hearing Date: March 9, 2026<br>Hearing Time: 8:00 a.m.<br>Location:    Courtroom of the<br>                  Hon. George H. Wu |

    Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California, and Assistant United States Attorneys Kyle W. Kahan, Kellye Ng, and Jason A. Gorn, hereby files its sentencing position for defendant Juan Sanchez, aka "Squeaks."

    This position is based upon the attached memorandum of points and authorities, the evidence at trial, the files and records in this

case, the exhibits, and such further evidence and argument as the Court may permit.  The government reserves the right to file any supplemental sentencing position that may be necessary.

Dated: March 2, 2026                    Respectfully submitted,

                                        TODD BLANCHE
                                        Deputy Attorney General

                                        BILAL A. ESSAYLI
                                        First Assistant United States
                                        Attorney

                                        ALEXANDER B. SCHWAB
                                        Assistant United States Attorney
                                        Acting Chief, Criminal Division

                                             /s/
                                        KYLE W. KAHAN
                                        KELLYE NG
                                        JASON A. GORN
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Juan Sanchez ("defendant") was a loyal member of the Michael Lerma Cell of the Mexican Mafia. He, along with his co-defendants, brutally murdered S.B., an inmate who owed a drug debt to the Mexican Mafia. Even worse, defendant was proud of what he did. He bragged about stabbing S.B. in the heart and the eye, while saying, "die, why aren't you dying." (Dkt. 1717, at 58:25-60:12; Dkt. 1882, "Revised PSR" ¶ 50.)

Defendant committed this murder because he was a willing and eager participant in a racketeering conspiracy that instilled fear in those under its rule and committed violence against those that defied it. For his crimes, defendant now faces a mandatory life sentence.

**II.   DEFENDANT MURDERS S.B. INSIDE OF A JAIL CELL**

Defendant has been in federal custody for this case since July 2018. (Dkt. 167.) But his crimes did not end when he entered federal custody. They simply began a new chapter. Defendant was a loyal foot soldier for the Michael Lerma Cell of the Mexican Mafia, an organization controlled by Michael Lerma, a Mexican Mafia brother, who controlled territories inside several Southern California correctional facilities and the City of Pomona. The enterprise maintained power through violence and extortion. (Revised PSR ¶¶ 33-37.)

While awaiting trial, defendant was housed in MDC's 6-North range. Defendant shared a cell with Michael Lerma himself. His co-defendants, Carlos Gonzalez and Jose Valencia Gonzalez, were housed in the cell next door.

In 2020, S.B., another inmate in 6-North, accumulated a drug debt to Lerma's enterprise. (Revised PSR ¶ 47.) Just days before S.B. was brutally murdered over his drug debt, Lerma told him, "You need to take care of this. You are not going to make it through this time." (Dkt. 1715, 115:25-116:1-16.) Co-defendant Jose Valencia Gonzalez openly told other inmates: "if he doesn't pay his ass, he's going to stab him." (Dkt. 1714, 181:18.)

Defendants made good on that promise. On June 28, 2020, defendants executed a choreographed plan to murder S.B. Defendant told another inmate to tell S.B. to "come by [defendant's cell] so [defendant] could give him that sugar" to make pruno. (Dkt. 1717, 206:10-15.) That inmate did as defendant instructed and told S.B. to stop by defendant's cell. (Dkt. 1717, 206:16-20.) But this was a ploy: defendant pushed S.B. into his cell, with co-defendants Carlos Gonzalez and Jose Valencia Gonzalez, and later Michael Lerma, all following. (Revised PSR ¶¶ 49; Dkt. 1717, 235:19-236:10, 209:11-17.)

Four men walked in S.B.'s cell. Only three men walked out. Defendants strangled S.B., stabbed him twice in the heart, and once in the eye. (Revised PSR ¶ 50.) They left S.B. on the bottom bunk, covered him with a blanket, and left him there. Just before S.B.'s cellmate returned to the cell, Lerma told him, go ahead and let your cellie rest, he's a little bit tired." (Revised PSR ¶ 51.) The cellmate returned only to find S.B.—his friend--laying lifeless on the bottom bunk, which was not his usual bed. Even worse, defendants forced him to sleep overnight with his friend's dead body in the bunk below him until they allowed him to alert the guards. Forcing the cellmate to stay quiet gave defendants enough time to dispose of the

2

murder evidence given co-defendant Lerma's and Valencia Gonzalez's status as "orderlies" who had heightened access in jail.

Defendant was proud of his work. After S.B.'s body was found, the inmates were moved to the basketball court. While on the court, defendant excitedly yelled for everyone to hear: "Don't mess with them, he did what he was supposed to do" and "bragging that" defendants "handled their business" but was "upset somebody else didn't." (Dkt. 1715, 150:14-151:12.) Defendant again bragged that he walked into a cell with two other individuals, choked and stabbed a man in the heart and in the eye, while defendant said, "die, why aren't you dying." (Dkt. 1717, 58:25-59:4, 59:18-21, 60:9-12; Revised PSR ¶ 50.)

### III. DEFENDANT AND CO-DEFENDANT CARLOS GONZALEZ KIDNAP TWO PEOPLE

Defendant's violence did not begin with murdering S.B. Five years earlier, in May 2015, defendant and co-defendant Carlos Gonzalez kidnapped and conspired to kill C.V. because they wanted what little money she had. As part of this plan, the two enlisted another man, R.R., to drive them to a place where they would kill C.V. To ensure things went according to plan, defendants carried firearms and handcuffed C.V. inside of the car. Before they could complete their plan, Pomona Police Department Officers attempted to pull the car over. Defendant and Carlos Gonzalez ordered R.R. to flee from the police. During the pursuit, both defendant and Carlos Gonzalez ditched their firearms. Officers were able to stop the car and rescue C.V.[1]

---

[1] At his federal trial, defendant was acquitted of the felon-in-possession charge related to this police pursuit. There was no discussion of the kidnapping at the federal trial.

3

Both defendant and Carlos Gonzalez were charged by the Los Angeles District Attorney's Office with kidnapping both C.V. and R.R., using a firearm during the kidnappings, assault with a firearm against R.R., and an enhancement for committing the acts for a street gang. (Gov't Exhibit ("Ex.") A – Criminal Complaint). In August 2015, R.R. and C.V. testified in a preliminary hearing against defendant and Carlos Gonzalez. At the conclusion, defendant and Carlos Gonzalez were held to answer on the charges. (Gov't Sealed Ex. B – R.R. and C.V. Preliminary Hearing Transcripts.) In March 2016, defendant was convicted of kidnapping and use of a firearm during the offense and was sentenced to 13 years' imprisonment. (Revised PSR ¶ 85; Govt. Ex. C – Judgment and Commitment Order.)

## IV. VICTIM IMPACT STATEMENT AND RESTITUTION

Defendant bragged about brutally murdering S.B. As S.B.'s daughter recounts, defendant's actions were cruel. (See Gov't Sealed Ex. D – Victim Impact Statement, at 1.) Learning of what happened to her father made her fall to her knees and sob uncontrollably. (Id.) It was the most heartbreaking news any child could receive. (Id.) Because of defendant's calculated and heinous crimes, he stole from S.B.'s daughter the memory of getting to walk with her father down the aisle and dance with him at her wedding. (Id.) He took away from S.B.'s daughter the many milestones children should have with their parents, the encouragement S.B. would give her when she was feeling down, and the unconditional love she knew she could depend on from her father. (Id.)

S.B. did not deserve what happened to him. His daughter did not deserve to lose her father in such a brutal and twisted manner. Her victim impact statement clearly shows the levels of grief defendant

4

has inflicted on her.  Even in her grief, she forgives the people responsible and hopes they become better people one day—-not only for themselves, but to be better examples for their own families.

Defendant should be ordered to pay – jointly and severally with his co-defendants – the $10,365.24 in funeral expenses that S.B.'s family incurred after the untimely death of S.B.  (Gov't Sealed Exhibit E – S.B. Funeral Expenses; Revised PSR ¶¶ 53, 149.)

**V.    GUIDELINES CALCULATIONS**

The United States Probation and Pretrial Services Office calculated a total offense level of 43 pursuant to the following calculations:

<u>Counts One/Seven/Eight:</u>

 Base Offense Level:       43                 U.S.S.G. § 2A1.1(a) (Revised PSR ¶¶ 59-77.)

Because no adjustments or acceptance of responsibility points were applied, the USPO calculated a total offense level of 43.  (Revised PSR ¶ 77.)   The Probation Office also calculated a Criminal History score of 10, placing defendant in Criminal History Category V.  (Revised PSR ¶ 88.)  The government agrees with these calculations.

With a total offense level of 43 and a Criminal History Category of V, the Guidelines Range is life imprisonment.  Because defendant was convicted of VICAR Murder and first-degree murder within the special maritime and territorial jurisdiction of the United States, he faces a mandatory life sentence.

**VI.   GOVERNMENT'S OBJECTION TO THE REVISED PSR**

The government's sole objection to the Revised PSR is regarding the nature of defendant's March 2016 kidnapping conviction.

5

Defendant was also convicted of using a firearm during the commission of the offense.  See Gov't Ex. C.

**VII. GOVERNMENT'S RECOMMENDATION**

The government respectfully recommends that the Court impose a sentence of life imprisonment for Counts 1, 7, and 8, all to be served concurrently, five years of supervised release, order that defendant pay the mandatory special assessment of $300, and order defendant pay $10,365.24 in restitution to S.B.'s estate.  The government further requests this sentence be ordered to run consecutive to any time remaining in People v. Sanchez, Superior Court for the State of California, County of Los Angeles, Case No. KA109699.  (See Revised PSR ¶ 135.)  This sentence is appropriate, reasonable, and not greater than necessary, in light of all the factors the Court must consider under 18 U.S.C. § 3553(a).

    **A.   Nature and Circumstances of the Offense**

Defendant's role as the proud and loyal foot soldier of a criminal enterprise, and his eagerness to viciously murder an inmate over a drug debt, demonstrate his dangerousness.  His direct involvement in luring S.B. to his cell, murdering S.B. with his co-defendants in a cell near the corner of the hallway away from surveillance, and attempts to cover up the crime reflect his cruelty, his planning, and his desire to place reputation and gang mentality over a human life.  He was loyal to Lerma, his cellmate and the all-powerful Mexican Mafia brother he answered to as a Sureño.  Lerma ran a drug-trafficking and extortion racket that allowed inmates to smuggle, sell, and use methamphetamine and heroin at inflated prices. He further ordered the beatings and stabbings of inmates who broke his rules.  Lerma's enterprise members attempted to extort a young

6

woman into giving it a car owed as a debt; an extortion that ended with the woman's boyfriend being shot in the leg.

The murder in this case demonstrates terrible cruelty. S.B. was not simply murdered. He was lured, isolated, and ambushed. He was viciously strangled. He was stabbed twice in the heart. And then he was stabbed in the eye by defendant who would then later brag about it. The nature and circumstances of defendant's conduct are simply ruthless. A life sentence is necessary, appropriate, and required given the scope and callousness of his conduct.

### B. History and Characteristics of Defendant

Defendant's history and circumstances reflect an ongoing danger to the community. Defendant is a documented member of the Pomona Cherryville street gang, a Sureño gang that owes allegiance to the Mexican Mafia. His tattoos, as well as his conduct, show his loyalty to the gang and its cause. (Revised PSR ¶¶ 108.)

In 2013, at the age of 20, defendant was convicted of carrying a loaded firearm in public, a felony, with special circumstances. (Revised PSR ¶ 82.) He was sentenced to 13 days' jail, and 36 months' probation; and after violating probation, he was sentenced to 90 days' imprisonment. (Id.) He had been in a car with a loaded revolver under the passenger seat.[2]

In April 2014, at the age of 21, he was convicted of a misdemeanor for possessing unlawful paraphernalia. (Revised PSR ¶ 83.) Just four months later, in August 2014, defendant was convicted

---

[2] While defendant was ultimately acquitted at his federal trial of being a felon-in-possession in relation to the 2015 police pursuit that happened two years after his 2013 firearm conviction, a Pomona Police Sergeant testified at trial that a loaded revolver had been recovered in the area where an officer saw a passenger toss a gun outside of the car window.

7

of three felonies for possessing a controlled substance (methamphetamine), second-degree burglary, and identity theft. (Revised PSR ¶ 84.) Less than one year later, in May 2015, defendant was arrested for the kidnapping described above. For that crime, he was convicted and sentenced to 13 years' imprisonment. (Revised PSR ¶ 85.) At the time he was transferred to federal custody, he was actively serving that sentence.

### C. Need for Deterrence and to Promote Respect for the Law

Despite having been convicted of multiple felonies, including in relation to his gang, defendant again participated in a choreographed and violent murder of an inmate who owed a debt to his enterprise. That defendant decided to do this while serving a lengthy sentence for kidnapping only adds to the depravity of his conduct and need for an appropriate sentence.

A life sentence in this case will promote respect for the law and ensure that those involved in similar racketeering activity for dangerous, violent gangs, understand the consequences should they follow defendant's path. Defendant's conduct in this case warrants one of the most severe consequences--a mandatory life sentence and restitution owed to the surviving family of the man he murdered. Defendant's conduct and history clearly demonstrate a disrespect for the law and to the health and wellbeing of anyone who gets in his gang's way. Given this, a life sentence is just.

## VIII. CONCLUSION

For the foregoing reasons, the government respectfully submits that defendant should be sentenced to concurrent life sentences on Counts 1, 7, and 8, all to run consecutive to any time remaining in his California state kidnapping sentence (Revised PSR ¶ 135), a five-

1 | year term of supervised release, a special assessment of $300, and
2 | restitution to the estate of S.B. totaling $10,365.24.

**DECLARATION OF KELLYE NG**

I, Kellye Ng, declare as follows:

1. I am an Assistant United States Attorney in the Central District of California. I am one of the assigned attorneys in the matter of United States v. Lerma, *et al.*, Case No. 2:18-CR-00172(A)-GW-1,6,7,8.

2. Attached to this sentencing memorandum are true and correct copies of the following exhibits:

| Exhibit | Exhibit Name |
|---|---|
| A **(UNDER SEAL)** | Criminal Complaint, People v. Sanchez, Superior Court for the State of California, County of Los Angeles, Case No. KA109699 |
| B **(UNDER SEAL)** | R.R. and C.V. Preliminary Hearing Transcripts - People v. Sanchez, Superior Court for the State of California, County of Los Angeles, Case No. KA109699 |
| C **(UNDER SEAL)** | Judgment and Commitment Order - People v. Sanchez, Superior Court for the State of California, County of Los Angeles, Case No. KA109699 |
| D **(UNDER SEAL)** | A.B. Victim Impact Statement |
| E **(UNDER SEAL)** | Victim Restitution Document – Funeral Expenses |

3. Because the preliminary hearing transcripts, victim impact statement, and victim restitution receipt contain personal identifying information, sensitive information, or the names of two

10

victims involved in a prior kidnapping offense, the government will move to file those exhibits under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on March 2, 2026.

_____
KELLYE NG
Declarant