UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

| Case No. | CR 18-172-GW | | Date | March 12, 2026 |
|---|---|---|---|---|

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|
| Interpreter | None |

| Javier Gonzalez | Terri A. Hourigan | Kellye Ng; Kyle W. Kahan; Jason A. Gorn |
|---|---|---|
| Deputy Clerk | Court Reporter | Assistant U.S. Attorney |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 1. Michael Lerma | ✔ | ✔ | | 1. Marri B. Derby, CJA; Joel Furman, CJA | ✔ | ✔ | |
| 6. Carlos Gonzalez | ✔ | ✔ | | 6. Kenneth M. Miller, CJA | ✔ | ✔ | |
| 7. Juan Sanchez | ✔ | ✔ | | 7. Charles Diamond, CJA | ✔ | ✔ | |
| 8. Jose Valencia Gonzalez | ✔ | ✔ | | 8. Shaun Khojayan, CJA | ✔ | ✔ | |

**Proceedings:** **DEFENDANT CARLOS GONZALEZ'S MOTION FOR A NEW TRIAL AND FOR EVIDENTIARY HEARING [1803]; and DEFENDANT LERMA'S MOTION FOR NEW TRIAL PURSUANT TO FED. RULES 29 AND 33 [1804]**

Attached hereto is the Court's Tentative Ruling on Defendants' Motions [1803, 1804]. Court and counsel confer. The Tentative Ruling is adopted as the Court's Final Ruling. Defendants' Motions are DENIED.

                                                                    :    02

                                            Initials of Deputy Clerk   JG

<u>USA v. Lerma et al</u>; Case No. 2:18-cr-00172-GW
Tentative Ruling on: (1) Defendant Carlos Gonzalez's Motion for a New Trial and for Evidentiary Hearing, and (2) Defendant Michael Lerma's Motion for Acquittal or, in the alternative, a New Trial

**I. Background**

On March 29, 2018, Defendants Michael Lerma ("Lerma"), Juan Sanchez ("Sanchez"), Carlos Gonzalez ("C. Gonzalez"), Jose Valencia Gonzalez ("J.V. Gonzalez") (collectively "Defendants"), and other co-defendants were indicted for numerous offenses related to the Mexican Mafia. *See* Docket No. 1. On October 14, 2021, the Government returned a First Superseding Indictment ("FSI"). *See* Docket No. 691.

The four Defendants mentioned above are charged in seventeen separate counts. Count 1 alleges that all four defendants conspired to participate in the affairs of a racketeering enterprise; the FSI sets forth that the four defendants were members of the "Michael Lerma Cell of the Mexican Mafia," "an organization engaged in, among other things, acts involving murder, kidnapping, robbery, extortion, trafficking in controlled substances, conspiracy and attempt to commit the foregoing acts, witness tampering, money laundering, and identity theft." *See* FSI at 7-31. Counts 7 and 8 charge all four defendants with the murder of victim S.B. on or about June 28, 2020 at MDC-Los Angeles ("MDC-LA"). *See id.* at 38-39. Count 10 charges Lerma, C. Gonzalez, and J.V. Gonzalez with conspiracy to distribute and possess with intent to distribute controlled substances. *See id.* at 41-43. Count 13 charges only C. Gonzalez with possession of a firearm, on October 28, 2013, in furtherance of the drug trafficking conspiracy alleged in Count 10. *See id.* at 46. Counts 4, 5, 6, 14, and 16 charge C. Gonzalez and Sanchez with crimes related to an alleged kidnapping of victim C.V. in the spring of 2015. *See id.* at 35-37, 47, 49. Counts 2, 3, 9, and 12 charge J.V. Gonzalez with crimes related to an alleged assault of victim M.A. with a dangerous weapon and attempted carjacking in July of 2013. *See id.* at 32-34, 40, 45. Finally, Counts 17, 18, and 19 each allege a single violation of possession of a firearm by a felon under Section 922(g)(1) against J.V. Gonzalez (Count 17), C. Gonzalez (Count 18), and Sanchez (Count 19). *See id.* at 50-53.

On March 28, 2025, following a five-week trial, a jury found Defendants guilty on all but one of the charged counts.[1] *See* Docket No. 1747. Specifically, the jury found Defendants guilty

---

[1] Prior to trial, the Government moved to dismiss with prejudice (1) Counts 4, 5, 6; (2) Count 9 as to only J.V.

1

on each murder count, including Counts 1, 7, and 8. *See id.* at 2-14. Lerma and J.V. Gonzalez were separately found guilty in Count 10, *see id.* at 15-16, J.V. Gonzalez was found guilty in Count 17, *see id.* at 17, and C. Gonzales was found guilty in Count 18, *see id.* at 18. The jury acquitted Sanchez in Count 19. *See id.* at 19.

In late September 2025, the Court received the following filings: (1) J.V. Gonzalez's Motion for Acquittal under Federal Rule of Criminal Procedure 29(c) or, in the alternative, Motion for New Trial Under Rule 33 ("J.V. Motion," Docket No. 1799); (2) C. Gonzalez's Motion for Acquittal as to Counts 7 and 8 and for the Striking of a Special Finding as to Count 1 ("C. Gonzalez Motion for Acquittal," Docket No. 1800); (3) Sanchez's Joint Motion for a New Trial Based on Exclusion of Expert Testimony of Roy "Tim" Gravette and Limitations on CW-6's[2] Cross-Examination ("Sanchez Joint Motion," Docket No. 1802); (4) C. Gonzalez's Motion for a New Trial and for Evidentiary Hearing ("C. Gonzalez Motion for a New Trial," Docket No. 1803); and (5) Lerma's Motion for Acquittal or, in the alternative, a New Trial ("Lerma Motion," Docket No. 1804) (collectively, the "Motions"). Each defendant noticed his joinder in the other defendants' motions. *See* J.V. Gonzalez's Joinder in the C. Gonzalez Motion for a New Trial, Docket No. 1805; Sanchez's Joinder in the C. Gonzalez Motion for a New Trial, Docket No. 1807; C. Gonzalez's Joinder in the Lerma Motion and the J.V. Motion, Docket No. 1808; Lerma's Joinder in the J.V. Motion and the C. Gonzalez Motion for a New Trial, Docket No. 1809.

On January 5, 2026, following consideration of the Motions, the Government's omnibus opposition ("Opp.," Docket No. 1821), C. Gonzalez's reply in support of the C. Gonzalez Motion for Acquittal ("C. Gonzalez Reply ISO Acquittal," Docket No. 1831), C. Gonzalez's reply in support of the C. Gonzalez Motion for a New Trial ("C. Gonzalez Reply ISO New Trial," Docket No. 1832), Sanchez's reply on behalf of all Defendants in support of the Joint Motion ("Sanchez Joint Reply," Docket No. 1833), and Lerma's reply in support of the Lerma Motion ("Lerma Reply," Docket No. 1834), the Court denied the Motions insofar as they sought judgments of acquittal and denied the Sanchez Joint Motion. *See* Docket Nos. 1868, 1872. The Court, however,

---

Gonzalez; (3) Count 10 as to only C. Gonzalez; (4) Count 13; (5) Count 14; and (6) Count 16. *See* Docket No. 1592. The Court granted the Government's motion to dismiss these counts of the FSI. *See* Docket No. 1603.

[2] The Court generally adopts the Government's use of the "CW" abbreviation to describe the Government's six cooperating witnesses and herein refers to the witnesses in accordance with how they are referenced in the legend at Docket No. 1824.

reserved judgment insofar as the Motions sought a new trial based on the sworn statements of Daniel Navarro ("Navarro") and Johnny Macias ("Macias").³ *Id.*

On February 12, 2026 and February 23, 2026, evidentiary hearings were held at which this Court heard the testimonies of various individuals, including Navarro and Macias. *See* Docket Nos. 1908, 1918. On March 5, 2026, the parties, pursuant to this Court's order, filed supplemental briefs with their closing arguments. *See* J.V. Gonzalez Supp. Brief, Docket No. 1950; Government Supp. Brief, Docket No. 1951; Defendants Supp. Brief, Docket No. 1952. For the reasons stated herein, the Court would **DENY** the Motions insofar as they seek a new trial based on the statements of Navarro and Macias.

## II. <u>Legal Standard</u>

Rule 33 of the Federal Rules of Criminal Procedure permits a court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." *See* Fed. R. Crim. P. 33(a). The burden of justifying a new trial rests with the defendant. *See United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989); *United States v. Steel*, 759 F.2d 706, 713 (9th Cir. 1985); *United States v. Katakis*, 252 F. Supp. 3d 988, 992 (E.D. Cal. 2017); *United States v. Harmon*, 21 F. Supp. 3d 1042, 1048 (N.D. Cal. 2014). In addition, a motion for new trial is directed to the *discretion* of the trial court judge. *See United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981); *Katakis*, 252 F. Supp. 3d at 992; *Harmon*, 21 F. Supp. 3d at 1048. Certain district courts have taken the approach that such motions are generally disfavored and should only be granted in exceptional cases. *See Katakis*, 252 F. Supp. 3d at 992; *United States v. Capati*, 980 F. Supp. 1114, 1132 (S.D. Cal. 1997). At the same time, "'[a] district court's power to grant a motion

---

³ Lerma and C. Gonzalez had moved for a new trial based on newly discovered evidence. *See* Lerma Motion at 9-12, 19; C. Gonzalez Motion for a New Trial at 4-5. This evidence included, *inter alia*, (1) the declaration of Navarro, an inmate at MDC-Los Angeles who claims to have received kites ("handwritten notes on small pieces of paper, usually attached to a string so they can be passed from inmate to inmate on a housing range") from CW-6 indicating the latter's confession to S.B.'s murder, *see* Declaration of Daniel Navarro ("Navarro Decl."), Docket No. 1803, Ex. B, at ¶¶ 7, 11-14; and (2) the declaration of Macias, an inmate at MDC-Los Angeles who claims to have heard CW-6 confess to killing S.B., *see* Declaration of Johnny Macias ("Macias Decl."), Ex. A, Docket No. 1803, at ¶¶ 7-8. With respect to the other allegedly newly discovered evidence, the Court concluded, based on Defendants' lack of a sufficient explanation, that Defendants' failure to discover such evidence sooner was the result of a lack of diligence on their part. *See* Docket No. 1868, at 18. At this time, therefore, Defendants' new trial motions are based only on the sworn statements of Navarro and Macias.

C. Gonzalez filed applications for writ of habeas corpus as to both Navarro and Macias for the hearing on the Motions, *see* Docket Nos. 1835-36. The Court granted the applications as to Navarro and Macias. *See* Docket No. 1843.

for a new trial is much broader than its power to grant a motion for judgment of acquittal.'" *United States v. Felix*, 76 F. Supp. 3d 984, 990 (N.D. Cal. 2014) (quoting *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992)); *see also United States v. Andrade*, 993 F. Supp. 2d 1269, 1280 (D. Nev. 2014). "The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citing *Alston*, 974 F.2d at 1211). However, the court may grant a new trial only if it finds that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Id.*

### III. Discussion

In its discretion, a court can grant a motion for new trial based on newly discovered evidence. *See United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991); Fed. R. Crim. P. 33(b)(1). In general, a defendant must satisfy a five-pronged test when moving for a new trial based on newly discovered evidence: "(1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal." *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005) (quoting *Kulczyk*, 931 F.2d at 548).

#### A. Macias' Evidence

##### 1. Macias' Declaration

In a declaration executed on September 19, 2025, *see* Docket No. 1803, Ex. A, Macias stated that in the months of February through August of 2025 he was placed in a "segregated housing unit" ("SHU") at MDC-LA where he encountered CW-6. Macias said that he and CW-6 had numerous conversations and, in two instances, CW-6 "bragged" to him: (1) about stabbing his cellmate in the eye and heart, and (2) that he was going to pin that murder on Michael Lerma.[4] *Id.*

##### 2. Analysis

As an initial matter, the Government moves to strike Macias' declaration following his

---

[4] As indicated in the FSI, since July 2018, Michael Lerma (who was in the hierarchy of and operated a "cell" within the Mexican Mafia) claimed control over the portions of MDC-LA where Hispanic inmates were housed. *See* FSI at pp. 7-8, 30.

4

repeated invocation of the privilege afforded by the Fifth Amendment at the evidentiary hearing on February 23, 2026. Government Supp. Brief at 5.

The Ninth Circuit "ha[s] long held that a district court may strike the testimony of a witness in a criminal proceeding to avoid a witness's improper use of the Fifth Amendment privilege against self-incrimination as a sword as well as a shield." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 640 (9th Cir. 2012) (citing *United States v. Seifert*, 648 F.2d 557, 561 (9th Cir. 1980)). "The purpose of this rule is to protect the integrity and truth-seeking function of the judicial system from the distortions that could occur if a witness could testify and then use the Fifth Amendment privilege to prevent any adversarial testing of the truth of that testimony."[5] *Id.* Such testimony may be stricken "if invocation of the privilege blocks inquiry into matters which are 'direct' and are not merely 'collateral'" to the proceeding." *Id.* at 641 (quoting *Seifert*, 648 F.2d at 561). This rule "applies equally to written testimony." *Id.* at 641 n.4 (citations omitted).

In his sworn declaration, Macias claims, *inter alia*, to have heard CW-6 "brag[ ] about killing his cellie by stabbing him in the eye and heart" and "that he was going to pin the murder of his cellie on Michael Lerma." Macias Decl. ¶¶ 7-8. The credibility of Macias was, therefore, a central issue during the evidentiary hearing at which he took the stand. Macias, however, repeatedly invoked the Fifth Amendment privilege to avoid answering any questions about the essential contents of his declaration – thereby frustrating any attempt to test the veracity of his statements and impairing the truth-seeking function of the judicial process. *See $133,420.00 in U.S. Currency*, 672 F.3d at 642. "Indeed, his claim of privilege here raises the core concern that his testimony may 'furnish one side with what may be false evidence and deprive the other of any

---

[5] In *$133,420.00 in U.S. Currency*, the Ninth Circuit referenced a number of court decisions explicating the point:
> *Denham v. Deeds*, 954 F.2d 1501, 1504 (9th Cir. 1992) ("Where a defense witness refuses to answer questions that go to the heart of the direct testimony on a central issue, . . . the truth-seeking function of the court is impaired."); *see also Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988) ("Important public policy protects even the prosecution's right to fair trials and the pursuit of truth, so that a similar principle should govern whether the recalcitrant witness was offered by the prosecution or by the defendant."). By striking testimony that a party shields from cross-examination, a court can respect the witness's constitutional privilege against self-incrimination while still preventing the witness from using the privilege to "'mutilate the truth a party offers to tell.'" *Lawson*, 837 F.2d at 656 (quoting *Brown v. United States*, 356 U.S. 148, 156, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958)); *see also United States v. St. Pierre*, 132 F.2d 837, 840 (2d Cir. 1943) (Hand, J.) (stating that, although the exercise of the Fifth Amendment privilege against self-incrimination "deprives the parties of evidence, it should not furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition") . . . .

672 F.3d at 640-41.

5

means of detecting the imposition.'" *Id.* (quoting *United States v. St. Pierre*, 132 F.2d 837, 840 (2d Cir. 1942)). Because Macias' credibility was a central issue and his refusal to answer key questions (from defense counsel, the Government, and this Court) blocked any inquiry into the truth of the important statements in his declaration, the Court declines to grant the new trial motions based upon the statements in Macias' declaration or upon his testimony at the hearing.

### B. Navarro's Evidence

#### 1. Navarro's Statements/Testimony

Navarro stated that he was again placed in the SHU at MDC-LA in February 20, 2025. *See* Navarro Decl. ¶ 3. Navarro had a reputation within MDC-LA for helping other inmates with their cases. *See* Reporter's Transcript of February 12, 2026 proceedings ("2/12/26 Transcript") at 75-76.

Around February 2025, Navarro became familiar with another inmate named "Slim."[6] Navarro Decl. ¶¶ 3-4. Navarro claims that Slim wrote four kites which were passed to him indirectly through three other inmates over a thirty-day period between February and March of 2025. *Id.* ¶¶ 6-8. In the first kite, Slim purportedly "introduced" himself[7] and told Navarro that he had killed his cellmate during a bad drug experience. *Id.* ¶¶ 11-13. Slim also delineated in the first kite that he was going to testify against other inmates who had been charged with that murder in order to get less time and in revenge for prior animosities. *Id.* ¶ 14. In the second kite, Slim supposedly asked Navarro "how he should approach his case" and "to advise him of the best approach regarding strategy." *Id.* ¶ 15.

#### 2. Jose Martinez' Plea and Sentencing

The Court takes judicial notice that Jose Martinez entered into a plea agreement with the Government in March of 2021. *See* Docket No. 652. After a hearing on March 30, 2021, the Court accepted the plea and it was entered on the record. *See* Docket No. 653. Martinez was sentenced on November 15, 2021. *See* Docket No. 736.

---

[6] "Slim" refers to CW-6's moniker. *See* Docket No. 1717, at 112:1-2.

[7] Navarro stated that in February 2025, while he was getting settled at MDC-LA, he encountered Slim who informed him about his membership in the "Green Light Gang." Navarro Decl. ¶ 4. Given that they had earlier met and spoken with each other, it is unclear why Slim would have again introduced himself to Navarro in the first kite. *See* 2/12/26 Transcript at 87:8-13 ("We spoke verbally on the range, not just me. Everybody would talk there."). Further, it is somewhat surprising that, in the course of introducing oneself, one would also let drop that one killed one's cellmate.

6

3. Analysis

a. *Evidence Must Be Newly Discovered*

First, the Ninth Circuit has defined newly discovered evidence as evidence discovered after a trial is complete. *See, e.g.*, *id.*; *United States v. McKinney*, 952 F.2d 333, 335-36 (9th Cir. 1991) (citing *Pitts v. United States*, 263 F.2d 808, 810 (9th Cir. 1959)).

C. Gonzalez asserts that neither he nor his counsel were aware of Navarro's knowledge of CW-6's statements until May 2025. *See* C. Gonzalez Motion for a New Trial at 7. J.V. Gonzalez claims that he learned about Navarro's communications with CW-6 concerning the murder of S.B. when J.V. Gonzalez and Navarro were in the custody of U.S. Marshals at the First Street Courthouse on May 7, 2025.[8] J.V. Gonzalez Supp. Brief at 2. On May 16, 2025, counsel for J.V. Gonzalez informed other defense counsel about these communications. Defendants Supp. Brief, at 3. On May 28, 2025, defense counsel met with Navarro at MDC-LA to prepare a declaration in support of Defendants' new trial motions. *Id.* at 3-4. Based on these representations, the Court finds that the first prong is met.

b. *Failure to Discover Sooner Must Not Be the Result of a Lack of Diligence*

Second, the Ninth Circuit has indicated that the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part. *See Harrington*, 410 F.3d at 601.

Based on what had been presented prior to the evidentiary hearings, the Court was "largely unpersuaded that defense counsel's failure to discover the evidence relating to Navarro . . . was not the result of a lack of diligence." Docket No. 1868, at 19. The Court "require[ed] defense counsel to provide an explanation at the hearing on the Motions as to precisely how (and when) they came to discover that Navarro . . . had pertinent information concerning S.B.'s murder, including the reason these steps were not taken sooner." *Id.* On January 18, 2026, defense counsel filed a joint statement, explaining how they came to learn about CW-6's alleged communications

---

[8] J.V. Gonzalez claims that "Mr. Navarro was there because he was transported to the courthouse for a court hearing in his own criminal proceeding that had been scheduled for that day." J.V. Gonzalez Supp. Brief at 2. The Court has reviewed the docket in Navarro's case, *see United States v. Navarro et al*, Case No. 2:22-cr-00340-AB-1 (C.D. Cal.), but sees no record of any court appearance on May 7, 2025. The Court takes note of the status conference that had been set for May 7, 2025 by Judge Andre Birotte Jr. that was vacated the day prior at the request of counsel. *See id.* at Docket Nos. 176-77. Counsel for J.V. Gonzalez has indicated that they have attempted to get Bureau of Prison records as to whether Navarro was transported to the courthouse on the day in question but have not been able to obtain them yet. *See* J.V. Gonzalez Supp. Brief at 2. The Court would find that there is a question in regard to this prong, but it will not find against the Defendants on this point.

7

with Navarro and indicating that they "had no reason to believe prior to May 2025 that [CW-6] had made statements about the death of [S.B.] to any inmates with whom he was in contact" during the period between June 2020 and March 2025. *See generally* Docket No. 1888. Defendants assert that "[d]iligence is not an issue here" because "[i]n the absence of any information that [CW-6] had spoken with other inmates about his role in the death of [S.B.] in June 2020, attempting to determine if, in fact, he had done so would require a fishing expedition far beyond what the law requires of a defendant." Defendants Supp. Brief at 4.

While the Court remains skeptical that Defendants have sufficiently demonstrated that the second prong is met, the Court will proceed to analyze the remaining prongs.

      *c. Evidence Must Be Material, Not Merely Cumulative or Impeaching*

Third and fourth, the Ninth Circuit has indicated that the evidence must be material to the issues at trial, not merely cumulative or impeaching. *See Harrington*, 410 F.3d at 601. The Ninth Circuit has clarified that "when the effect of newly-discovered evidence is merely to impeach a witness, a new trial is unwarranted." *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992) (first citing *Kulczyk*, 931 F.2d at 549; and then citing *United States v. Alexander*, 695 F.2d 398, 402 (9th Cir. 1982)). "In some situations, however, the newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence of an essential element of the government's case, the impeachment evidence would be 'material.'" *Id.*

Defendants assert that Navarro's testimony, including "the documentary evidence that corroborates significant portions of [his] affidavit[ ] concerning the housing location of the relevant witnesses" is material to the issues at trial and neither cumulative nor merely impeaching. Defendants Supp. Brief at 14-15. As this Court previously indicated, "such evidence also appears 'so powerful that, *if it were to be believed by the trier of fact*, it could render [CW-6's] testimony totally incredible." Docket No. 1868, at 21-22 (emphasis and alteration in original) (quoting *Davis*, 960 F.2d at 825). The evidence is certainly material to the issues involved and appears not to have been merely cumulative or impeaching. The Government does not suggest otherwise in its arguments. *See generally* Government Supp. Brief. As such, the Court finds that the third prong is met.

      *d. Evidence Must Indicate That a New Trial Would Probably Result in Acquittal*

8

Lastly, the Ninth Circuit has indicated that the evidence must be of such significance that it would probably result in acquittal. *See Harrington*, 410 F.3d at 601.

While the Court acknowledged that "[t]he testimon[y] of Navarro . . . , if introduced, would certainly reflect adversely upon the credibility of the Government's principal witness at trial," it further indicated that it "ha[d] serious doubts about the credibility of such evidence." Docket No. 1868, at 21-22. Having since heard testimony from Navarro at the evidentiary hearing on February 12, 2026, the Court concludes that such doubts have not been resolved in Defendants' favor for primarily the following four reasons:

First, Navarro's faulty memory on various issues reflected adversely on his credibility. As the Government points out, "Navarro's testimony regarding [CW-6's] alleged confession came only in the form of unpreserved kites passed to Navarro fourth-hand through a number of other inmates such as 'Player,' 'Bad Boy,' and 'G.'" Government Supp. Brief at 4. Navarro had difficulty recalling dates and other specifics about the kites, including the circumstances in which he reviewed his sworn declaration. *See, e.g.*, 2/12/26 Transcript at 71:1-7, 90:25-91:11, 104:17-105:15.

Second, certain information that logically should have been included in his declaration (or at least shared with defense counsel) was revealed only at the evidentiary hearing. For example, Navarro testified that the kites at-issue were taken from him by a correctional officer and that he notified this individual that such kites were evidence of the murder of an inmate at MDC-LA. *See id.* at 88:18-89:19; Defendants Supp. Brief at 8-9. Navarro, however, could not recall whether he shared this information with defense counsel, *see* 2/12/26 Transcript at 90:25-91:11; Government Supp. Brief at 4-5, and absent from his declaration is any indication of his attempt to report the substance of the kites to BOP authorities.

Third, Navarro's statements and testimony regarding the use of kites are inexplicable. Apparently, Navarro had discussions with CW-6 before CW-6 supposedly sent kites to him. For example, when asked about the period of time between Navarro's first meeting with Slim and Navarro's receipt of the first kite, Navarro testified that he and CW-6 "had conversations and conversations throughout the whole day for days, for weeks, for months – for the whole month [Navarro] was there." 2/12/26 Transcript at 111:4-12. As such, the Court fails to understand why CW-6 would send a kite to "introduce[ ] himself and explain[ ] why he was in the SHU." Navarro Decl. ¶ 11. The necessity for using kites at all was not sufficiently explained. *See* 2/12/26

9

Transcript at 111:13-113:9.

Fourth, and most importantly, the Court simply does not find the situation described by Navarro to be credible or believable. At the time when Navarro received the purported kites from CW-6 in February-March of 2025, CW-6 (who had always been represented by able defense counsel) had already entered a plea agreement and been sentenced by the Court over three years earlier. Yet according to Navarro, he explained to CW-6 "the elements of the crime" and "rules and procedures" before directing him to do research at the law library. *See* 2/12/26 Transcript at 91:15-92:5. The Court can think of no reason why CW-6 would have consulted Navarro (whom he supposedly had never met before) for legal advice in 2025. In his declaration, Navarro claims that the second of four kites he received from CW-6 "asked how he should approach his case." *See* Navarro Decl. ¶¶ 15. Given the plea agreement and imposed sentence, it strains credulity that CW-6 would have "ask[ed Navarro] to advise him of the best approach regarding strategy" when it is not apparent to this Court precisely for what legal action CW-6 would have needed such "strategy."

As this Court already indicated, "there was a significant amount of evidence against Defendants presented at trial that Defendants appear to have either largely ignored or declined to view in totality. If the Court's doubts regarding the credibility of Navarro . . . are not resolved at the evidentiary hearing, then the Court would be far from inclined to grant a new trial on the basis of such newly discovered evidence." Docket No. 1868, at 23 (footnote omitted). Defendants' newly discovered evidence attempts to create a tale that, in 2025, CW-6 sua sponte told two inmates (whom he had not previously met) that he killed his cellmate S.B. and was attempting to frame Defendants (one of whom was a leader within the Mexican Mafia with control over the prison facilities within which CW-6 was being housed) for the murder; and this was after CW-6 had already pled in this criminal case and had been sentenced. That story is so far-fetched and totally fails to discredit the significant amount of evidence presented at trial demonstrating that Lerma and his co-defendants conspired to murder S.B. in his cell. Due to the ample evidence of guilt notwithstanding Navarro's testimony and the various concerns this Court has with the credibility of Navarro, the Court finds that the fifth and last prong is not met.

## IV. Conclusion

Based on the foregoing discussion, the Court would **DENY** the Motions insofar as they seek a new trial based on the statements/testimony of Navarro and Macias.